**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

GERALD CELANO, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

FULCRUM THERAPEUTICS, INC., BRYAN STUART, ROBERT J. GOULD, CHRISTOPHER MORABITO, and JUDITH DUNN,

Defendants.

No. 1:23-cv-11125-IT

**CLASS ACTION**

Hon. Indira Talwani

**AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

I. NATURE OF THE ACTION .......... 1

II. JURISDICTION AND VENUE .......... 5

III. PARTIES .......... 6

A. Lead Plaintiff .......... 6

B. Defendants .......... 6

IV. FACTUAL BACKGROUND .......... 8

A. The Crowded Race to Treat SCD .......... 8

B. Protocol for IND Submissions to the FDA .......... 10

C. Orphan Drug Designation and Fast Track Review Provide for Enhanced Communication with the FDA .......... 13

D. Fulcrum Enters the SCD Treatment Race .......... 14

E. Undisclosed Risks Associated with SCD Treatment .......... 17

V. DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT .......... 18

A. Defendants' Material Misstatements and Omissions Made with Scienter in Violation of the Exchange Act .......... 18

1. Defendants' March 3, 2022 Statements .......... 18

2. Defendants' March 24, 2022 Statement .......... 24

3. Defendants' May 9, 2022 Statements .......... 25

4. Defendants' May 12, 2022 Statements .......... 28

5. Defendants' August 11, 2022 Statements .......... 29

6. Defendants' November 8, 2022 Statements .......... 31

7. Defendants' January 4, 2023 Statements .......... 32

B. The Truth About FTX-6058 Slowly Emerges .......... 37

1. The FDA's Clinical Hold Causes Fulcrum Shares to Decline by 56.09% .......... 40

2. Additional Detail About the FDA's Clinical Hold Triggers Another Material Decline in Fulcrum Shares ........ 41

C. Additional Allegations of Scienter ........ 45

VI. CLASS ACTION ALLEGATIONS ........ 48

VII. CLAIMS FOR RELIEF ........ 50

VIII. PRAYER FOR RELIEF ........ 54

IX. JURY TRIAL DEMANDED ........ 55

# TABLE OF DEFINED TERMS

| | |
|---|---|
| Arroyo | Santiago Arroyo, Fulcrum's Chief Medical Officer from November 2022 to March 2023 |
| CDC | U.S. Centers for Disease Control and Prevention |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| Class | All persons and entities other than Defendants that purchased or otherwise acquired Fulcrum securities between March 3, 2022 and March 8, 2023, both dates inclusive |
| CMO | Chief Medical Officer |
| Class Period | March 3, 2022 and March 8, 2023, both dates inclusive. |
| Company | Fulcrum Therapeutics, Inc. |
| Defendants | Fulcrum, Stuart, Dunn, and Gould |
| Dunn | Judith ("Judy") Dunn, Ph.D., President of Research and Development at Fulcrum between 2021 and January 2023. |
| EED | Embryonic Ectoderm Development, a subunit of the polycomb repressive complex 2 |
| EZH2 | Enhancer of Zeste Homolog 2, a subunit of the polycomb repressive complex 2 |
| Exchange Act | Securities Exchange Act of 1934 |
| FE | Former Employee |
| FTX-6058 | Fulcrum's investigational treatment for Sickle-Cell Disease, a genetic disorder of the red blood cells |
| Fulcrum | Fulcrum Therapeutics, Inc. |
| Gould | Robert J. Gould, Ph.D., Fulcrum's CEO from 2016 to 2021, and January 2023 to June 2023 |
| Hematological malignancy | Cancer that begins in the cells of the immune system or in blood-forming tissue, such as the bone marrow. |
| HbF | Fetal hemoglobin |
| IND | Investigational New Drug, a request from a clinical study sponsor to obtain authorization from the FDA to administer an investigational drug or biological product to humans. |
| Individual Defendants | Stuart, Dunn, and Gould |
| Iskandarani | Bassel Iskandarani, Fulcrum's Executive Director for Research Development from March 2022 through the present. |
| Item 303 | Item 303 of Regulation S-K, 17 C.F.R. §229.303 |
| Lead Plaintiff | Steven Santillanes |
| Losmapimod | Fulcrum's drug candidate for treatment of Facioscapulohumeral Muscular Dystrophy |
| Mennen | Steven Mennen, Fulcrum's Director and Senior Director, Head of Chemistry, Manufacturing, and Controls from May 2019 to December 2022. |
| Morabito | Christopher Morabito, Fulcrum's CMO from May 2021 to July 2022 |

| | |
|---|---|
| NASDAQ | The NASDAQ Global Market, a market tier of the three-tiered NASDAQ Stock Market |
| Pociredir | FTX-6058 |
| Plaintiff | Lead Plaintiff |
| PRC2 | The polycomb repressive complex 2, one of two classes of polycomb-group proteins. |
| 2021 10-K | Fulcrum's Form 10-K for the year ended December 31, 2021, filed with the SEC on March 3, 2022. |
| Q1 2022 Earnings Call | May 9, 2022 Fulcrum conference call with analysts and investors, in connection with Fulcrum's announcement of Q1 2022 results. |
| Q2 2022 Earnings Call | August 11, 2022 Fulcrum conference call with analysts and investors, in connection with Fulcrum announcement of Q2 2022 results |
| Q3 2022 Earnings Call | November 8, 2022 Fulcrum conference call with analysts and investors, in connection with Fulcrum's announcement of Q3 2022 results |
| Q4 2021 Conference Call | March 3, 2022 Fulcrum conference call with analysts and investors, in connection with Fulcrum's announcement of Q4 and full-year 2021 results |
| Rajavel | Esther Rajavel Fulcrum's CFO from January 2022 to April 2023 |
| R&D | Research and Development |
| SCD | Sickle-Cell Disease, a genetic disorder of the red blood cells. |
| SEC | U.S. Securities and Exchange Commission |
| Stuart | Bryan Stuart, Fulcrum's CEO from March 2021 to January 2023 |
| Tazverik | Brand-name of tazemetostat, the only FDA-approved EED/EZH2 inhibitor |

Lead Plaintiff Steven Santillanes ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Fulcrum Therapeutics, Inc. ("Fulcrum" or the "Company"), analysts' reports and advisories about the Company, statements of knowledgeable former employees of Fulcrum, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Fulcrum securities between March 3, 2022 and March 8, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Fulcrum is a small biopharmaceutical concern which focuses on gene expression to treat the root cause of genetically-defined diseases.

3. The Company has just two lead product candidates. One of these is FTX-6058 (also known as "Pociredir"), an investigational treatment for Sickle-Cell Disease ("SCD"), a genetic

disorder of the red blood cells.

4. FTX-6058 is a potent and orally available small molecule inhibitor of the Embryonic Ectoderm Development ("EED"), a subunit of the polycomb repressive complex 2 (or "PRC2"). PRC2 is one of the two classes of polycomb-group proteins.

5. In preclinical studies, Fulcrum has claimed to show that using FTX-6058 to target EED induces an increase in fetal hemoglobin ("HbF") and corresponding reduction in SCD symptoms.

6. During 2022, Fulcrum submitted preclinical data to the U.S. Food and Drug Administration ("FDA") in connection with the Company's intention to file an Investigational New Drug application (or "IND") for FTX-6058. An IND is a request from a clinical study sponsor to obtain authorization from the FDA to administer an investigational drug or biological product to humans.[1]

7. During the past decade, drug companies have scrambled to develop an effective treatment for SCD. Fulcrum joined this crowded and lucrative race after discontinuing the COVID-19 treatment efforts that had been its focus up until that point.

8. FTX-6058 was Fulcrum's entry into the competition, and one of the Company's two drug candidates in development during the Class Period.

9. Former Fulcrum employees attested to this limited pipeline, as well as the intense pressure exerted toward the Company's goals of beating the competition to FDA approval.

10. This was matched with a reckless lack of concern for adverse FDA action against the upstart Company.

[1] https://www.fda.gov/vaccines-blood-biologics/development-approval-process-cber/investigational-new-drug-applications-inds-cber-regulated-products

11. Before the start of the Class Period, Fulcrum received Orphan Drug designation for FTX-6058, which garnered additional FDA oversight and access to FDA officials.

12. Indeed, FTX-6058 carried far greater safety risks than Fulcrum disclosed to investors, including hematological malignancies, which are cancers that begin in the cells of the immune system or in blood-forming tissue, such as the bone marrow.[2]

13. A high-level former Fulcrum employee confirmed that FTX-6058's toxicity and potential to cause hematological malignancies were well-known internally during the Class Period.

14. Yet, Fulcrum never previously disclosed the material negative trends affecting FTX-6058, which ultimately resulted in an FDA clinical hold, as required by SEC Regulation S-K Item 303 and to make the statements it did make not misleading.

15. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) preclinical data submitted in support of FTX-6058 showed safety concerns regarding potential hematological malignancies; (ii) FTX-6058 demonstrated toxicity; (iii) FTX-6058 did not meet FDA requirements for continued human trials because subjects would be exposed to an unreasonable and significant risk of illness or injury; (v) accordingly, the Company had overstated FTX-6058's clinical and/or commercial prospects; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

16. According to a knowledgeable former employee, during the Summer of 2022, Fulcrum hired several experts in hematological malignancies, followed by layoffs comprising approximately 17% of the Company's workforce.

[2] https://www.cdc.gov/cancer/uscs/about/data-briefs/no30-hematologic-incidence-surv-prev.htm

17. In December 2022, FTX-6058 received Fast Track Review from the FDA. Under Fast Track Review, Defendants were entitled to receive, and on information and belief did receive, regular and intense feedback from the FDA both before the IND was submitted and throughout the time that the IND was pending.

18. In January 2023, Fulcrum announced the replacement of its CEO, Bryan Stuart ("Stuart"), with Robert J. Gould, Ph.D. ("Gould"), who had previously served as the Company's CEO before he was succeeded by Stuart in March 2021.

19. Later that month, Fulcrum raised $125 million in a secondary offering, premised, in part, on the promise of FTX-6058.

20. About a month later, on February 24, 2023, Fulcrum stunned investors when it announced that the FDA had placed a complete clinical hold on IND for FTX-6058.

21. Fulcrum disclosed that "[t]he clinical hold was initiated by the Agency due to previously reported preclinical data. Fulcrum will suspend dosing in the Phase 1b trial of FTX-6058 and intends to work diligently with the Agency to resolve the hold as soon as possible."

22. The news around the new clinical hold cut the Company's stock price by more than half: Fulcrum shares fell $7.23 per share, or 56.09%, to close at $5.66 per share on February 24, 2023.

23. Then, on March 9, 2023, before the market opened, Fulcrum issued a press release announcing recent business highlights and the Company's Q4 and full year 2022 financial results. The press release provided that in the clinical hold letter the Company received on February 24, 2023, the FDA referenced "preclinical data previously submitted in April, October and December 2022, and non-clinical and clinical evidence of hematological malignancies observed with other inhibitors of polycomb repressive complex 2 (PRC2)," and noted that "the profile of hematological

malignancies observed in the non-clinical studies of FTX-6058 is similar to that observed with other inhibitors of PRC2, and that hematological malignancies have been reported clinically with other PRC2 inhibitors." Finally, the FDA requested that Fulcrum "further define the population where the potential benefit of continued treatment with FTX-6058 outweighs potential risk."

24. In addition, Fulcrum announced the sudden departure of its Chief Medical Officer ("CMO"), whose appointment had been announced just four months previously.

25. On this news, Fulcrum's stock price fell $1.44, or 23%, to close at $4.82 per share on March 9, 2023.

26. The fallout from the FDA's clinical hold continued into April 2023, when Chief Financial Officer ("CFO") and treasurer Esther Rajavelu ("Rajavelu") resigned effective April 21.

27. Even after the FDA reversed the clinical hold in late August 2023, the damage was already done. While FTX-6058 languished, competing drugmakers outpaced Fulcrum in the development of SCD treatments. Meanwhile, Fulcrum shares continued to trade at approximately one-third to one-half of the stock's share price at the time the clinical hold was announced.

28. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

29. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

30. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

31. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Pursuant to Fulcrum's most recent annual report on Form 10-K, as of March 2, 2023, there were 61,758,994 shares of the Company's common stock outstanding. Fulcrum's securities trade on the NASDAQ Global Market ("NASDAQ"). Accordingly, there are presumably hundreds, if not thousands, of investors in Fulcrum's securities located within the U.S., some of whom undoubtedly reside in this Judicial District.

32. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiff

33. Plaintiff, as set forth in his previously-filed Certification [ECF No. 13-3], acquired Fulcrum securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

### B. Defendants

34. Defendant Fulcrum is a Delaware corporation with principal executive offices located at 26 Landsdowne Street, Cambridge, Massachusetts. The Company's common stock trades in an efficient market on the NASDAQ under the ticker symbol "FULC."

35. Defendant Stuart served as Fulcrum's Chief Executive Officer ("CEO") from March 2021 until January 2023. At the time Defendant Stuart assumed his role as Fulcrum's CEO, the Company touted his "over 20 years of industry experience, predominantly in the rare disease space …. proven track record of helping to successfully advance numerous rare disease programs

from the clinic to commercialization," and potential to "bring significant value to Fulcrum in his new role."[3]

36. Defendant Gould served his second tenure as Fulcrum's CEO from January 2023 to June 2023. Prior to his first term as Fulcrum's CEO from 2016 to 2021, "to which he br[ought] over 30 years of experience to the role", Defendant Gould served as president and CEO of Epizyme from 2010 to 2015, and as director of novel therapeutics at Broad Institute of MIT and Harvard from 2006 to 2010. Defendant Gould also spent twenty-three years at Merck, where, according to Fulcrum's website, he held a variety of leadership positions, culminating in the role of vice president, and was instrumental in advancing more than 20 compounds from discovery into clinical development in multiple therapeutic areas.[4] Toward the end of the Class Period, on January 13, 2023, Defendant Gould sold 6,766 Fulcrum shares while in the possession of material, inside information at $13.70 per share, netting over $92,000 in proceeds.

37. Christopher Morabito, M.D. ("Morabito"), served as Fulcrum's CMO from May 2021 through his resignation on July 13, 2022.

38. Judith Dunn, Ph.D. ("Dunn"), served as President of Research and Development ("R&D") at Fulcrum between 2021 and January 2023.

39. Defendants Stuart, Gould, Morabito, and Dunn are sometimes referred to herein as the "Individual Defendants."

40. The Individual Defendants possessed the power and authority to control the contents of Fulcrum's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Fulcrum's SEC filings and press releases

---

[3] https://sg.finance.yahoo.com/news/fulcrum-therapeutics-announces-ceo-transition-120000580.html

[4] https://www.fulcrumtx.com/amo-team/2-robert-j-gould-ph-d/

alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Fulcrum, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

41. Fulcrum and the Individual Defendants are collectively referred to herein as "Defendants."

## IV. FACTUAL BACKGROUND

### A. The Crowded Race to Treat SCD

42. About seven per cent of the world's population is a carrier of globin-gene mutations, of which the sickle gene is one of the most common.[5]

43. Red blood cells contain hemoglobin, a protein that carries oxygen. Healthy red blood cells are round, and they move through small blood vessels to carry oxygen to all parts of the body.[6]

44. In someone who has SCD, adult hemoglobin is abnormal, which causes the red blood cells to become hard and sticky and look like a C-shaped farm tool called a "sickle." The sickle cells die early, which causes a constant shortage of red blood cells. Also, when they travel through small blood vessels, they get stuck and clog the blood flow. This can cause pain and other

[5] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7602930/

[6] https://www.cdc.gov/ncbddd/sicklecell/facts.html

serious complications (health problems) such as infection, acute chest syndrome and stroke.[7]

45. There are several types of SCD. The specific type of SCD a patient has depends on the genes inherited from their parents. According to the U.S. Centers for Disease Control and Prevention ("CDC"), the most common types of SCD are as follows:

- **HbSS**: People who have this form of SCD inherit two genes, one from each parent, that code for hemoglobin "S." Hemoglobin S is an abnormal form of hemoglobin that causes the red cells to become rigid, and sickle shaped. This is commonly called sickle cell anemia and is usually the most severe form of the disease.

- **HbSC**: People who have this form of SCD inherit a hemoglobin "S" gene from one parent and a gene for a different type of abnormal hemoglobin called "C" from the other parent. This is usually a milder form of SCD.

- **HbS beta thalassemia**: People who have this form of SCD inherit a hemoglobin "S" gene from one parent and a gene for beta thalassemia, another type of hemoglobin abnormality, from the other parent. There are two types of beta thalassemia: "zero" (HbS beta0) and "plus" (HbS beta+). Those with HbS beta0-thalassemia usually have a severe form of SCD. People with HbS beta+-thalassemia tend to have a milder form of SCD.

46. SCD is caused by inherited defects in the adult version of hemoglobin. During fetal development, another version of the protein, called fetal hemoglobin (HbF), is produced. This version of hemoglobin transports oxygen more efficiently than its adult counterpart. Unfortunately for those afflicted by SCD, HbF is gradually replaced by adult hemoglobin.[8]

47. In recent years, SCD has been placed higher on the agenda of research funding institutions in India, USA and Europe. Until 2017, only two disease-modifying therapies for SCD (hydroxyurea and blood transfusions) were in wide use.[9]

---

[7] *Id.*

[8] https://sicklecellanemianews.com/news/ftx-6058-raised-fetal-hemoglobin-sickle-cell-patient-trial-hold/

[9] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7602930/

48. Then, in 2017, L-Glutamine was approved by the FDA. Next, crizanlizumab, a P-selectin inhibitor, received expedited approval by the FDA, followed by the approval of voxelotor, an oral medication that targets HbS polymerization two weeks later. [10]

49. Currently, several pharmacological agents targeting specific sites in the pathophysiologic pathway of SCD are in the pipeline as drug developers seek to take advantage of Orphan Drug designation policies now existing in many countries. In the United States, the FDA has authority to grant Orphan Drug designation to a drug or biological product to prevent, diagnose or treat a rare disease or condition. Orphan Drug designation qualifies sponsors for numerous, potentially-lucrative incentives, including:

- tax credits for qualified clinical trials;
- exemption from user fees; and
- the potential seven years of market exclusivity after approval.[11]

50. Several emerging drugs are being studied both alone and in combination with hydroxyurea, as combination therapies offer the best prospects for optimizing disease outcomes.[12]

**B. Protocol for IND Submissions to the FDA**

51. Federal law requires that a drug be the subject of an approved marketing application before it is transported or distributed across state lines. Because a sponsor will likely want to ship the investigational drug to clinical investigators in many states, it must seek an exemption from that legal requirement. The IND is the means through which the sponsor technically obtains this exemption from the FDA.

---

[10] *Id.*

[11] https://www.fda.gov/industry/medical-products-rare-diseases-and-conditions/designating-orphan-product-drugs-and-biological-products

[12] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7602930/

52. During a new drug's early preclinical development, the sponsor's primary goal is to determine if the product is reasonably safe for initial use in humans, and if the compound exhibits pharmacological activity that justifies commercial development. When a product is identified as a viable candidate for further development, the sponsor then focuses on collecting the data and information necessary to establish that the product will not expose humans to unreasonable risks when used in limited, early-stage clinical studies.

53. The FDA's role in the development of a new drug begins when the drug's sponsor (usually the manufacturer or potential marketer), having screened the new molecule for pharmacological activity and acute toxicity potential in animals, wants to test its diagnostic or therapeutic potential in humans. At that point, the molecule changes in legal status under the Federal Food, Drug, and Cosmetic Act and becomes a new drug subject to specific requirements of the drug regulatory system.

54. There are three IND types:

- An **Investigator IND** is submitted by a physician who both initiates and conducts an investigation, and under whose immediate direction the investigational drug is administered or dispensed. A physician might submit a research IND to propose studying an unapproved drug, or an approved product for a new indication or in a new patient population.

- An **Emergency Use IND** allows the FDA to authorize use of an experimental drug in an emergency situation that does not allow time for submission of an IND in accordance with 21 C.F.R. , Sec. 312.23 or Sec. 312.20. It is also used for patients who do not meet the criteria of an existing study protocol, or if an approved study protocol does not exist.

- A **Treatment IND** is submitted for experimental drugs showing promise in clinical testing for serious or immediately life-threatening conditions while the final clinical work is conducted and the FDA review takes place.

55. There are two IND categories:

- Commercial

- Research (non-commercial)

56. The IND application must contain information in three broad areas:

- Animal Pharmacology and Toxicology Studies - Preclinical data to permit an assessment as to whether the product is reasonably safe for initial testing in humans. Also included are any previous experience with the drug in humans (often foreign use).

- Manufacturing Information - Information pertaining to the composition, manufacturer, stability, and controls used for manufacturing the drug substance and the drug product. This information is assessed to ensure that the company can adequately produce and supply consistent batches of the drug.

- Clinical Protocols and Investigator Information - Detailed protocols for proposed clinical studies to assess whether the initial-phase trials will expose subjects to unnecessary risks. Also, information on the qualifications of clinical investigators--professionals (generally physicians) who oversee the administration of the experimental compound--to assess whether they are qualified to fulfill their clinical trial duties. Finally, commitments to obtain informed consent from the research subjects, to obtain review of the study by an institutional review board, and to adhere to the investigational new drug regulations.

57. Once the IND is submitted, the sponsor must wait thirty (30) calendar days before initiating any clinical trials. This delay is designed to give the FDA an opportunity to initially review the IND for safety to assure that research subjects will not be subjected to unreasonable risk, but the passage of this time period does not mean that the FDA has affirmatively approved of the trial or trial design in any way.

58. A clinical hold is an order that may be issued by the FDA to delay or suspend new or existing clinical trials with respect to an applicant's products. When a proposed study is placed on clinical hold, no new subjects may be recruited for testing the drug, and patients already testing the drug must be taken off. A clinical hold can be imposed, among other grounds, where "(i) [h]uman subjects are or would be exposed to an unreasonable and significant risk of illness or injury; (ii) [t]he clinical investigators named in the IND are not qualified by reason of their scientific training and experience to conduct the investigation described in the IND; (iii) [t]he

investigator brochure is misleading, erroneous, or materially incomplete ....”[13]

**C. Orphan Drug Designation and Fast Track Review Provide for Enhanced Communication with the FDA**

59. Orphan Drug designation is granted by the FDA to drugs and biologics which are defined as those intended for the safe and effective treatment, diagnosis or prevention of rare diseases/disorders that affect fewer than 200,000 people in the United States. Orphan Drug designation provides certain incentives and if a product that has Orphan Drug designation subsequently receives the first FDA approval for the disease for which it has such designation, the product is entitled to Orphan Drug exclusivity.

60. Orphan Drug designation subjects the sponsor to added FDA oversight while providing the sponsor with special access to FDA officials and the ability to work closely with the FDA on the sponsor’s trials and submissions.

61. Fast Track Review is a process designed to facilitate the development, and expedite the review of drugs to treat serious conditions and fill an unmet medical need. [14]

62. A drug that receives Fast Track designation is eligible for some or all of the following:

- “More frequent meetings with FDA to discuss the drug’s development plan and ensure collection of appropriate data needed to support drug approval”; [and]
- “More frequent written communication from FDA about such things as the design of the proposed clinical trials and use of biomarkers”;
- “Eligibility for *Accelerated Approval and Priority Review, if relevant criteria are met”*; and

[13] https://www.fda.gov/drugs/investigational-new-drug-ind-application/ind-application-procedures-clinical-hold

[14] *See* https://www.fda.gov/patients/fast-track-breakthrough-therapy-accelerated-approval-priority-review/breakthrough-therapy.

- "*Rolling Review*, which means that a drug company can submit completed sections of its Biologic License Application (BLA) or [NDA] for review by FDA, rather than waiting until every section of the NDA is completed before the entire application can be reviewed. BLA or NDA review usually does not begin until the drug company has submitted the entire application to the FDA."[15] (Emphasis in original).

63. Fast Track designation must be requested by the drug company. The request can be initiated at any time during the drug development process. The FDA will review the request and make a decision within sixty days based on whether the drug fills an unmet medical need in a serious condition.[16]

64. According to the FDA:

> ***Once a drug receives Fast Track designation, early and frequent communication between the FDA and a drug company is encouraged throughout the entire drug development and review process***. The frequency of communication assures that questions and issues are resolved quickly, often leading to earlier drug approval and access by patients. [17]

**D. Fulcrum Enters the SCD Treatment Race**

65. Fulcrum, founded in 2016, is a clinical-stage biopharma company purports to focus on genetically defined rare diseases in areas of high unmet medical need.

66. In July 2019, Fulcrum raised $67 million in its IPO and began to trade publicly on the NASDAQ.

67. During the coronavirus pandemic, Fulcrum concentrated on then abandoned COVID-19 treatment efforts, leaving the Company with a couple of earlier stage candidates: (i) FTX-6058, an investigational oral fetal hemoglobin inducer for the treatment of SCD and other hemoglobinopathies; and (ii) Losmapimod, which targets Facioscapulohumeral Muscular

---

[15] *Id.*

[16] *Id.*

[17] *Id.*

Dystrophy.

68. Fulcrum also has a proprietary engine called "FulcrumSeek" that pinpoints cellular drug targets for genetic diseases, having identified Losmapimod and FTX-6058.

69. In January 2021, Fulcrum raised $46 million in a secondary offering, in part based on its having "advanced FTX-6058 … into Phase 1 clinical development."

70. In March 2021, Defendant Stuart succeeded Defendant Gould as CEO of Fulcrum.

71. FTX-6058 is an oral therapeutic designed to induce expression of fetal hemoglobin (HbF) to compensate for the mutated adult hemoglobin in SCD. By activating these genes, the therapy aims to switch HbF production back on, improving oxygen transport, and easing SCD symptoms.[18]

72. According to Fulcrum, preclinical data with FTX-6058 showed an increase in HbF levels up to approximately 30% of total hemoglobin:




[18] https://sicklecellanemianews.com/news/ftx-6058-raised-fetal-hemoglobin-sickle-cell-patient-trial-hold/

73. In August 2021, Fulcrum announced results from the first clinical trial of FTX-6058. Immediately thereafter, the Company sought to capitalize on the results through a $100 million share offering.

74. Former Employee ("FE") 1 was an Associate Director of Drug Product Development at Fulcrum from September 2020 until August 2022. FE1 initially reported to Steven Mennen ("Mennen"), the Head of Chemistry, Manufacturing, and Controls. Subsequently, FE1 reported to Bassel Iskandarani ("Iskandarani"), the Executive Director for Research Development. During FE1's time at Fulcrum, Mennen and Iskandarani reported to Mani Sundararajan, Vice President of Research and Development.

75. FE1 confirmed that Fulcrum had competition from several other drug companies pursuing similar sickle cell treatments, resulting in a rush to complete the research and secure FDA approval.

76. FE1 revealed that with two to three other drug companies working on a similar sickle-cell treatments, there was intense pressure to stay ahead of the competition, which manifested in marching orders to obtain "fast track" approval from the FDA.

77. FE1 recalled frequent internal discussions of the FTX-6058 IND at Fulcrum, including at town halls and quarterly staff meetings.

78. In addition to FDA approval, FE1 revealed that Fulcrum sought approval of FTX-6058 in the Middle East and in any other country or region where SCD was prevalent.

79. FE2 was an Associate Scientist at Fulcrum from July 2019 to January 2020; a Computational Biologist I from January 2020 to January 2021; and then a Computational Biologist II from January 2021 to September 2021. In fulfilling the role of Computational Biologist, FE2 focused on data analysis.

80. FE2 stated that Fulcrum did not have a rich pipeline, and lacked further drug trials following the Company's SCD and muscular dystrophy projects.

81. Over the course of 2022, Fulcrum submitted preclinical data to the FDA in connection with the Company's intention to file an IND for FTX-6058 for the potential treatment of SCD.

**E. Undisclosed Risks Associated with SCD Treatment**

82. As known to Defendants, but not to investors, FTX-6058 carried with it safety concerns which increased the likelihood that the FDA would place a clinical hold on preclinical studies of FTX-6058.

83. Most of the other epigenetic drugs inhibiting EED or EZH2 (another PRC2 subunit) have frequent, severe treatment-related adverse events of thrombocytopenia (or low blood platelet count) and neutropenia (abnormally low count of a type of white blood cell).

84. The only FDA-approved EED/EZH2 inhibitor, tazemetostat (brand name: Tazverik), has a warning in its FDA label indicating secondary malignancies and preclinical toxicology of tumorigenesis in a rat model.

85. H.C. Wainwright analyst Andrew Fein summarized the risks impacting Tazverik (and potentially FTX-6058) as follows:

> Specifically, across all clinical trials of 729 adults who received TAZVERIK 800 mg twice daily, myelodysplastic syndrome (MDS) or acute myeloid leukemia (AML) occurred in 0.7% of patients. ***While the genetic makeup of these malignancies is very diverse, we believe one that could be associated with Tazverik and potential FTX-6058 is oncogenic mimicry by a loss-of-function mutation in EZH2***, which has been frequently seen in patients with MDS and other myeloproliferative neoplasm. ***What we believe is driving these secondary malignancies is Tazverik's ability to completely ablate methylation of H3K27***, which we also believe was the key driver in the high incidences of cytopenias and anemia also reported in the label. A quick literature search points to secondary malignancy occurring around 9 months, with no clarity yet on the preclinical emergence of secondary malignancies stemming from FTX-6058. ***For context,***

> ***FTX-6058 reduces methylation by around 70% compared to Tazverik, which at face value may seem advantageous, however a clear mechanistic rationale of the baseline threshold of H3K27 methylation correlating to malignancies occurrence remains unclear.*** [19]

86. Even worse, "[t]he dysregulation of Polycomb Repressive Complex 2 (PRC2) methyltransferase activity can lead to tumorigenesis in a wide range of cancers including prostate cancer, breast cancer, and hematological malignancies."[20]

87. At all relevant times, Defendants were, at minimum, on notice that (i) FTX-6058 belonged to a class of drugs with increased potential to cause cancers, including hematological malignancies and (ii) as a result, the FDA was focused on the dangerous side effects associated with of those drugs.

88. Fulcrum's clinical trial for FTX-6058 did not meet FDA's published requirements for continued human trials because enrolled patients would be exposed to an unreasonable and significant risk of illness or injury.

## V. DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT

### A. Defendants' Material Misstatements and Omissions Made with Scienter in Violation of the Exchange Act

#### 1. Defendants' March 3, 2022 Statements

89. The Class Period begins on begins on March 3, 2022, when Fulcrum issued a press release announcing recent business highlights and the Company's Q4 and full year 2021 financial results. The press release quoted, Defendant Stuart, in relevant part:

> "Our progress in 2021 has set us up for a tremendous 2022 with meaningful catalysts across our key programs," said [Defendant Stuart]. We are also on track to report initial data from our Phase 1b with FTX-6058 in people with sickle cell disease. We believe a once-daily well-tolerated oral [fetal hemoglobin ("HbF")] inducer that can deliver robust increases in HbF over baseline could be life-

[19] All emphases included herein are added unless otherwise indicated.

[20] https://oricpharma.com/pipeline/

> changing. ***We are also on track to initiate a Phase 1b trial with FTX-6058 in other hemoglobinopathies, including beta thalassemia.*** With our cash runway into 2024, we are focused on delivering key data to support our goal of bringing therapies to people with rare genetic diseases."

90. The statements referenced in ¶89 was materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) they were not "on track to initiate a Phase 1b trial with FTX-6058 in other hemoglobinopathies, including beta thalassemia" because preclinical data submitted in support of FTX-6058 showed safety concerns regarding potential hematological malignancies; (ii) FTX-6058 demonstrated toxicity; (iii) FTX-6058 failed to meet target therapeutic goals; (iv) Fulcrum's clinical trial for FTX-6058 did not meet FDA requirements for continued human trials because subjects would be exposed to an unreasonable and significant risk of illness or injury; (v) accordingly, the Company had overstated FTX-6058's clinical and/or commercial prospects; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

91. Fulcrum's March 3, 2022 press release was also materially misleading because Fulcrum was required under SEC Regulation S-K Item 303 ("Item 303") to disclose therein:

> any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed. 17 C.F.R. § 229.303(b)(2)(ii).

92. At the time Defendants issued the March 3, 2022 press release, they knew, but failed to disclose, as required by Item 303, that Fulcrum had begun to implement a clinical trial for FTX-6058 that failed to meet regulatory safety requirements for human trials, as was ultimately

disclosed at the end of the Class Period. This material adverse trend, event, and uncertainty relating to FTX-6058 was reasonably likely to cause a material change in the relationship between costs and revenues.

93. On the same day, March 3, 2022, Fulcrum filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2021 (the "2021 10-K"). In providing an overview of the Company's business, the 2021 10-K stated, in relevant part:

> [. . .] FTX-6058 [] is an investigational oral fetal hemoglobin, or HbF, inducer that is in development for [sickle cell disease] ["SCD"] and select other hemoglobinopathies, including ß-thalassemia. FTX-6058 is designed to bind to embryonic ectoderm development, or EED, and inhibit the transcriptional silencing activity of the polycomb repressive complex 2, or PRC2. By doing so, preclinical studies have shown that FTX-6058 downregulates key HbF repressors, including BCL11A and MYB, and upregulates HbF.
>
> ***
>
> SCD is a genetic blood disorder caused by a mutation in the ß-subunit gene, or HBB gene. This mutation results in the formation of abnormal hemoglobin, or HbS, which causes red blood cells, or RBCs, to change from a round shape into a sickle shape that significantly impairs their function. ß-thalassemia is a rare blood disorder caused by various genetic mutations in the HBB gene that can significantly impair the production of hemoglobin and RBCs. We designed FTX-6058 to compensate for the root cause of these hemoglobinopathies by inducing the expression of the two γ-globin genes, HBG1/2, whose expression is normally silenced shortly after birth. The HBG1/2 genes encode for γ-globin, a component of HbF, which is known to repair the abnormal RBC shape in SCD and to compensate for the presence of HbS in SCD and ß-thalassemia. We have observed in vitro and in vivo activation of the HBG1/2 genes in preclinical studies with FTX-6058. ***We have also observed that FTX-6058 demonstrated robust levels of HbF elevation with no adverse effects on important cellular health markers.*** We conducted additional pre-clinical profiling in CD34+ derived cells and observed that treatment with FTX-6058 increased HbF levels to approximately 30% of total hemoglobin, as measured by mass spectrometry, high performance liquid chromatography, and fast protein liquid chromatography techniques. The elevation of HbF was significantly greater than we observed with hydroxyurea in the cell models.
>
> ***

> ***FTX-6058 was generally well-tolerated with no serious adverse events reported and no discontinuations due to treatment-emergent adverse events, or TEAEs, across all SAD and MAD cohorts***. Data continued to show dose-proportional PK, with a mean half-life of approximately 6-7 hours in the MAD cohorts, supporting once-daily dosing, and no food effect was observed with FTX-6058. Data from the MAD cohorts continued to show robust target engagement, as evidenced by an approximately 75-95% reduction from baseline in H3K27me3 after 14 days of treatment.

94. Further, in discussing the Company's strategy, the 2021 10-K stated, in relevant part:

> We are leveraging the broad applicability of our proprietary product engine to discover and develop small molecule therapies that modulate gene expression to address the known root cause of genetically defined rare diseases in areas of high unmet medical need. We believe that our initial product candidates for the treatment of FSHD, SCD and ß-thalassemia may have the potential to treat patients with these debilitating and, in some cases, life-threatening illnesses. The key components of our strategy include:
>
> ***
>
> - ***Rapidly develop FTX-6058 for the treatment of select hemoglobinopathies***. We have initiated a Phase 1b clinical trial of FTX-6058 in people with SCD and ***expect to report initial data from the trial in the second quarter of 2022***. We submitted an IND to the FDA in the fourth quarter of 2021 for FTX-6058 in other select hemoglobinopathies, including ß-thalassemia, ***and expect to initiate a Phase 1b study in the second quarter of 2022***.
>
> ***
>
> - ***Maximize the commercial potential of our product candidates***. We have retained all rights to our lead product candidates focused on rare genetically defined diseases, and plan to commercialize any approved product for such rare genetically defined diseases using a targeted sales infrastructure. We may in the future pursue commercialization partnerships for certain product candidates and/or markets outside the United States.

95. The statements referenced in ¶¶93-94 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically,

Defendants made false and/or misleading statements and/or failed to disclose that: (i) FTX-6058 had adverse effects on important cellular health markers; (ii) preclinical data submitted in support of FTX-6058 indicated the presence of serious adverse events; (iii) Defendants would be unable to "rapidly develop FTX-6058 for the treatment of select hemoglobinopathies" because preclinical data submitted in support of FTX-6058 showed safety concerns regarding potential hematological malignancies; (iv) for the same reason, they would be unable to "report initial data from the trial in the second quarter of 2022"; (v) for the same reason, they would be unable "to initiate a Phase 1b study in the second quarter of 2022"; (vi) for the same reason, they would be unable to "maximize the commercial potential of" FTX-6058; (vii) FTX-6058 demonstrated toxicity; (viii) FTX-6058 failed to meet target therapeutic goals; (ix) the foregoing safety concerns increased the FTX-6058 did not meet FDA requirements for continued human trials because subjects would be exposed to an unreasonable and significant risk of illness or injury; (x) accordingly, the Company had overstated FTX-6058's clinical and/or commercial prospects; (xi) Defendants had overstated the safety of EED inhibitors; and (xii) as a result, the Company's public statements were materially false and misleading at all relevant times.

96. The 2021 10-K was also materially misleading because Defendants, in violation of Item 303, omitted to disclose a known material adverse trend, event, and uncertainty relating to FTX-6058, as discussed in ¶¶91-92 above.

97. Also on March 3, 2022, Fulcrum hosted an earnings call with investors and analysts to discuss the Company's Q4 2021 results (the "Q4 2021 Earnings Call"). During the scripted portion of the Q4 2021 Earnings Call, Defendant Stuart stated, in relevant part:

> Our second clinical program, FTX-6058, an oral HbF inducer for sickle cell disease and other hemoglobinopathies shows great promise in addressing important unmet needs in these patient populations. The current treatment landscape in sickle cell disease consists of therapies that only target select symptoms.

> HbF is the only mechanism that has been shown to broadly improve outcomes for key symptoms of sickle cell disease such as VOC events, pain, fatigue, and acute chest syndrome. A robust body of genetic data shows that increases in HbF in every patient is meaningful. Emerging clinical data from gene editing further supports the benefit of HbF induction, but in the case of gene editing, it comes with a tremendous treatment burden making it most likely to be used as a salvage therapy.
>
> ***
>
> We discovered FTX-6058 using our FulcrumSeek product engine. Pre-clinically, across multiple in vivo and in vitro assays, 6058 generated a consistent two to threefold induction in HBG mRNA that translated into the same fold induction in HbF protein.
>
> ***
>
> ***We are highly encouraged that our robust preclinical data*** and Phase 1 healthy volunteer data, both predict that we can achieve these absolute increases that will be life changing for people with sickle cell disease.

98. Further, during the Q&A portion of the Q4 2021 Earnings Call, when asked to discuss "***[a] preclinical chronic tox[icity] [study] for the 6058 program***", Defendant Morabito responded, in relevant part:

> …. ***we have completed three-month tox and the three months tox gave us the continued encouragement to continue pursuing clinical development as planned.*** We made no changes to our development plans based on the results from the two months tox. We have entered chronic tox. We don't have any updates on that and we don't have any new findings to share at this point.

99. The statements referenced in ¶¶97-98 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the preclinical data submitted in support of FTX-6058 was not "robust," but in fact showed safety concerns regarding potential hematological malignancies; (ii) FTX-6058 demonstrated toxicity; (iii) FTX-6058 failed to meet target therapeutic goals; (iv) FTX-6058 did not meet FDA

requirements for continued human trials because subjects would be exposed to an unreasonable and significant risk of illness or injury; (v); the Company had overstated FTX-6058's clinical and/or commercial prospects; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

**2. Defendants' March 24, 2022 Statement**

100. On March 24, 2022, Defendants presented at the Fulcrum Therapeutics KOL event on FSHDA, during which Defendant Stuart claimed that Fulcrum had "***a robust preclinical pipeline*** …."

101. The statement referenced in ¶100 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the preclinical data submitted in support of FTX-6058 was not "robust," but in fact showed safety concerns regarding potential hematological malignancies; (ii) Defendant Stuart had overstated FTX-6058's clinical and/or commercial prospects; and (iii) as a result, Defendant Stuart's public statements were materially false and misleading at all relevant times.

102. A Credit Suisse analyst report dated April 14, 2022 echoed the Company's claims regarding supposed safety of FTX-6058 in stating that "***[a] 5-10% increase in HbF from a safe, oral, small molecule could be a material change in the treatment paradigm.***" (Emphasis in original).

103. To the contrary, FE1 recalled that FTX-6058 failed to meet target therapeutic goals and that it was on the toxic side.

**3. Defendants' May 9, 2022 Statements**

104. On May 9, 2022, Fulcrum issued a press release announcing recent business highlights and the Company's Q1 2022 financial results. The press release stated, in relevant part: ***"'Our clinical programs continued to make significant progress in the first quarter,'*** said Bryan Stuart, president and chief executive officer."

105. The statement referenced in ¶104 was materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) their SCD program had not made progress in the first quarter, but rather was poised to regress because preclinical data submitted in support of FTX-6058 showed safety concerns regarding potential hematological malignancies; (ii) accordingly, the Company had overstated FTX-6058's clinical and/or commercial prospects; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

106. The May 9, 2022 press release was also materially misleading because Defendants, in violation of Item 303, omitted to disclose a known material adverse trend, event, and uncertainty relating to FTX-6058, as discussed in ¶¶91-92 above.

107. Also on May 9, 2022, Fulcrum's Twitter account posted the following statement by Defendant Stuart: "***As we advance two potentially life-changing therapies through clinical development while expanding our pipeline, we are well-positioned to establish Fulcrum as a leading rare disease company, supported with a strong financial foundation and a cash runway into 2024***."

FulcrumTx @FulcrumTx · May 9, 2022

Today we reported Q1 financial results and recent business highlights. An archived replay of our conference call & webcast is available on our website. For full details, see our press release: bit.ly/3PaonbW




1

108. The statements referenced in ¶107 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) they were not "well-positioned to establish Fulcrum as a leading rare disease company" based on FTX-6058, which showed safety concerns regarding potential hematological malignancies; (ii) FTX-6058 did not meet FDA requirements for continued human trials because subjects would be exposed to an unreasonable and significant risk of illness or injury; (iii) FTX-6058 demonstrated toxicity; (iv) FTX-6058 failed to meet target therapeutic goals; (v) accordingly, the Company had overstated FTX-6058's clinical and/or commercial prospects; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

109. That same day, Fulcrum hosted an earnings call with investors and analysts to discuss the Company's Q1 2022 results (the "Q1 2022 Earnings Call"). During the scripted portion

of the Q1 2022 Earnings Call, Defendant Stuart stated, in relevant part:

> I'll start with an update on FTX-6058, our oral HbF inducer for sickle cell disease and other hemoglobinopathies. 6058 shows great promise in addressing critical unmet needs in these patient populations. The current treatment landscape consists of therapies that only target select symptoms of sickle cell disease. ***HbF is the only mechanism that has been shown to broadly improve clinical outcomes*** including anemia, VOC events, pain, fatigue, and acute chest syndrome. As the only agent in development with the potential to induce HbF, we believe that 6058 is uniquely positioned in the current and emerging landscape.

110. Also during the scripted portion of the Q1 2022 Earnings Call, Defendant Dunn repeated the claim that FTX-6058 was "***well-tolerated***."

111. Further, during the Q&A portion of the Q1 2022 Earnings Call, when asked to discuss how the Company determined an early 2023 timeline to transition into a registration trial for FTX-6058, Defendant Stuart responded, in relevant part, "[…] our goal and I think as we've stated all along that if we're able to see robust HbF increases, ***our goal is to transition into a registrational trial as early as possible in 2023***," and "[w]e do believe that that is consistent with what we're hearing … ***that this would be a drug because of the benefits of HbF that would be broadly utilized and has the potential to be standard of care***."[21]

112. The statements referenced in ¶¶108-110 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Fulcrum's deployment of HbF had not broadly improved clinical outcomes because preclinical data submitted in support of FTX-6058 showed safety concerns regarding potential hematological malignancies; (ii) for the same reason, FTX-6058 was not "well-tolerated"; (iii) Defendants would not be able

[21] Emphasis added throughout, except where otherwise noted.

"to transition into a registrational trial as early as 2023"; (iv) for the same reason, Fulcrum's deployment of HbF would not be broadly utilized and had no potential to be the standard of care; (v) FTX-6058 demonstrated toxicity; (vi) FTX-6058 failed to meet target therapeutic goals; (vii) FTX-6058 did not meet FDA requirements for continued human trials because subjects would be exposed to an unreasonable and significant risk of illness or injury; (viii) accordingly, the Company had overstated FTX-6058's clinical and/or commercial prospects; and (ix) as a result, the Company's public statements were materially false and misleading at all relevant times.

**4. Defendants' May 12, 2022 Statements**

113. On May 12, 2022, Fulcrum issued a press release entitled "Fulcrum Therapeutics to Present Initial Data from Phase 1b Trial of FTX-6058 in Adults Living with Sickle Cell Disease at the European Hematology Association (EHA) Hybrid Congress in Vienna, Austria." The press release stated, in relevant part:

> "***HbF is the only mechanism that has shown the ability to broadly improve clinical outcomes for patients with SCD***— including anemia, vaso-occlusive crises, pain, fatigue, and acute chest syndrome," said Judy Dunn, Ph.D., president of research and development at Fulcrum. "***This Phase 1b study was designed to provide proof-of-concept that FTX-6058 produces increases in HbF and could potentially be the first oral HbF inducer to address critical unmet needs in this population***."

114. The statements referenced in ¶113 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Fulcrum's deployment of HbF had not broadly improved clinical outcomes because preclinical data submitted in support of FTX-6058 showed safety concerns regarding potential hematological malignancies; (ii) for the same reason, Fulcrum's deployment of HbF would not be the first oral HbF inducer to

address unmet critical needs in the SCD patient population; (iii) FTX-6058 demonstrated toxicity; (iv) FTX-6058 failed to meet target therapeutic goals; (vi) FTX-6058 did not meet FDA requirements for continued human trials because subjects would be exposed to an unreasonable and significant risk of illness or injury; (v) accordingly, the Company had overstated FTX-6058's clinical and/or commercial prospects; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

115. The May 12, 2022 press release was also materially misleading because Defendants, in violation of Item 303, omitted to disclose a known material adverse trend, event, and uncertainty relating to FTX-6058, as discussed in ¶¶91-92 above.

116. FE1 stated that between July and August of 2022, Fulcrum hired two to three experts in hematological malignancies, the very same complication that later formed the basis for the FDA's clinical hold.

117. Immediately after the hiring of these specialists, FE1 said Sundararajan informed him that the Company situation was going down and the market was not favorable, as well as that the Company needed to restructure. In response to these concerns, Fulcrum laid off approximately eighteen (out of just 104) employees (or 17.3% of the Company's total workforce) in August 2022.

**5. Defendants' August 11, 2022 Statements**

118. On August 11, 2022, Fulcrum issued a press release announcing the Company's Q2 2022 financial results and business updates. The press release stated, in relevant part:

> "In the second quarter, we achieved major milestones in both of our clinical programs," said [Defendant Stuart]. "We demonstrated compelling proof of concept data for 6058 and initiated the first registrational trial for FSHD. ***Our strategic refocus will better position us to continue to advance our exciting pipeline*** and deliver on our unwavering commitment to patients with genetically defined rare diseases."
>
> **<u>Key Business Updates</u>**

**FTX-6058**

- Announced data from initial patients in first cohort of Phase 1b trial of FTX-6058 in SCD; achieved HbF increases of up to 6.3% over baseline, showing proof-of-concept for FTX-6058 as an oral HbF inducer.

- Enrolling new patients in 6mg and 2mg dose cohorts of Phase 1b SCD trial, including patients both on and off hydroxyurea.

- Planning to initiate additional cohort at higher dose; ***expect to complete enrollment in three dose cohorts by end of 2022***.

- ***Planning to initiate registrational trial in 2023***.

119. The statements referenced in ¶118 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) they would be unable to achieve a strategic refocus with respect to FTX-6058 due to safety concerns regarding potential hematological malignancies; (ii) for the same reason, Defendants would be unable to advance the SCD portion of Fulcrum's pipeline; (iii) for the same reason, Defendants could not reasonably expect to complete enrollment in three dose cohorts by the end of 2022; (iv) for the same reason, Defendants had no reasonable basis to anticipate initiation of registrational trials in 2023; (v) Defendant Stuart had overstated FTX-6058's clinical and/or commercial prospects; and (vi) as a result, Defendant Stuart's public statements were materially false and misleading at all relevant times.

120. The August 11, 2022 press release was also materially misleading because Defendants, in violation of Item 303, omitted to disclose a known material adverse trend, event, and uncertainty relating to FTX-6058, as discussed in ¶¶91-92 above.

121. That same day, Fulcrum hosted an earnings call with investors and analysts to

discuss the Company's Q2 2022 results (the "Q2 2022 Earnings Call"). During the scripted portion of the Q2 2022 Earnings Call, Defendant Dunn stated, in relevant part:

> As a once-daily oral HbF inducer, ***6058 has tremendous potential to deliver life-changing benefits for people living with sickle cell disease***. 6058 originated through our FulcrumSeek discovery engine and is a potent and highly selective EEB inhibitor with a clean off-target profile. ***We have strong preclinical evidence and now clinical evidence in sickle cell disease subjects demonstrating that 6058 produces rapid and durable HbF induction***.

122. During the same scripted portion of the Q2 2022 Earnings Call, Defendant Dunn claimed "***that 6058 was generally well-tolerated with no serious treatment-emergent adverse events***."

123. The statements referenced in ¶¶121-122 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) FTX-6058 did not have the "tremendous potential to deliver life-changing benefits for people living with [SCD]" because preclinical data submitted in support of FTX-6058 showed safety concerns regarding potential hematological malignancies; (ii) FTX-6058 demonstrated toxicity; (iii) FTX-6058 failed to meet target therapeutic goals; (iv) FTX-6058 did not meet FDA requirements for continued human trials because subjects would be exposed to an unreasonable and significant risk of illness or injury; (v) FTX-6058 was not "well-tolerated"; (vi) accordingly, the Company had overstated FTX-6058's clinical and/or commercial prospects; and (vii) as a result, the Company's public statements were materially false and misleading at all relevant times.

**6. November 8, 2022 Statements**

124. On November 8, 2022, Fulcrum issued a press release announcing recent business

highlights and the Company's Q3 2022 financial results. The press release stated, in relevant part:

> "In the third quarter, ***we have continued our focus on strong clinical and operational execution***. Now that we have established proof of concept for FTX-6058 as an oral HbF inducer and have initiated our Phase 3 registration-enabling trial in FSHD, the team is focused on progressing our clinical programs and developing high-quality, compelling data," said Bryan Stuart, president and chief executive officer. "We believe we are well positioned, with a strong cash runway to deliver on our upcoming catalysts as we prepare to have two registration-enabling trials in the next 18 months."

125. The statements referenced in ¶124 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) FTX-6058 showed safety concerns regarding potential hematological malignancies; (ii) FTX-6058 demonstrated toxicity; (iii) FTX-6058 failed to meet target therapeutic goals; (iv) FTX-6058 did not meet FDA requirements for continued human trials because subjects would be exposed to an unreasonable and significant risk of illness or injury; (v) FTX-6058 had laid off a substantial portion of its workforce; (vi) accordingly, the Company had overstated FTX-6058's operational execution; and (vii) as a result, the Company's public statements were materially false and misleading at all relevant times.

126. The November 8, 2022 press release was also materially misleading because Defendants, in violation of Item 303, omitted to disclose a known material adverse trend, event, and uncertainty relating to FTX-6058, as discussed in ¶¶91-92 above.

127. Also on November 8, 2022, Fulcrum's Twitter account posted the following statement by Defendant Stuart: "***This third quarter for Fulcrum was focused on execution, and we've been able to make major strides in both our lead programs***."

**FulcrumTx** @FulcrumTx · Nov 8, 2022
Today we reported our 3Q financial results.

Visit our website for an archived replay of the webcast: bit.ly/3UjmFHB

See our full press release here: bit.ly/3fQBJxp




1

128. The statement referenced in ¶127 was materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) their SCD program had not made major strides in the third quarter, but rather was poised to regress because preclinical data submitted in support of FTX-6058 showed safety concerns regarding potential hematological malignancies; (ii) FTX-6058 demonstrated toxicity; (iii) FTX-6058 failed to meet

target therapeutic goals; (iv) Fulcrum's clinical trial for FTX-6058 did not meet FDA requirements for continued human trials because subjects would be exposed to an unreasonable and significant risk of illness or injury; (v) accordingly, the Company had overstated FTX-6058's clinical and/or commercial prospects; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

129. That same day, Fulcrum hosted an earnings call with investors and analysts to discuss the Company's Q3 2022 results (the "Q3 2022 Earnings Call"). During the scripted portion of the Q3 2022 Earnings Call, Defendant Stuart stated, in relevant part:

> ***Currently, we have two clinical programs with the potential to dramatically transform the treatment paradigm in sickle cell disease*** and FSHD. ***We are committed to moving both programs through the development and regulatory process as rapidly as possible*** to address the significant unmet needs that we know exist in these patient populations. We are also continuing to invest in our research engine and expect to file our next IND in 2023.
>
> ***
>
> As our work on the Phase Ib trial continues, we will continue to focus on understanding the effect of 6058 across multiple dose cohorts and the consistency and response with 6058, both as monotherapy and in combination with hydroxyurea. In addition to our ongoing 6 milligram and 2 milligram dose cohorts, we have selected 12 milligrams as the dose for our next cohort and plan to continue enrollment into 2023. Our goal is to have high quality data across multiple cohorts to inform our plans for a registration enabling trial in 2023. We have been focused on clinical trial operations and trial conduct. During the second half of the year, we have increased the number of sites that are participating in the program and have targeted our recruitment efforts in areas with meaningful populations of people living with sickle cell disease. We are focused on building connections and partnerships with the SCD community because we understand that local community-based organizations have been on the front lines of the fight to treat sickle cell disease. The feedback that we have received from the community has been clear. ***The accessibility and ease of use of a new SCD therapy is extremely important.*** Our approach of developing an oral small molecule that can be taken once a day and deliver robust HbF induction has been met with very positive response from patients and health care providers.

130. Further, during the Q&A portion of the Q3 2022 Earnings Call, when asked to

discuss dosing and trial execution of the FTX-6058 program, Defendant Stuart responded, in relevant part:

> In terms of trial execution, this has been a big focus of the company. One of the things that we mentioned at [European Hematology Association] is that we were transitioning towards observed dosing. We are now utilizing that. I think what we can say is we believe it is effective. And our goal from a trial execution perspective, as we've spoken to, is less about quantity of data and number of patients, but more about high quality data. Making sure that we are generating good data from patients that are adherent that will really help inform our next trial with our goal of that being a registrational trial. So I think that is proceeding well. ***We are going to be continuing enrollment into 2023***, and that will be focused on all 3 dose cohorts. ***And we believe that, that is going to be able to provide sufficient data to transition into that registrational trial***.

131. The statements referenced in ¶¶130-131 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) they were not on track to continue enrollment into 2023 because preclinical data submitted in support of FTX-6058 showed safety concerns regarding potential hematological malignancies; (ii) for the same reason, they were not going to be able to provide sufficient data to transition into that registration trial; (iii) FTX-6058 demonstrated toxicity; (iv) FTX-6058 did not meet FDA requirements for continued human trials because subjects would be exposed to an unreasonable and significant risk of illness or injury; (vi) accordingly, the Company had overstated FTX-6058's clinical and/or commercial prospects; and (vii) as a result, the Company's public statements were materially false and misleading at all relevant times.

132. On January 4, 2023, Fulcrum issued a press release providing a business update and 2023 outlook. The press release stated, in relevant part:

> "***We are entering 2023 with a tremendous amount of momentum and expect it to be a productive year for our two clinical programs: FTX-6058 for SCD***, and

losmapimod for FSHD," said [Defendant Gould]. "***FTX-6058 is a potential best-in-class oral HbF inducer candidate that could address critical gaps in the SCD treatment landscape***. We are excited by the levels of HbF induction in our initial doses and look forward to further broadening our understanding of its effect at a higher dose.["]

"We are encouraged by the new FTX-6058 data at 6 mg that show clinically relevant HbF increases, up to 9.5% from baseline with hemolysis and anemia improvement, suggesting its potential for best-in-class therapy for people living with sickle cell disease," said Santiago Arroyo, M.D., Ph.D., Fulcrum's chief medical officer.

**Key Business Updates and Upcoming Milestones**

**FTX-6058**

- Received Fast Track Designation from the U.S. Food and Drug Administration (FDA) for the treatment of SCD in December 2022

- Phase 1b data from Cohort 1 subjects in the 6 mg cohort (n=10) showed up to 9.5% absolute HbF increases from baseline; data suggest no difference in response in subjects on (n=3) and off (n=7) background hydroxyurea

- Improved biomarkers of hemolysis in evaluable patients dosed at 6 mg

- In the Phase 1b trial, FTX-6058 appears to have dose dependent and clinically relevant increases in HbF; all subjects adherent to dosing regimen showed a response

- ***Generally well tolerated with no drug-related treatment emergent serious adverse events and no discontinuations due to treatment emergent adverse events to date***

- Enrolling 12 mg dose cohort of the Phase 1b trial

133. The statements referenced in ¶132 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) they had no reasonable basis to believe that 2023 would be a productive year for FTX-6058 because preclinical data submitted in support of FTX-6058 showed safety concerns regarding potential hematological

malignancies; (ii) for the same reason, FTX-6058 was not a potential best-in-class oral HbF inducer candidate that could address critical gaps in the SCD treatment landscape; (iii) FTX-6058 demonstrated toxicity; (iv) FTX-6058 failed to meet target therapeutic goals; (v) FTX-6058 did not meet FDA requirements for continued human trials because subjects would be exposed to an unreasonable and significant risk of illness or injury; (vi) accordingly, the Company had overstated FTX-6058's clinical and/or commercial prospects; and (vii) as a result, the Company's public statements were materially false and misleading at all relevant times.

134. The January 4, 2023 press release was also materially misleading because Defendants, in violation of Item 303, omitted to disclose a known material adverse trend, event, and uncertainty relating to FTX-6058, as discussed in ¶¶91-92 above.

**B. The Truth About FTX-6058 Slowly Emerges**

135. On January 4, 2023, the same day that Fulcrum provided a business update and 2023 outlook, Fulcrum announced that Defendant Stuart, who had led the Company for less than two years, would be "transitioning from his CEO role and the Board of Directors to pursue other opportunities." Defendant Stuart was replaced by Defendant Gould, Fulcrum's former founding CEO and a then-current member of the Company's Board of Directors.[22]

136. On January 11, 2023, Fulcrum's Twitter account posted the following statement by Defendant Gould: "***We are entering 2023 with a tremendous momentum and expect it to be a productive year for our two clinical programs: FTX-6058 for SCD, and losmapimod for FSHD***."

---

[22] https://www.globenewswire.com/news-release/2023/01/04/2582769/0/en/Fulcrum-Therapeutics-Announces-CEO-Transition.html

**FulcrumTx** @FulcrumTx · Jan 11

Our CEO, Robert Gould, will present at this year's J.P. Morgan Healthcare Conference. Join the webcast on January 11th to learn how Fulcrum is changing the course of genetically defined diseases. Watch here: bit.ly/3Qxkq2g

#JPM2023 #JPM23




1 7 601

137. The statement referenced in ¶136 was materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) they had no reasonable basis to assume a productive year for FTX-6058 given that it showed safety concerns regarding potential hematological malignancies; (i) their SCD program had not made major strides in the third quarter, but rather was poised to regress because preclinical data submitted in support

of FTX-6058 showed safety concerns regarding potential hematological malignancies; (ii) FTX-6058 demonstrated toxicity; (iii) FTX-6058 failed to meet target therapeutic goals; (iv) Fulcrum's clinical trial for FTX-6058 did not meet FDA requirements for continued human trials because subjects would be exposed to an unreasonable and significant risk of illness or injury; (v) accordingly, the Company had overstated FTX-6058's clinical and/or commercial prospects; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

138. On January 20, 2023, Defendants capitalized on their misrepresentations about FTX-6058 by closing a secondary offering of its common stock, raising $125 million in gross proceeds in the process.[23]

139. On February 15, 2023, Fulcrum presented at the SVB Securities Global Biopharma Conference, during which Defendant Gould stated, in relevant part:

> ***FTX-6058 was generally well tolerated. There were 14 treatment emerging AEs, two of them are reported as possibly related to study drug. This was headache and lip numbness, both of which resolved spontaneously with continued drug treatment, no AEs resulted in drug discontinuation and they were all reported as mild and non-serious***.
>
> Two of the 14 adverse events were characterized as vaso-occlusive crises, which of course these patients experience. And they were characterized as unrelated to study drug. One was reported as a serious AE with Acute Chest Syndrome, but this was in a subject that was non-adherent to drug. The other was reported as unrelated to study drug. There are no lab related adverse events. So, ***there were no effects on blood chemistries or hematologic assessments and there are no discontinuations due to these adverse events***.

140. The statement referenced in ¶139 was materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse

[23] https://ir.fulcrumtx.com/news-releases/news-release-details/fulcrum-therapeutics-announces-pricing-upsized-public-offering; https://www.sec.gov/Archives/edgar/data/1680581/000119312523010269/d405392d424b5.htm

facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) FTX-6058 was not "well-tolerated" given that it showed safety concerns regarding potential hematological malignancies; (ii) FTX-6058 demonstrated toxicity; (iii) there was sufficient hematologic data to show that Fulcrum's clinical trial for FTX-6058 did not meet FDA requirements for continued human trials because subjects would be exposed to an unreasonable and significant risk of illness or injury; (iv) accordingly, the Company had overstated FTX-6058's clinical and/or commercial prospects; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

### 1. Fulcrum Shares Decline by 56.09% after the FDA Clinical Hold Reveals Defendants' Previously Undisclosed Safety Violations

141. On February 24, 2023, Fulcrum issued a press release announcing that the FDA had placed a clinical hold on FTX-6058 in Sickle Cell Disease. The press release stated, in relevant part:

> Fulcrum Therapeutics [. . .] today announced that on February 23, 2023, ***the U.S. Food and Drug Administration (FDA) verbally informed the company that it has issued a full clinical hold regarding the Investigational New Drug (IND) application for FTX-6058 for the potential treatment of sickle-cell disease. The Agency indicated that it would provide a formal Clinical Hold Letter to the company within 30 days***.
>
> ***The clinical hold was initiated by the Agency due to previously reported preclinical data***. Fulcrum will suspend dosing in the Phase 1b trial of FTX-6058 and intends to work diligently with the Agency to resolve the hold as soon as possible.
>
> "***Patient safety remains paramount to me***. I am encouraged by the Agency's willingness to work with us to clarify the therapeutic potential of FTX-6058. Fulcrum intends to address questions related to modulation of the PRC2 complex and the preclinical data," said [Defendant Gould]. "We continue to have confidence in the benefit-risk profile of FTX-6058 and remain committed to our goal of providing a differentiated therapeutic option for people living with sickle cell disease."

142. On this news, Fulcrum's stock price fell $7.23 per share, or 56.09%, to close at $5.66 per share on February 24, 2023.




143. Analysts, too, responded swiftly to the February 24 press release. On February 27, 2023, Morgan Stanley downgraded Fulcrum to "equal weight" and lowered the price target to $8. Oppenheimer, too, lowered its price target on February 27, "based on added regulatory risk and development timelines." Oppenheimer also noted that "***[r]ecent management turnover is fueling speculation that this is an issue the company has been aware of for some time***."

**2. Additional Details About the FDA's Clinical Hold Triggers Another Material Decline in Fulcrum Shares**

144. On March 9, 2023, before the market opened, Fulcrum issued a press release announcing recent business highlights and the Company's Q4 and full year 2022 financial results. The press release stated, in relevant part:

> Fulcrum [. . .] today reported financial results for the fourth quarter and full year 2022 and provided a business update, including on FTX-6058.
>
> "We are confident that FTX-6058 has the potential to provide a differentiated

therapeutic option for people living with sickle cell disease and that the clinical and preclinical data generated to date demonstrate a favorable benefit-risk profile. We are working diligently to address the clinical hold," said [Defendant Gould]. "Additionally, we remain on track to complete enrollment in the losmapimod Phase 3 REACH trial in the second half of 2023, and are excited about potentially being first to market with a treatment for FSHD patients who have no approved therapies."

Key Business Updates

**FTX-6058**

- On February 23, 2023, the FDA placed the investigational new drug (IND) application for FTX-6058 for the potential treatment of sickle cell disease (SCD) on full clinical hold. In its communication, the Agency noted preclinical data previously submitted in April, October and December 2022, and non-clinical and clinical evidence of hematological malignancies observed with other inhibitors of polycomb repressive complex 2 (PRC2).

- The Company received a formal Clinical Hold Letter from the Agency on February 24, 2023. Enrollment has been paused and dosing suspended in the Phase 1b trial of FTX-6058.

- ***The clinical hold noted that the profile of hematological malignancies observed in the non-clinical studies of FTX-6058 is similar to that observed with other inhibitors of PRC2, and that hematological malignancies have been reported clinically with other PRC2 inhibitors. The Agency requested that Fulcrum further define the population where the potential benefit of continued treatment with FTX-6058 outweighs potential risk***.

Preceding the FDA hold:

- ***The Company made submissions to the FDA in April, October and December 2022 that included non-clinical data***.

- In December, the FDA granted FTX-6058 Fast Track Designation for the treatment of SCD.

- The Company previously disclosed Phase 1b data from Cohort 1 subjects in the 6 mg cohort (n=10): Primary endpoint showed up to 9.5% absolute fetal hemoglobin (HbF) increases from baseline, data suggest no difference in response in subjects on (n=3) and off (n=7) background hydroxyurea.

    - FTX-6058 treatment appears to result in dose dependent and clinically relevant increases in HbF; all subjects adherent to the

dosing regimen showed a response.

- Improved biomarkers of hemolysis were observed in evaluable patients.

- FTX-6058 was generally well tolerated with no drug-related treatment emergent serious adverse events and no discontinuations due to treatment emergent adverse events to date.

- Data from subjects in the 2 mg cohort (n=2) demonstrated continued absolute HbF increases up to 4.6% through the end of treatment, suggesting 2 mg is a potentially minimally efficacious dose.

- Data from a subject in the 12 mg dose cohort (n=3), prior to the suspension of the trial, showed up to 10.0% absolute HbF increases from baseline after 42 days of treatment.

- On February 17, 2023, the Company responded to a request received on February 9, 2023, from the FDA about non-clinical data submitted in 2022.

145. Also on March 9, 2023, Fulcrum announced the sudden and unexpected departure of CMO Santiago Arroyo ("Arroyo"), who had been on the job for approximately four months.

146. On this news, Fulcrum's stock price fell $1.44, or 23%, to close at $4.82 per share on March 9, 2023.



147. Analysts again reacted forcefully. For example, an analyst report issued by H.C. Wainwright on March 10, 2023 downgraded Fulcrum to neutral, and reduced the price target to $6, "until further clarity is garnered on a development pathway forward." The same report explained that the risk of hematologic malignancies which formed the basis for the clinical hold called into question the wisdom of targeting EEC over other portions of PRC2.

148. Upon hearing about the FDA's clinical hold on FTX-6058, FE2 was not surprised. Specifically, FE2 stated that adverse FDA reactions are not unusual at Fulcrum.

149. Then, on April 5, 2023, Rajavelu abruptly resigned effective April 21, 2023.

150. On May 15, 2023, Fulcrum announced the appointment of Alex Sapir as CEO, the Company's third such appointment in just over two years.

151. On July 5, 2023, the financial research report *BuySellSignals* observed that in 2023 Fulcrum had plummeted 53.7% year-to-date, underperformed 93% of NASDAQ-listed stocks, and witnessed the decline of its market capitalization from $268.8 million to $110.1 million.

152. On August 22, 2023, the FDA lifted the clinical hold. In noting the increase in Fulcrum's share price to $5.86 in premarket trading that day, *Fierce Biotech* nonetheless reminded investors that, post-hold, Fulcrum would "be trailing behind [competitors] bluebird bio and Vertex-CRISPR, which are awaiting FDA decisions for their respective gene therapies for SCD in December" with yet "a long way to go to reclaim the heights of over $12 that its share price was sitting at before the hold was placed in February."[24]

153. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered

[24] https://www.fiercebiotech.com/biotech/fulcrums-scd-program-back-business-after-fda-lifts-6-month-hold

significant losses and damages.

### C. Additional Allegations of Scienter

154. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Fulcrum, during the Class Period their control over, and/or receipt and/or modification of Fulcrum allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Fulcrum, participated in the fraudulent scheme alleged herein. Defendants' scienter is further evidenced by several additional factors in addition to the allegations set forth above.

155. Given the substantial importance of FDA approval for FTX-6058 to the Company's financial performance, there is no doubt that Defendants had processes and procedures in place to immediately be made aware of any concerns raised by the FDA regarding FTX-6058's failure meet agency requirements for continued human trials because subjects would be exposed to an unreasonable and significant risk of illness or injury. If Defendants lacked such processes and procedures, Defendants were reckless in not establishing them, and in not informing investors that they lacked such crucial controls.

156. Before the Class Period commenced, Defendants applied for and obtained Orphan Drug status from the FDA for FTX-6058. This Orphan Drug designation contributes to a strong inference of scienter because it provided Fulcrum with special access to FDA officials, as well as

the ability to work closely with the FDA on Fulcrum's trials and submissions.

157. During the Class Period, Defendants purposefully sought and obtained Fast Track designation for FTX-6058 from the FDA, which entitled them to, among other things, "***more frequent meetings with FDA to discuss the drug's development plan and ensure collection of appropriate data needed to support drug approval***" and "***[m]ore frequent written communication from FDA*** …." Fulcrum has not disputed that such standard practices were followed here, providing, at least, the Individual Defendants with actual knowledge of the agency's serious concerns.

158. Defendants' misrepresentations detailed above concerned the Company's most important clinical trial for FTX-6058, one of the Company's two lead product candidates, the design and conduct of which was a core operation for Fulcrum. Consequently, knowledge of the fraud may be imputed to the Individual Defendants.

159. Moreover, given the extensive communications that the Individual Defendants had with analysts and investors, and the detail of their representations, they each made themselves aware of the Company's and FDA's actual (but undisclosed) findings with respect to FTX-6058 or had no factual basis to make the specific statements that they made. In either event, the Individual Defendants were at least reckless with respect to the truth.

160. The Company confirmed Defendants Stuart and Gould's knowledgeability when it touted their 20 and 30 years of respective experience in the pharmaceutical industry and/or senior level experience.

161. Numerous executive resignations during and after the Class Period further support an inference of scienter. For example,

- Fulcrum's CMO, Defendant Morabito, resigned effective July 13, 2022;

- Defendant Stuart, Fulcrum's CEO, resigned effective January 3, 2023;
- Defendant Dunn, Fulcrum's President of R&D, resigned effective January 3, 2023;
- Fulcrum's CMO, Arroyo, resigned effective March 7, 2023;
- Fulcrum's CFO and Treasurer, Rajavelu, resigned effective April 21, 2023; and
- Defendant Gould was replaced as Fulcrum's CEO effective July 1, 2023.

162. Likewise, that Defendants engaged experts on hematological malignancies evidences their actual knowledge of the relationship between these cancers and FTX-6058, and the fact that it laid off 17% of the Company's workforce thereafter demonstrates that the advice received was negative, not positive.

163. Defendants were financially motivated to misrepresent the truth and artificially inflate the market price of Fulcrum stock during the Class Period. Among other things, Defendants conducted a secondary offering on January 20, 2023, selling 9,615,384 million shares of Fulcrum common stock at $13.00 per share, for gross proceeds of $125 million.

164. Each of the Individual Defendants was a senior executive at Fulcrum with responsibilities related to overseeing the drug development that was a core operation of the Company, including for FTX-6058, and the disclosure of those efforts to investors. The scienter of each of the Individual Defendants and of other senior managers and executives, is imputable to Fulcrum. The knowledge of each of these individuals should therefore be imputed to Fulcrum for the purposes of assessing corporate scienter.

165. Additionally, corporate scienter is established because the statements in question would have been approved by corporate officials sufficiently knowledgeable about the company to know the statement was false. Here, the statements alleged were made to the investing public regarding one of Fulcrum's primary business segments (*i.e.*, FTX-6058), an important topic that

would necessarily require approval by appropriate corporate officers who, as alleged, had access to information contradicting their public statements made to investors.

## VI. CLASS ACTION ALLEGATIONS

166. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Fulcrum securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

167. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Fulcrum securities were actively traded on the NASDAQ. Based on the Company's recent disclosure that, as of July 27, 2023, Fulcrum had 61,822,554 shares outstanding, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Fulcrum or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

168. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

169. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

170. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Fulcrum;
- whether the Individual Defendants caused Fulcrum to issue false and misleading statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;
- whether the prices of Fulcrum securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

171. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

172. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Fulcrum securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased, acquired and/or sold Fulcrum securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

173. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

174. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## VII. CLAIMS FOR RELIEF

### COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

175. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

176. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

177. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Fulcrum securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Fulcrum securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

178. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Fulcrum securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Fulcrum's finances and business prospects.

179. Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

180. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Fulcrum, the Individual Defendants had knowledge of the details of Fulcrum's internal affairs.

181. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Fulcrum. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Fulcrum's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Fulcrum securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Fulcrum's business and operational condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Fulcrum securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

182. During the Class Period, Fulcrum securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Fulcrum securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired

said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Fulcrum securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Fulcrum securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

183. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

184. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented information to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

185. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

186. During the Class Period, the Individual Defendants participated in the operation and management of Fulcrum, and conducted and participated, directly and indirectly, in the conduct of Fulcrum's business affairs. Because of their senior positions, they knew the adverse non-public information about FTX-6058.

187. When making statements about Fulcrum's financial condition and results of operations, the Individual Defendants were duty-bound to disseminate accurate and truthful information and to correct promptly any public statements issued by Fulcrum which had become

materially false or misleading.

188. As noted above, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, public filings, and statements to analysts, which Fulcrum disseminated in the marketplace during the Class Period concerning Fulcrum's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Fulcrum to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Fulcrum within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Fulcrum securities.

189. Each of the Individual Defendants, therefore, acted as a controlling person of Fulcrum. In their respective executive roles, each of the Individual Defendants had the power to direct the actions of, and exercised the same in order to cause Fulcrum to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Fulcrum and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

190. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Fulcrum.

## VIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason

of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## IX. JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 29, 2023

Respectfully submitted,

*/s/ Louis C. Ludwig*
**POMERANTZ LLP**
Joshua B. Silverman (*pro hac vice*)
Louis C. Ludwig (*pro hac vice*)
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 229-8811
jbsilverman@pomlaw.com
lcludwig@pomlaw.com

*Lead Counsel for Lead Plaintiff and the Class*

Daryl Andrews (BBO #658523)
Glen DeValerio (BBO #122010)
**ANDREWS DEVALERIO LLP**
P.O. Box 67101
Chestnut Hill, MA 02467
Telephone: (617) 999-6473
daryl@andrewsdevalerio.com
glen@andrewsdevalerio.com

*Liaison Counsel for Lead Plaintiff and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") on this September 29, 2023.

*/s/ Louis C. Ludwig*
Louis C. Ludwig