# Exhibit 3

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-K

(Mark One)

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2021

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE TRANSITION PERIOD FROM            TO

Commission File Number 001-38978

# FULCRUM THERAPEUTICS, INC.

(Exact name of registrant as specified in its Charter)

| | |
|---|---|
| **Delaware** | **47-4839948** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **26 Landsdowne Street** | |
| **Cambridge, Massachusetts** | **02139** |
| (Address of principal executive offices) | (Zip Code) |

**Registrant's telephone number, including area code: (617) 651-8851**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.001 per share | FULC | Nasdaq Global Market |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. YES ☐ NO ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. YES ☐ NO ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. YES ☒ NO ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). YES ☒ NO ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| Emerging growth company | ☒ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). YES ☐ NO ☒

As of June 30, 2021, the last business day of the registrant's most recently completed second fiscal quarter, the aggregate market value of the registrant's common stock held by non-affiliates of the registrant, based on the closing price of the shares of common stock on the Nasdaq Global Market on June 30, 2021, was approximately $248,910,889.

The number of shares of registrant's common stock outstanding as of February 24, 2022 was 40,637,216.

**DOCUMENTS INCORPORATED BY REFERENCE**

The registrant intends to file a definitive proxy statement pursuant to Regulation 14A relating to the 2022 Annual Meeting of Stockholders within 120 days of the end of the registrant's fiscal year ended December 31, 2021. Portions of such definitive proxy statement are incorporated by reference into Part III of this Annual Report on Form 10-K to the extent stated herein.

**Table of Contents**

|  |  |  | Page |
|---|---|---|---|
| **PART I** | | | |
| Item 1. | Business | | 1 |
| Item 1A. | Risk Factors | | 51 |
| Item 1B. | Unresolved Staff Comments | | 92 |
| Item 2. | Properties | | 92 |
| Item 3. | Legal Proceedings | | 92 |
| Item 4. | Mine Safety Disclosures | | 92 |
| **PART II** | | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | | 93 |
| Item 6. | Reserved | | 93 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | | 94 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | | 106 |
| Item 8. | Financial Statements and Supplementary Data | | 106 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | | 106 |
| Item 9A. | Controls and Procedures | | 107 |
| Item 9B. | Other Information | | 108 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | | 108 |
| **PART III** | | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | | 109 |
| Item 11. | Executive Compensation | | 109 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | | 109 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | | 109 |
| Item 14. | Principal Accountant Fees and Services | | 109 |
| **PART IV** | | | |
| Item 15. | Exhibits and Financial Statement Schedules | | 110 |
| Item 16. | Form 10-K Summary | | 110 |

In this Annual Report on Form 10-K, unless otherwise stated or as the context otherwise requires, references to "Fulcrum," "Fulcrum Therapeutics," "the Company," "we," "us," "our" and similar references refer to Fulcrum Therapeutics, Inc. together with its consolidated subsidiary.  The Fulcrum Therapeutics logo, FulcrumSeek and other trademarks or service marks of Fulcrum Therapeutics, Inc. appearing in this Annual Report on Form 10-K are the property of Fulcrum Therapeutics, Inc. This Annual Report on Form 10-K also contains registered marks, trademarks and trade names of other companies. All other trademarks, registered marks and trade names appearing herein are the property of their respective holders.

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Annual Report on Form 10-K contains forward-looking statements, which reflect our current views with respect to, among other things, our operations and financial performance. All statements other than statements of historical facts contained in this Annual Report on Form 10-K, including statements regarding our strategy, future operations, future financial position, future revenue, projected costs, prospects, plans, objectives of management and expected market growth are forward-looking statements. The words "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "might," "outlook," "plan," "potential," "predict," "project," "should," "target," "would," and the negative version of these words and other similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain these identifying words. Such forward-looking statements are subject to various risks and uncertainties. Accordingly, there are or will be important factors that could cause actual outcomes or results to differ materially from those indicated in these statements. We believe these factors include but are not limited to those described under the "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" sections and include, among other things:

- our ongoing clinical trials of losmapimod and FTX-6058;

- the impact of the ongoing COVID-19 pandemic on our business and operations, including our clinical trials and development plans, as well as our future financial results;

- the initiation, timing, progress and results of our drug target discovery screening programs;

- the initiation, timing, progress and results of our current and future preclinical studies and clinical trials and our research and development programs;

- our plans to develop and, if approved, subsequently commercialize losmapimod, FTX-6058 and any other product candidates, including in combination with other drugs and therapies;

- the timing of and our ability to submit applications for, and obtain and maintain regulatory approvals for losmapimod, FTX-6058 and any other product candidates;

- our expectations regarding our ability to fund our operating expenses and capital expenditure requirements with our cash, cash equivalents, and marketable securities;

- the potential advantages of our product candidates;

- the rate and degree of market acceptance and clinical utility of our products, if our product candidates are approved;

- our estimates regarding the potential market opportunity for our product candidates;

- our commercialization, marketing and manufacturing capabilities and strategy;

- our intellectual property position;

- the progress and results of our collaborations with Acceleron Pharma Inc., or Acceleron, a wholly-owned subsidiary of Merck & Co., Inc., or Merck, and MyoKardia, Inc., or MyoKardia, a wholly-owned subsidiary of Bristol-Myers Squibb Company;

- our ability to identify additional products, product candidates or technologies with significant commercial potential that are consistent with our commercial objectives;

- our estimates regarding expenses, future revenue, timing of any future revenue, capital requirements and needs for additional financing;

- the impact of government laws and regulations;

- our competitive position;

- developments relating to our competitors and our industry;

- our ability to maintain and establish collaborations or obtain additional funding; and

- our expectations regarding the time during which we will be an emerging growth company or a smaller reporting company as defined under the federal securities laws.

We may not actually achieve the plans, intentions or expectations disclosed in our forward-looking statements, and you should not place undue reliance on our forward-looking statements. Actual results or events could differ materially from the plans, intentions and expectations disclosed in the forward-looking statements we make. We have included important factors in the cautionary statements included in this Annual Report on Form 10-K, particularly in the "Risk Factors" section, that we believe could cause actual results or events to differ materially from the forward-looking statements that we make. Our forward-looking statements do not reflect the potential impact of any future acquisitions, mergers, dispositions, collaborations, joint ventures or investments we may make or enter into.

You should read this Annual Report on Form 10-K and the documents that we have filed as exhibits to Annual Report on Form 10-K completely and with the understanding that our actual future results may be materially different from what we expect. The forward-looking statements contained in this Annual Report on Form 10-K are made as of the date of this Annual Report on Form 10-K, and we do not assume any obligation to update any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by applicable law.

This Annual Report on Form 10-K includes statistical and other industry and market data that we obtained from industry publications and research, surveys and studies conducted by third parties as well as our own estimates of potential market opportunities. All of the market data used in this Annual Report on Form 10-K involves a number of assumptions and limitations, and you are cautioned not to give undue weight to such data. Industry publications and third-party research, surveys and studies generally indicate that their information has been obtained from sources believed to be reliable, although they do not guarantee the accuracy or completeness of such information. Our estimates of the potential market opportunities for our product candidates include several key assumptions based on our industry knowledge, industry publications, third-party research and other surveys, which may be based on a small sample size and may fail to accurately reflect market opportunities. While we believe that our internal assumptions are reasonable, no independent source has verified such assumptions.

## SUMMARY RISK FACTORS

Our business is subject to a number of risks that if realized could materially affect our business, financial condition, results of operations, cash flows and access to liquidity. These risks are discussed more fully in the "Risk Factors" section of this Annual Report on Form 10-K. Our principal risks include the following:

- We have incurred significant losses since our inception. Our net loss was $80.8 million for the year ended December 31, 2021 and $70.8 million for the year ended December 31, 2020. We expect to incur losses over the next several years and may never achieve or maintain profitability. As of December 31, 2021, we had an accumulated deficit of $302.5 million.

- We will need substantial additional funding. If we are unable to raise capital when needed, we could be forced to delay, reduce or eliminate our product development programs or commercialization efforts. We expect to devote substantial financial resources to our ongoing and planned activities, particularly as we continue our clinical trials of losmapimod and FTX-6058 and continue research and development and initiate additional clinical trials of, and seek regulatory approval for, these and other product candidates.

- We are early in our development efforts, and we only have two product candidates in clinical trials. If we are unable to commercialize our product candidates or experience significant delays in doing so, our business will be materially harmed.

- We may not be successful in our efforts to use FulcrumSeek, our proprietary product engine to build a pipeline of product candidates. A key element of our strategy is to use FulcrumSeek to identify and validate cellular drug targets that can potentially modulate gene expression to address the root cause of genetically-defined rare diseases, with an initial focus on identifying small molecules specific to the identified cellular target.

- Clinical drug development involves a lengthy and expensive process, with an uncertain outcome. The results of preclinical studies and early clinical trials may not be predictive of future results. We may incur additional costs or experience delays in completing, or ultimately be unable to complete, the development and commercialization of our product candidates.

- Because we are developing some of our product candidates for the treatment of diseases in which there is limited clinical experience and, in some cases, using new endpoints or methodologies, the U.S. Food and Drug Administration, or FDA, or other regulatory authorities may not consider the endpoints of our clinical trials to predict or provide clinically meaningful results.

- The ongoing COVID-19 pandemic has and may continue to affect our ability to initiate and complete current or future preclinical studies or clinical trials, disrupt regulatory activities or have other adverse effects on our business and operations. In addition, this pandemic may continue to adversely impact economies worldwide, which could result in adverse effects on our business and operations.

- If serious adverse events or unacceptable side effects are identified during the development of our product candidates, we may need to abandon or limit our development of some of our product candidates.

- We face substantial competition, which may result in others discovering, developing or commercializing products before or more successfully than we do.

- We rely, and expect to continue to rely, on contract manufacturing organizations, or CMOs, to manufacture our product candidates. If we are unable to enter into such arrangements as expected or if such organizations do not meet our supply requirements, development and/or commercialization of our product candidates may be delayed.

- We rely, and expect to continue to rely, on third parties to conduct our clinical trials, and those third parties may not perform satisfactorily, including failing to meet deadlines for the completion of such trials, which may harm our business.

- We have entered into, and may in the future enter into, collaborations with third parties for the discovery, development or commercialization of product candidates, including our collaborations with Acceleron and MyoKardia. If our collaborations are not successful, we may not be able to capitalize on the market potential of these product candidates and our business could be adversely affected.

- If we are unable to obtain, maintain, enforce and protect patent protection for our technology and product candidates or if the scope of the patent protection obtained is not sufficiently broad, our competitors could develop and commercialize technology and products similar or identical to ours, and our ability to successfully develop and commercialize our technology and product candidates may be adversely affected.

- If we fail to comply with our obligations in our intellectual property licenses and funding arrangements with third parties, or otherwise experience disruptions to our business relationships with our licensors, we could lose intellectual property rights that are important to our business.

iii

**Item 1. Business.**

**Overview**

We are a clinical-stage biopharmaceutical company focused on improving the lives of patients with genetically defined rare diseases in areas of high unmet medical need. Our most advanced clinical product candidate, losmamipod, is in development to treat the root cause of facioscapulohumeral muscular dystrophy, or FSHD. Our other clinical product candidate is FTX-6058, which is being developed for the treatment of certain hemoglobinopathies, including sickle cell disease, or SCD, and ß-thalassemia. We expect to initiate REACH, a randomized, double-blind, placebo-controlled, multi-national Phase 3 clinical trial of losmapimod, our product candidate for FSHD, in the second quarter of 2022. We initiated a Phase 1b clinical trial of FTX-6058 in people with SCD in the fourth quarter of 2021, and we expect to report initial data from that Phase 1b trial in the second quarter of 2022. Additionally, we submitted an investigational new drug application, or IND, in the fourth quarter of 2021 for FTX-6058 in other select hemoglobinopathies, including ß-thalassemia, and expect to initiate a Phase 1b study in the second quarter of 2022.

We have developed a proprietary product engine, FulcrumSeek, that we employ to systematically identify and validate cellular drug targets that can potentially modulate gene expression to treat known root causes of genetically defined diseases. Our product engine integrates patient-derived tissue and disease-relevant cell models that we interrogate using our pharmacologically diverse and highly annotated small-molecule compound library and customized CRISPR and RNAi libraries. These screens generate tens of millions of data points and high-content imaging. We then apply computational biology and analytics to identify targets with specificity and selectivity accompanied by a comprehensive data set that significantly accelerates development. This approach led to the identification of both losmamipod for FSHD and FTX-6058 for hemoglobinopathies, as well as a robust discovery pipeline. We expect to nominate our next development candidate this year to support our fourth IND by the end of the first quarter of 2023.

Our most advanced product candidate, losmapimod, is a small molecule that we are developing for the treatment of FSHD, a rare, progressive and disabling disorder characterized by muscle degeneration and fat infiltration. Disease progression results in the accumulation of disability with many patients ultimately becoming dependent on wheelchairs and losing independence as their ability to perform activities of daily living decreases. Losmapimod selectively targets p38α/ß mitogen activated protein kinase, or p38α/ß. We utilized our product engine to discover that inhibition of p38α/ß reduced expression of the *DUX4* gene in muscle cells derived from patients with FSHD. The aberrant expression of the *DUX4* gene is the known root cause of FSHD. There are no approved therapies for FSHD, one of the most common forms of muscular dystrophy, with an estimated patient population of 16,000 to 38,000 in the United States and 300,000 to 780,000 globally. Losmapimod has received orphan drug designation from both the FDA and the European Medicines Agency, or EMA, for the treatment of FSHD, and in May 2021, received fast track designation from the FDA.

Following our discovery of the role of p38α/ß inhibitors in the reduction of *DUX4* expression in preclinical models of FSHD, we performed an extensive review of known compounds. As a result of our evaluation, we identified losmapimod as the preferred developmental candidate based on the substantial and attractive preclinical and clinical data. We in-licensed losmapimod from affiliates of GlaxoSmithKline plc, or GSK, in February 2019. GSK had previously administered losmapimod to nearly 3,500 subjects across multiple clinical trials, including one Phase 3 clinical trial, and losmapimod was generally well-tolerated across these studies. GSK did not conduct a clinical trial of losmapimod in patients with FSHD or any other muscle disorder. We conducted extensive preclinical testing of losmapimod in patient-derived, tissue-relevant cell models and observed that losmapimod selectively reduced *DUX4*-driven gene expression and restored a healthy gene expression signature with minimal impact on healthy human muscle cells or other cell types.

We conducted a randomized, double-blind, placebo-controlled, multicenter, international Phase 2b clinical trial, referred to as ReDUX4, to evaluate losmapimod in 80 patients with FSHD. In this Phase 2b clinical trial, the primary endpoint was change in *DUX4*-driven gene expression, an experimental molecular biomarker. Secondary endpoints included evaluation of safety and tolerability, pharmacokinetics, or PK, in blood, as well as measures of muscle health, structure and function, including muscle fat infiltration, or MFI, reachable workspace, or RWS, and patient-reported outcomes. Concurrently, we initiated a single-center open label Phase 2 clinical trial to investigate the safety and tolerability of chronic treatment with losmapimod in patients with FSHD. In the ongoing extension of the open label trial, we are also evaluating measures of muscle function, muscle strength, and patient reported quality of life.

We presented the full data from the ReDUX4 trial in June 2021. While the primary endpoint was not met, results demonstrated clinically relevant benefits versus placebo on multiple measures of muscle health and function as well as

1

patient reported outcomes at 48 weeks. Losmapimod-treated participants showed decreased progression of MFI as measured in intermediate muscles, which are muscles already affected by disease and most likely to show signs of disease progression. Normal appearing muscles appeared to be preserved in the losmapimod group versus placebo. Treatment with losmapimod was shown to slow the rate of decline and improve accessible surface area in RWS, which is a measure of function that assesses upper extremity range of motion and has been shown to be an important measure of independence. Additionally, patients reported feeling better when treated with losmapimod compared to placebo through the Patient Global Impression of Change, or PGIC, assessment. PGIC is a measure of self-reported change in how a patient feels and functions. Losmapimod was generally well-tolerated, with no drug-related serious adverse events reported.

Based on the ReDUX4 data , we engaged with external experts,U.S. and EU regulatory agencies, including FDA, and gained alignment on key aspects of the design of a Phase 3 trial. We expect to initiate our Phase 3 trial, REACH, in the second quarter of 2022. REACH will be a randomized, double-blind, placebo-controlled, multi-national trial to evaluate the efficacy and safety of losmapimod for the treatment of FSHD. The trial is expected to enroll approximately 230 adults with FSHD. Patients will be randomized 1:1 to receive either losmapimod, administered orally as a 15 mg tablet twice a day, or placebo, and evaluated over a 48-week treatment period. The primary endpoint of the study is the absolute change from baseline in RWS. Secondary endpoints include MFI, PGIC, and Quality of Life in Neurological Disorders of the upper extremity, or Neuro QoL UE. The trial will also include patient-centered assessments of healthcare utilization.

Our other product candidate, FTX-6058, is an investigational oral fetal hemoglobin, or HbF, inducer that is in development for SCD and select other hemoglobinopathies, including ß-thalassemia. FTX-6058 is designed to bind to embryonic ectoderm development, or EED, and inhibit the transcriptional silencing activity of the polycomb repressive complex 2, or PRC2. By doing so, preclinical studies have shown that FTX-6058 downregulates key HbF repressors, including BCL11A and MYB, and upregulates HbF.

SCD is a genetic blood disorder caused by a mutation in the ß-subunit gene, or *HBB* gene. This mutation results in the formation of abnormal hemoglobin, or HbS, which causes red blood cells, or RBCs, to change from a round shape into a sickle shape that significantly impairs their function. ß-thalassemia is a rare blood disorder caused by various genetic mutations in the *HBB* gene that can significantly impair the production of hemoglobin and RBCs. We designed FTX-6058 to compensate for the root cause of these hemoglobinopathies by inducing the expression of the two γ-globin genes, *HBG1/2*, whose expression is normally silenced shortly after birth. The *HBG1/2* genes encode for γ-globin, a component of HbF, which is known to repair the abnormal RBC shape in SCD and to compensate for the presence of HbS in SCD and ß-thalassemia. We have observed *in vitro* and *in vivo* activation of the *HBG1/2* genes in preclinical studies with FTX-6058. We have also observed that FTX-6058 demonstrated robust levels of HbF elevation with no adverse effects on important cellular health markers. We conducted additional pre-clinical profiling in CD34+ derived cells and observed that treatment with FTX-6058 increased HbF levels to approximately 30% of total hemoglobin, as measured by mass spectrometry, high performance liquid chromatography, and fast protein liquid chromatography techniques. The elevation of HbF was significantly greater than we observed with hydroxyurea in the cell models.

In the fourth quarter of 2020, we initiated a Phase 1 clinical trial of FTX-6058 in healthy adult volunteers. The Phase 1 randomized, double-blind, placebo-controlled trial was designed to evaluate the safety, tolerability, and PK of ascending doses of FTX-6058. In the single-ascending dose, or SAD, cohorts, healthy volunteers received one dose of either placebo or 2, 4, 10, 20, 30, 40 or 60mg of FTX-6058. In the multiple-ascending dose, or MAD, cohorts, healthy volunteers received a once-daily dose of placebo or 2, 6, 10, 20 or 30mg of FTX-6058 for 14 consecutive days. Each MAD cohort had six subjects on drug and two on placebo. Food effect was also studied in a separate 20mg dose cohort. Exploratory measures were included in the MAD cohorts to assess target engagement, changes in HBG mRNA and HbF-containing reticulocytes, or F-reticulocytes. A 6mg dose cohort in people with SCD was later added to this trial to further inform PK and pharmacodynamic, or PD, modeling for future dose selections.

We reported data from the 2, 4, 10, 20, 30 and 40mg SAD cohorts and the 2, 6 and 10 mg MAD cohorts in healthy volunteers in August 2021, and we reported data from the 60 mg SAD cohort and the 20 and 30 mg MAD cohorts in healthy volunteers, as well as data from the 20 mg cohort assessing food effect in December 2021.

FTX-6058 was generally well-tolerated with no serious adverse events reported and no discontinuations due to treatment-emergent adverse events, or TEAEs, across all SAD and MAD cohorts. Data continued to show dose-proportional PK, with a mean half-life of approximately 6-7 hours in the MAD cohorts, supporting once-daily dosing, and no food effect was observed with FTX-6058. Data from the MAD cohorts continued to show robust target engagement, as evidenced by an approximately 75-95% reduction from baseline in H3K27me3 after 14 days of treatment.

Data from the MAD cohorts also showed time- and dose-dependent HBG mRNA induction, as shown in the chart below, demonstrating proof-of-biology. Persistent HBG mRNA induction was observed for 7-10 days after treatment. In preclinical studies of FTX-6058, increases in HBG mRNA have consistently translated to the same fold increases in HbF protein. Notably, human genetics show that 2-3-fold increases in HbF above typical baseline levels in SCD are associated with significantly improved outcomes, and even functional cures, in people with SCD. FTX-6058 has now demonstrated dose-proportional greater than mean 2-fold induction in HBG mRNA, the key precursor to HbF protein, starting with the 6mg dose.

HBG mRNA Mean Fold Induction for FTX-6058 versus Placebo

| | 2mg* | | 6mg* | | 10mg* | | 20 mg | | 30mg | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean Fold Induction | P-value | Mean Fold Induction | P-value | Mean Fold Induction | P-value | Mean Fold Induction | P-value | Mean Fold Induction | P-value |
| Day 7 | 1.28 | 0.3494 | 1.94 | 0.0135 | 2.08 | 0.0063 | 2.06 | 0.0072 | 2.29 | 0.0025 |
| Day 14 | 1.20 | 0.5122 | 2.45 | 0.0025 | 3.54 | <0.0001 | 5.63 | <0.0001 | 6.15 | <0.0001 |
| Safety Follow-up (Day 21-24) | 1.21 | 0.3736 | 2.75 | <0.0001 | 3.22 | <0.0001 | 6.45 | <0.0001 | 6.13 | <0.0001 |

As shown in the chart below, HbF containing F-cells, or F-reticulocytes, also increased starting at day 14 and continued to increase at the safety follow-up visit, which was seven to 10 days after conclusion of dosing. Notably, increases in F-reticulocytes of any magnitude are a first indicator that HBG mRNA is translating to HbF protein production but fold changes in F-reticulocytes are not correlated with fold changes in HbF.

F-Reticulocyte Mean Fold Increase for FTX-6058 versus Placebo

| | 2mg* | | 6mg* | | 10mg* | | 20 mg | | 30mg | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean Fold Increase | P-value | Mean Fold Increase | P-value | Mean Fold Increase | P-value | Mean Fold Increase | P-value | Mean Fold Increase | P-value |
| Day 7 | 0.53 | 0.1070 | 1.02 | 0.9524 | 0.83 | 0.6214 | 0.71 | 0.3831 | 1.50 | 0.2928 |
| Day 14 | 0.88 | 0.6881 | 1.25 | 0.4895 | 2.23 | 0.0180 | 1.00 | 0.9880 | 1.71 | 0.1049 |
| Safety Follow-up (Day 21-24) | 0.63 | 0.2167 | 1.65 | 0.0943 | 3.93 | <0.0001 | 1.79 | 0.0591 | 2.38 | 0.0059 |

* Fold changes from these cohorts were updated to reflect the fold-increase over pooled placebo data across all cohorts from 2-30mg versus previously reported fold changes over pooled placebo data across 2-10mg cohorts.

We initiated a Phase 1b clinical trial of FTX-6058 in people with SCD in the fourth quarter of 2021, with the aim of establishing early proof of concept in SCD. The open label trial is designed to assess safety, tolerability, PK and PD effects, including HbF protein induction of up to three doses, starting with 6mg once daily dose, to inform dose selection for future development. Each dose cohort will have up to 10 patients who will be treated for up to three months. We expect to report initial data, including HbF protein levels, from the trial in the second quarter of 2022.

According to the National Institutes of Health, or NIH, there are approximately 7,000 rare, genetically defined human diseases, many of which have inadequate or no approved treatments. Our current drug target identification and development efforts are focused on rare muscular, hematologic and neurologic, disorders. We also anticipate utilizing FulcrumSeek to discover drug targets for genetically defined diseases in other therapeutic areas and for other disorders. In addition to drug targets that we prioritize for internal development, we may identify other drug targets that we would consider for development through partnerships. For example, we are utilizing FulcrumSeek to discover drug targets within a targeted indication within the pulmonary disease space under our collaboration and license agreement with Acceleron, a wholly owned subsidiary of Merck, and for the potential treatment of certain genetically defined cardiomyopathies under our collaboration and license agreement with MyoKardia, a wholly-owned subsidiary of Bristol-Myers Squibb Company.

**Our Pipeline**

Using FulcrumSeek, we have generated a pipeline of disease-modifying therapies that address the known root cause of rare genetic diseases. The following chart summarizes key information about our pipeline.



**Our Strategy**

We are leveraging the broad applicability of our proprietary product engine to discover and develop small molecule therapies that modulate gene expression to address the known root cause of genetically defined rare diseases in areas of high unmet medical need. We believe that our initial product candidates for the treatment of FSHD, SCD and ß-thalassemia may have the potential to treat patients with these debilitating and, in some cases, life-threatening illnesses. The key components of our strategy include:

- *Rapidly develop losmapimod for the treatment of FSHD.* We aim to rapidly develop losmapimod for the treatment of FSHD through clinical development and regulatory approval. In the second quarter of 2022, we plan to initiate a randomized, double-blind, placebo-controlled, 48-week Phase 3 trial to evaluate the efficacy and safety of losmapimod for the treatment of FSHD.

- *Rapidly develop FTX-6058 for the treatment of select hemoglobinopathies.* We have initiated a Phase 1b clinical trial of FTX-6058 in people with SCD and expect to report initial data from the trial in the second quarter of 2022. We submitted an IND to the FDA in the fourth quarter of 2021 for FTX-6058 in other select hemoglobinopathies, including ß-thalassemia, and expect to initiate a Phase 1b study in the second quarter of 2022.

- *Continue to apply FulcrumSeek to grow our portfolio of product candidates for the treatment of genetically defined diseases.* We have developed a rigorous assessment and selection process to determine which of the approximately 7,000 rare, genetically defined diseases we intend to evaluate in drug target identification activities. We are applying FulcrumSeek to discover drug targets to modulate gene expression and develop product candidates for the potential treatment of the root cause of disease.

- *Further expand our product engine capabilities.* We have significantly enhanced the scale and power of FulcrumSeek to increase the pace of discovery and we intend to further expand our capabilities to enhance the therapeutic reach and productivity of our drug discovery process. We expect to name our next development candidate in 2022 to support our fourth IND by the end of the first quarter of 2023.

4

- ***Maximize the commercial potential of our product candidates.*** We have retained all rights to our lead product candidates focused on rare genetically defined diseases, and plan to commercialize any approved product for such rare genetically defined diseases using a targeted sales infrastructure. We may in the future pursue commercialization partnerships for certain product candidates and/or markets outside the United States.

- ***Selectively enter into strategic partnerships to maximize the value of our product engine and pipeline.*** Given the breadth of opportunities for our proprietary product engine to discover drug targets and develop product candidates for genetically defined diseases, we may enter into strategic partnerships for certain drug targets, product candidates or disease areas, such as our collaboration and license agreements with Acceleron, a wholly-owned subsidiary of Merck, and MyoKardia, a wholly-owned subsidiary of Bristol Myers Squibb. Partnerships may provide an attractive avenue for expanding the impact of our proprietary product engine

## Gene Regulation

The human genome provides the blueprint, or genetic code, for life. The sequencing of the human genome has enabled significant insights into understanding the genetic underpinnings of many diseases. Genes are the fundamental units of biology, but the gene itself is rather static. The identity and function of each cell is determined by a specific set of factors that activate or repress mechanisms that regulate genes in the desired manner. There are many mechanisms that control the human genome by up or down regulating gene expression, and these regulatory mechanisms are controlled by various pathways and signals. Defects in a gene or any of these regulatory mechanisms can result in misexpression, aberrant expression or silencing of a gene that may lead to or is closely associated with disease.

The graphic below illustrates the key steps in the gene expression process in cells and how they are under the control of a variety of regulatory signals and pathways.



5

*Prior Clinical Development of Losmapimod by GSK*

GSK conducted multiple Phase 1 and Phase 2 clinical trials and one Phase 3 clinical trial of losmapimod, including in patients with chronic obstructive pulmonary disease, or COPD, acute coronary syndrome and other cardiovascular diseases, neuropathic pain, major depression disorder, focal segmental glomerulosclerosis, and rheumatoid arthritis. Nearly 3,500 subjects in 24 trials were given losmapimod with single doses as high as 60 mg and repeated oral doses as high as 15 mg twice per day for up to 52 weeks. We are using a dose of 15 mg twice per day in our clinical trials of losmapimod in FSHD. GSK did not conduct a clinical trial of losmapimod in patients with FSHD or any other muscle disorder.

In clinical trials of losmapimod conducted by GSK, no significant differences were observed in the frequency of adverse events, or AEs, in subjects given losmapimod and subjects given placebo. GSK generally observed a similar frequency of serious adverse events, or SAEs, and deaths between patients given losmapimod and patients given placebo. These trials included extensive evaluation of the cardiovascular risk profile of losmapimod, including completion of an evaluation of the potential to prolong corrected QT. GSK reported that there was no clinically relevant difference with regard to the occurrence of electrocardiogram abnormalities post-baseline or vital signs with losmapimod as compared to placebo. GSK did not identify a safety signal attributed to losmapimod in any of these trials. There were no SAEs reported in 14 of these 24 clinical trials of losmapimod.

The largest placebo-controlled clinical trial of losmapimod conducted by GSK was a Phase 3 clinical trial for the treatment of acute coronary syndrome following a heart attack, in which over 1,700 patients were given 7.5 mg of losmapimod or placebo twice per day for 12 weeks and were followed for an additional 12 weeks. In this trial, GSK observed a similar proportion of AEs and SAEs in the placebo group as compared to the losmapimod group.

There were also ten SAEs of fatality in the placebo group and 13 SAEs of fatality in the losmapimod group. In the placebo group, the SAEs of fatality were infections and infestations (two), general disorders and administrative site conditions (two), respiratory, thoracic and mediastinal disorders (three), cardiac disorder (one), gastrointestinal disorder (one) and neoplasm (one). In the losmapimod group, the SAEs of fatatity were infections and infestations (four), general disorders and administrative site conditions (three), respiratory, thoracic and mediastinal disorders (two), cardiac disorder (one), injury poisoning and procedural complications (one), gastrointestinal disorder (one) and neoplasm (one).

Among the total of 14 Phase 1 and Phase2 placebo-controlled clinical trials of losmapimod (N=1327 on losmapimod; N=735 on placebo), the distribution of SAEs was similar among losmapimod-treated and placebo-treated subjects. The most common SAEs were cardiac disorders (2% placebo; 3% losmapimod) and respiratory, thoracic and mediastinal disorders (1% placebo; 2% losmapimod). SAEs were reported in 11 of these 14 trials; 3 trials reported no SAEs.

In addition to the 24 trials conducted by GSK, another sponsor conducted a placebo-controlled Phase 2 clinical trial of losmapimod in which 73 subjects with COPD with cardiovascular manifestations were given 7.5 mg of losmapimod or placebo for 16 weeks. There were 36 subjects in the losmapimod group and 37 in the placebo group. In this trial, there were a total of six (17%) SAEs in the losmapimod group, consisting of exacerbations of COPD and pneumonia, and there was one (3%) SAE in the placebo group.

In prior studies, GSK observed that the p38α/ß target inhibition in humans was approximately 10%, 30% and 50% at trough and 40%, 60% and 70% at peak following twice per day doses of 2.5 mg, 7.5 mg and 15 mg, respectively. In addition, based on *in vitro* data from our studies in FSHD myotubes with losmapimod, we believe that the muscle exposures that we have achieved in rodents, which are similar to concentrations in human blood from the 15 mg twice per day dose, will result in robust p38α/ß target engagement and will reduce *DUX4*-driven gene expression in FSHD skeletal muscle by more than 50%. We believe that this data supports our determination that 15 mg of losmapimod twice per day is an appropriate dose for the treatment of patients with FSHD.

### *Our Product Candidate for Hemoglobinopathies - FTX-6058*

Hemoglobinopathies are a category of genetic disorders affecting hemoglobin, a critical component of RBCs. The function of hemoglobin is to delivery oxygen to tissues: hemoglobin picks up oxygen as RBCs circulate through the lungs and then drops off oxygen to the tissues so that they may function normally. Hemoglobinopathies result in either abnormal (mutant) hemoglobin or low levels of hemoglobin, and both of these conditions are associated with significant morbidity and mortality risks. We are developing FTX-6058, which is designed elevate the level of HbF for the treatment of patients with SCD and select other hemoglobinopathies, including ß-thalassemia.

*Overview of Sickle Cell Disease*

Sickle cell disease is a genetic disorder of RBCs. The root cause of SCD is a mutant hemoglobin that polymerizes in low oxygen conditions. This polymerization creates the abnormal, elongated, or sickle, shape of the RBC and results in, ultimately, hemolysis and vascular injury that causes major morbidities and significantly limits lifespan in people with SCD.

14

SCD patients typically suffer from serious clinical consequences, which may include vaso-occlusive crises, anemia, pain, infections, stroke, heart disease, pulmonary hypertension, kidney failure, liver disease and reduced life expectancy. According to a study published by the American Medical Association, approximately 32.5% of adult patients with SCD were hospitalized three or more times per year due to pain crises. SCD is reported to shorten patient life expectancy by approximately 20 to 30 years. Patients with SCD are primarily treated by hematologists.

In the United States, where newborn screening for SCD is mandatory, the estimated prevalence is approximately 100,000 individuals. In Europe, the estimated prevalence is approximately 134,000 individuals according to the EMA. According to the World Health Organization, the global incidence is estimated to be approximately 300,000 births annually. SCD is most prevalent in Africa and the Middle East.

Approved drug treatments for SCD focus primarily on the management and reduction of pain episodes, vaso-occlusive crises, and inhibition of hemoglobin S polymerization. The four drug treatments approved in the United States are hydroxyurea, voxelotor, crizanlizumab, and L-glutamine. Hydroxyurea is approved for the treatment of anemia related to SCD to reduce the frequency of painful crises and the need for blood transfusions. Hydroxyurea has a black box warning for myelosuppression and malignancy. In general, it is limited by its adverse side effects, inconsistent patient responses and concerns regarding the cytotoxic effect of the drug. L-glutamine is approved to reduce severe complications associated with the disorder. Voxelotor, marketed by Global Blood Therapeutics, is approved under accelerated approval as a hemoglobin polymerization inhibitor. This approach maintains or increases the total amount of HbS, the mutant hemoglobin in SCD, by holding on to oxygen longer. Crizanlizumab, a P-selectin inhibitor marketed by Novartis AG, or Novartis, is approved for the reduction in the frequency of vaso-occlusive crises.

Blood transfusions can be utilized to decrease the sickling of RBCs. While blood transfusions can be critical to manage SCD, there are a number of limitations associated with this therapeutic approach, including limited patient access and serious complications such as iron overload. The only potentially curative treatment currently approved for severe SCD is bone marrow transplantation. However, this treatment option is not commonly used due to the difficulties of finding a suitable matching donor and the risks associated with the treatment, which include an approximately 5% mortality rate. Bone marrow transplantation is more commonly offered to pediatric patients with available sibling-matched donors.

While multiple experimental approaches to treat SCD are being explored in clinical trials, the majority are focused on symptomatic relief or as last-line gene therapy approaches. Symptomatic approaches under investigation aim to affect issues associated with cell adhesion, sickling, thrombosis and iron homeostasis. We anticipate that a novel oral HbF inducer that affects the root cause of SCD by inhibiting the pathological polymerization caused by the mutant hemoglobin may become the standard of care for SCD.  Novartis and Global Blood Therapeutics, Inc. have received approval for therapies aiming to provide relief for specific elements of SCD (low hemoglobin and VOCs respectively). Several gene therapy approaches to treat SCD are focused on elevating HbF, however no gene therapy approaches have been approved for SCD and the efficacy, safety and durability of gene therapy approaches have yet to be established. Gene therapies need to be administered in an in-patient procedure through a bone marrow transplant, which is also referred to as a stem cell transplant or hematopoietic stem cell transplant. As part of the transplant process, the patient receives myeloablative chemotherapy which kills cells in the bone marrow in order to support the gene therapy. Despite ongoing efforts to develop gene therapies for SCD, we believe there is still a high unmet need that could be better addressed by a small molecule, oral therapy to treat the disease by increasing HbF.

*SCD Biology*

SCD is caused by a mutation in the *HBB* gene. This gene encodes a protein that is a key component of hemoglobin, a protein complex whose function is to transport oxygen in the body. Hemoglobin in adults is a complex of four proteins, two hemoglobin ß-subunits and two hemoglobin α-subunits. In patients with SCD, hemoglobin is composed of two mutant ß-subunits and two α-subunits and the result is the formation of HbS. The result of the mutation is less efficient oxygen transport and the formation of RBCs that have a sickle shape. These sickle shaped cells are much less flexible than healthy cells and can block blood vessels (vaso-occlusion) or rupture cells (lysis), leading to pain, anemia, irreversible organ damage or even death.

During fetal development, the major form of hemoglobin is HbF. Similar to hemoglobin in adults, HbF is also a complex of four proteins, two α-subunits and two γ-subunits. Shortly after birth, the genes encoding the γ-subunits, the *HBG1* and *HBG2* genes, are silenced and the *HBB* gene is activated. As described above, SCD is caused by a mutation in the *HBB* gene that gives rise to mutated ß-subunits.

A small subset of individuals with the sickle cell mutation continue to produce high levels of HbF due to inheritance of additional genetic mutations, which is called Hereditary Persistence of HbF, or HPFH. Patients with elevated HbF exhibit

15

minimal clinical manifestations of SCD. HbF levels as low as 3% over baseline in patients without HPFH, due to either therapeutic intervention or the inheritance of other genetic traits, can result in reduced clinical manifestations of the disease.



*Our Approach to Address the Root Cause of SCD*

Our strategy to address the root cause of SCD was to identify a drug mechanism that induces expression of HbF. We believe that FTX-6058 may address the root cause of SCD through this mechanism of action.

*Overview of ß-Thalassemia*

ß-thalassemia is a rare blood disorder associated with the absence or reduced production of ß-globin, which is one of the two proteins that comprise adult hemoglobin. This results in an abnormally low level of hemoglobin as well as an excess of α-globin chains that cause destruction of RBCs. The severity of the phenotype is related to the degree of imbalance between α- and non-α-globin chain synthesis. The absence of ß-globin due to *HBB* gene deletions is referred to as ß$^0$ thalassemia. Other *HBB* gene alterations allow some ß-globin to be produced but in reduced amounts. A reduced amount of ß-globin is called ß$^+$thalassemia. Many patients with ß-thalassemia require chronic blood transfusions due to severe anemia that results from low hemoglobin levels, which are referred to as transfusion-dependent patients. It is estimated that 40,000 babies are born worldwide with ß-thalassemia per year of whom 25,000 require blood transfusions. Patients with ß-thalassemia are primarily treated by hematologists.

ß-thalassemia has been clinically characterized into three forms, depending on disease severity: major, intermedia and minor. The most severe form, ß-thalassemia major (also known as Cooley's anemia), is generally diagnosed shortly after birth and patients have life-threatening anemia. Pediatric patients do not grow and gain weight at the typical rates, and often have liver, heart and bone problems. Many ß-thalassemia major patients require frequent blood transfusions to prevent severe anemia, a treatment that itself can cause long-term problems due to a build-up of iron in the body. ß-thalassemia intermedia is a less severe form of the disease that results in mild to moderate anemia. These patients sometimes require blood transfusions depending on the severity of the symptoms. Patients with ß-thalassemia minor suffer from very mild anemia and generally do not require treatment. Having either ß$^0$ or ß$^+$ thalassemia does not necessarily predict clinical disease severity as people with both types have been diagnosed with thalassemia major and thalassemia intermedia. Any increase in HbF has the potential to ameliorate the disease.

The current standard of care for many patients with ß-thalassemia is frequent blood transfusions to manage anemia. The only potentially curative therapy for ß-thalassemia is allogeneic hematopoietic stem cell transplant, which is associated with risks of complications, including mortality, and is limited to patients with a suitable donor. The European Commission granted conditional marketing authorization for ZYNTEGLO, a gene therapy developed by bluebird bio, Inc., or bluebird, for the treatment of adult and adolescent patients with transfusion-dependent ß-thalassemia and with certain genotypes, in Europe in June 2019. bluebird has initiated a rolling biologics license application, or BLA, submission for betibeglogene autotemcel in the United States. The FDA accepted the BLA for betibeglogene autotemcel for priority review in November 2021, with a PDUFA goal date of May 20, 2022. Acceleron in collaboration with Celgene Corp., or Celgene, received FDA

16

and EMA approval for luspatercept, an erythroid maturation agent for the treatment of adult patients with anemia associated with ß-thalassemia and who require frequent transfusions. There are also multiple other experimental approaches to treat ß-thalassemia being explored in clinical trials, including approaches that use small molecule, gene therapy and gene editing approaches. Despite ongoing efforts to develop new therapies for ß-thalassemia, we believe there is still a high unmet need that could be addressed by a small molecule, oral therapy to treatment the disease by increasing HbF.

*Biology of ß-Thalassemia*

ß-thalassemia is caused by genetic mutations in the *HBB* gene. The mutations interfere with the production of ß-globin. Some mutations result in no ß-globin being produced, while other mutations result in a decreased amount of ß-globin being produced.

*Our Approach to Address the Root Cause of ß-Thalassemia*

We believe that some types of ß-thalassemia may be treated by a therapy that upregulates HbF. Babies born with ß-thalassemia major generally do not have any symptoms shortly after birth because they have HbF in their blood. As the HbF levels decrease after birth and the ß-globin fails to increase, anemia appears and the babies with ß-thalassemia begin to exhibit symptoms of the disease. Patients with ß-thalassemia intermedia that have higher levels of HbFhave fewer symptoms than patients with low levels of HbF. We believe that FTX-6058 may be suitable for clinical development for the treatment of patients who are not $ß^0$ but who are transfusion dependent.

*FulcrumSeek Identified the Drug Target for SCD and ß-Thalassemia*

Applying FulcrumSeek, we conducted target identification and validation activities using human umbilical cord blood-derived erythroid progenitor 2, or HUDEP2, cells as a model to study HbF reactivation. HUDEP2 cells are immature RBCs. By screening our small molecule probe library and a CRISPR library, we identified several potential drug targets that activated the *HBG1/2* genes and resulted in HbF elevation. Each screening approach identified the same protein complex which we believe plays an important role in the expression of genes responsible for the production of HbF. We conducted additional validation experiments in which we observed that inhibition of several components of this complex resulted in the desired elevation of HbF. We also observed that inhibition of these components did not adversely affect important cell health markers.

We selected a member of this protein complex for drug discovery activities following an assessment of its tractability as a drug target, which we refer to as the HbF drug target. The normal physiological role of the HbF drug target is to facilitate a post-translational protein modification, and the goal of our medicinal chemistry program was to optimize inhibitors of the HbF drug target. We developed *in vitro* and *in vivo* target engagement assays, as well as enabled X-ray crystallography, to discover and develop FTX-6058, a novel small molecule inhibitor of the HbF drug target.

*FTX-6058*

FTX-6058 is an oral HbF inducer that is in development for SCD and select other hemoglobinopathies, including ß-thalassemia. FTX-6058 is designed to bind to EED and inhibit the transcriptional silencing activity of the PRC2. By doing so, preclinical studies have shown that FTX-6058 downregulates key HbF repressors, including BCL11A and MYB, and upregulates HbF. We initiated our Phase 1b clinical trial of FTX-6058 in people with SCD in the fourth quarter of 2021. Additionally, we submitted an IND in the fourth quarter of 2021 for FTX-6058 in other select hemoglobinopathies, including ß-thalassemia, and expect to initiate a Phase 1b study in the second quarter of 2022. In February 2022, the FDA granted orphan drug designation to FTX-6058 for the treatment of SCD.

*Clinical Trial: Phase 1 FTX-6058*

In the fourth quarter of 2020, we initiated a Phase 1 clinical trial of FTX-6058 in healthy adult volunteers. The Phase 1 randomized, double-blind, placebo-controlled trial was designed to evaluate the safety, tolerability, and PK of ascending doses of FTX-6058. In the SAD cohorts, healthy volunteers received one dose of either placebo or 2, 4, 10, 20, 30, 40 or 60mg of FTX-6058. In the MAD cohorts, healthy volunteers received a once-daily dose of placebo or 2, 6, 10, 20 or 30mg of FTX-6058 for 14 consecutive days. Each MAD cohort had six subjects on drug and two on placebo. Food effect was also studied in a separate 20mg dose cohort. Exploratory measures were included in the MAD cohorts to assess target engagement, changes in HBG mRNA and HbF-containing reticulocytes (F-reticulocytes). A 6mg dose cohort in people with SCD was later added to this trial to further inform PK and PD modeling for future dose selection. All other cohorts in the trial have been completed.

17

We reported data from the 2, 4, 10, 20, 30 and 40mg SAD cohorts and the 2, 6 and 10 mg MAD cohorts in healthy volunteers in August 2021, and we reported data from the 60 mg SAD cohort and the 20 and 30 mg MAD cohorts in healthy volunteers, as well as data from the 20 mg cohort assessing food effect in December 2021.

FTX-6058 was generally well-tolerated with no SAEs reported and no discontinuations due to TEAEs across all SAD and MAD cohorts. Data continued to show dose-proportional PK, with a mean half-life of approximately 6-7 hours in the MAD cohorts, supporting once-daily dosing, and no food effect was observed with FTX-6058. Data from the MAD cohorts continued to show robust target engagement, as evidenced by an approximately 75-95% reduction from baseline in H3K27me3 after 14 days of treatment. Based on our preclinical studies, this level of target engagement is predicted to result in robust induction of *HBG1/2* and subsequently increase HbF production.

Data from the MAD cohorts also showed time- and dose-dependent HBG mRNA induction, as shown in the chart below, demonstrating proof-of-biology. Persistent HBG mRNA induction was observed for 7-10 days after treatment. In preclinical studies of FTX-6058, increases in HBG mRNA have consistently translated to the same fold increases in HbF protein. Notably, human genetics show that 2-3-fold increases in HbF are associated with significantly improved outcomes, and even functional cures, in people with SCD. FTX-6058 has now demonstrated greater than a mean 2-fold induction starting with the 6mg dose.

HBG mRNA Mean Fold Induction for FTX-6058 versus Placebo

|  | 2mg* | | 6mg* | | 10mg* | | 20 mg | | 30mg | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | Mean Fold Induction | P-value | Mean Fold Induction | P-value | Mean Fold Induction | P-value | Mean Fold Induction | P-value | Mean Fold Induction | P-value |
| Day 7 | 1.28 | 0.3494 | 1.94 | 0.0135 | 2.08 | 0.0063 | 2.06 | 0.0072 | 2.29 | 0.0025 |
| Day 14 | 1.20 | 0.5122 | 2.45 | 0.0025 | 3.54 | <0.0001 | 5.63 | <0.0001 | 6.15 | <0.0001 |
| Safety Follow-up (Day 21-24) | 1.21 | 0.3736 | 2.75 | <0.0001 | 3.22 | <0.0001 | 6.45 | <0.0001 | 6.13 | <0.0001 |

As shown in the chart below, F-reticulocytes also increased as of the safety follow up visit, which was seven to 10 days after conclusion of dosing. Notably, increases in F-reticulocytes of any magnitude are a first indicator that HBG mRNA is translating to HbF protein production but fold changes in F-reticulocytes are not correlated with fold changes in HbF.

F-Reticulocyte Mean Fold Increase for FTX-6058 versus Placebo

|  | 2mg* | | 6mg* | | 10mg* | | 20 mg | | 30mg | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | Mean Fold Increase | P-value | Mean Fold Increase | P-value | Mean Fold Increase | P-value | Mean Fold Increase | P-value | Mean Fold Increase | P-value |
| Day 7 | 0.53 | 0.1070 | 1.02 | 0.9524 | 0.83 | 0.6214 | 0.71 | 0.3831 | 1.50 | 0.2928 |
| Day 14 | 0.88 | 0.6881 | 1.25 | 0.4895 | 2.23 | 0.0180 | 1.00 | 0.9880 | 1.71 | 0.1049 |
| Safety Follow-up (Day 21-24) | 0.63 | 0.2167 | 1.65 | 0.0943 | 3.93 | <0.0001 | 1.79 | 0.0591 | 2.38 | 0.0059 |

* Fold changes from these cohorts were updated to reflect the fold-increase over pooled placebo data across all cohorts from 2-30mg versus previously reported fold changes over pooled placebo data across 2-10mg cohorts.

In fourth quarter of 2021, we initiated a Phase 1b clinical trial in SCD patients and we expect to report initial data from that trial in the second quarter of 2022. This trial could provide an opportunity to demonstrate HbF protein induction in people living with SCD and will be used to help inform a potential Phase 2/3 trial, which we anticipate initiating in 2023. We also submitted an IND in the fourth quarter of 2021 to support the initiation of clinical development in non-SCD hemoglobinopathies, including ß-thalassemia. We anticipate initiating a Phase 1b trial in non-SCD hemoglobinopathies in the second quarter of 2022.

*Preclinical Studies*

We have observed *in vitro* and *in vivo* activation of the *HBG1/2* genes in preclinical studies with FTX-6058. We observed that FTX-6058 elevated levels of HbF with minimal adverse effects on important cellular health markers. As

18

depicted in the graphic below, we also observed *in vitro* upregulation of HbF in primary human CD34+ cells differentiated into RBCs from five different healthy human donors and one SCD donor after seven days of drug treatment. FTX-6058 showed a significant elevation of HbF over baseline in each of these six donor cell lines. We have conducted additional preclinical profiling in CD34+ derived cells and observed that treatment with FTX-6058 increased HbF levels to approximately 30% of total hemoglobin, as measured by mass spectrometry, high performance liquid chromatography, and fast protein liquid chromatography techniques. Notably, based on a review of data from other mechanisms, HbF fold induction in CD34+ cells has translated reliably into the clinic.

**Effect of FTX-6058 treatment**
**in differentiated primary human CD34+ cells**



Additionally, we compared the effect of FTX-6058 in CD34+ derived cells relative to that of hydroxyurea. We observed that hydroxyurea had a minimal impact on HbF elevation, whereas we observed that FTX-6058 significantly elevated HbF. In cells treated with the combination of FTX-6058 and hydroxyurea, we observed an increased effect relative to either compound alone.

Additionally, we studied FTX-6058 in a mouse model of SCD, known as the Townes mouse model. In this model, mouse globin genes have been replaced with human globin genes, thereby allowing investigations of mechanisms that may regulate human hemoglobin gene expression. The Townes mouse model has been widely used to study potential treatments for SCD. As shown in the figures below, we observed that FTX-6058 resulted in a significant increase in HbFexpressing cells, or F-cells, and HbF protein levels after 13 days of dosing at 5 mg/kg once per day whereas hydroxyurea resulted in modest increases in F-cells and HbF.

**Percentage of F-cells in Townes mice**
**treated with FTX-6058**



**HbF protein levels in Townes mice**
**treated with FTX-6058**



In the graphic on the left, we quantified the percentage of F-cells as a percentage of total cells (%F-cells) for the three treatment conditions from mouse blood, shown as a percentage of vehicle-alone-treated SCD mice. In the graphic on the right, we determined the level of human HbF protein for the three treatment conditions, quantifying HbF protein as a

19

percentage of total hemoglobin. Each value represents the mean value from eight mice per treatment after 13 days of treatment. In these studies, we used a conventional method of assessing statistical significance known as a one-way analysis of variance, or ANOVA. The p-value for FTX-6058 was less than 0.001 for both studies and the p-value for hydroxyurea in the study depicted on the right was less than 0.01.

*Overview of Our Product Engine*

FulcrumSeek is a high-throughput discovery platform that we designed to identify and validate drug targets that balance the expression of the genes known to drive or ameliorate root cause biology. We obtain patient-derived, tissue-relevant cell lines or other relevant human cell lines. We then differentiate these cell lines into those most relevant for the disease pathology, including skeletal muscle myotubes, cardiomyocytes, neurons, RBCs, or other cell lines of interest, which we then scale up, characterize and prepare for screening. We also generate methods to quantify the desired modulation of expression of the gene of interest in these cell lines. We apply our highly annotated proprietary small-molecule compound library and customized CRISPR or RNAi libraries to the cells to assess for the desired modulation. We have continued to build our capabilities to maximally profile changes in transcription that occur when relevant cells are treated with small molecules or genetic reagents. In addition to profiling a specific gene of interest, we can evaluate multiple genes of potential interest through multiplexed transcriptome profiling to assess effects on root cause biology. We have made significant enhancements to FulcrumSeek so thousands of transcripts can be measured, and additional features of cellular health and function can be assessed using high-throughput imaging techniques. We confirm drug target hits with multiple modalities and undertake further validation in several patient-derived, tissue-relevant cell lines. Additional studies in these cell models are conducted to understand how the modulation of the gene of interest affects cellular function. We employ computational biology, such as machine learning algorithms, to guide drug target selection and generate hypotheses on other drug targets that might be related along a gene regulatory pathway.

To further optimize and increase productivity of FulcrumSeek, we have continued to invest in customized lab automation and applied technologies. We believe that these investments have increased assay throughput and robustness and have expanded the breadth of biological parameters we can effectively measure in our assay systems. The first-generation of our product engine was focused on single gene readouts, simple immunocytochemistry, and one-dimensional data analysis focused on an individual gene of interest. With continued investment in the product engine, we have enabled our next-generation product engine which utilizes RNAseq, high-content imaging, and machine learning. We believe that this next-generation product engine enables drug target screening at scale in physiologically relevant assay systems.

We designed our discovery and development model to recapitulate this systematic approach of applying FulcrumSeek to each new disease that we evaluate with the goal of providing disease-modifying therapies to patients. The following graphic presents an overview of our drug target identification process.



20

In addition to patent protection, we rely upon unpatented trade secrets and confidential know-how and continuing technological innovation to develop and maintain our competitive position. However, trade secrets and confidential know-how are difficult to protect. We seek to protect our proprietary information, in part, using confidentiality agreements with any collaborators, scientific advisors, employees and consultants and invention assignment agreements with our employees. We also have agreements requiring assignment of inventions with selected consultants, scientific advisors and collaborators. These agreements may not provide meaningful protection. These agreements may also be breached, and we may not have an adequate remedy for any such breach. In addition, our trade secrets and/or confidential know-how may become known or be independently developed by a third party, or misused by any collaborator to whom we disclose such information. Despite any measures taken to protect our intellectual property, unauthorized parties may attempt to copy aspects of our products or to obtain or use information that we regard as proprietary. Although we take steps to protect our proprietary information, third parties may independently develop the same or similar proprietary information or may otherwise gain access to our proprietary information. As a result, we may be unable to meaningfully protect our trade secrets and proprietary information. See "Risk Factors—Risks Related to our Intellectual Property" for a more comprehensive description of risks related to our intellectual property.

## Manufacturing

We do not have any manufacturing facilities. We have obtained sufficient losmapimod tablets, or drug product, from GSK to complete our ongoing Phase 2 clinical trials in FSHD. We have engaged a contract manufacturing organization to prepare our own API and to manufacture losmapimod tablets, and we believe that we have produced a sufficient quantity of losmapimod API and tablets to complete our planned Phase 3 clinical trial in FSHD.

We have obtained sufficient quantities of FTX-6058 from a contract manufacturing organization to complete our ongoing Phase 1 clinical trials.

We expect to continue to rely on third parties for the manufacture of FTX-6058 for any future clinical trials and for the manufacture of any future product candidates for preclinical and clinical testing, as well as for commercial manufacture if our product candidates receive marketing approval. Our lead product candidates are small molecules and can be manufactured in reliable and reproducible synthetic processes from readily available starting materials. We expect to continue to develop product candidates that can be produced cost-effectively at contract manufacturing facilities.

## Competition

The biotechnology and pharmaceutical industries are characterized by rapidly advancing technologies, intense competition and a strong emphasis on proprietary products. While we believe that our technologies, knowledge, experience and scientific resources provide us with competitive advantages, we face competition from many different sources, including major pharmaceutical, specialty pharmaceutical and biotechnology companies, academic institutions and governmental agencies and public and private research institutions. Any product candidates that we successfully develop and commercialize will compete with existing therapies and new therapies that may become available in the future.

Many of the companies against which we are competing or against which we may compete in the future have significantly greater financial resources and expertise in research and development, manufacturing, preclinical testing, conducting clinical trials, obtaining regulatory approvals and marketing approved products than we do. Mergers and acquisitions in the pharmaceutical and biotechnology industry may result in even more resources being concentrated among a smaller number of our competitors. Smaller or early stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large and established companies. These competitors also compete with us in recruiting and retaining qualified scientific and management personnel and establishing clinical trial sites and patient registration for clinical trials, as well as in acquiring technologies complementary to, or necessary for, our programs.

The key competitive factors affecting the success of all of our therapeutic product candidates, if approved, are likely to be their efficacy, safety, convenience, price, the effectiveness of companion diagnostics in guiding the use of related therapeutics, the level of generic competition and the availability of reimbursement from government and other third-party payors.

Our commercial opportunity could be reduced or eliminated if our competitors develop and commercialize products that are safer, more effective, have fewer or less severe side effects, are more convenient or are less expensive than any products that we may develop. Our competitors also may obtain FDA or other regulatory approval or emergency use authorizations for their products more rapidly than we may obtain approval for ours, which could result in our competitors establishing a strong market position before we are able to enter the market. In addition, our ability to compete may be affected in many cases by insurers or other third-party payors seeking to encourage the use of generic products. If our product

candidates achieve marketing approval, we expect that they will be priced at a significant premium over competitive generic products.

If our lead product candidates are approved for the indications for which we are currently undertaking clinical trials, they will compete with the therapies and currently marketed drugs discussed below.

### FSHD

There are no approved therapies for the treatment of FSHD. Controlled trials of albuterol, corticosteroids and a myostatin inhibitor all failed to demonstrate a clinical benefit to patients with FSHD. Low-intensity aerobic exercise tailored to the patient's distribution of weakness may provide some limited beneficial effect. Limited range of motion in the shoulder girdle can stem from periscapular muscle weakness, and in such cases surgical scapular fixation can result in some functional improvement for certain patients. There is also no standard practice regarding the use of physical or occupational therapy across countries and sites.

We are not aware of any product candidate currently in clinical development for FSHD with the same mechanism of action as losmapimod or that is designed to treat the root cause of FSHD.

### SCD

Approved drug treatments for SCD focus primarily on the management and reduction of pain episodes, vaso-occlusive crises, and inhibition of hemoglobin S polymerization. The four drug treatments approved in the United States are hydroxyurea, voxelotor, crizanlizumab, and L-glutamine. Hydroxyurea, marketed by Bristol-Myers Squibb Company, is approved for the treatment of anemia related to SCD, to reduce the frequency of painful crises and the need for blood transfusions. Voxelotor, marketed by Global Blood Therapeutics, is approved under accelerated approval as a hemoglobin polymerization inhibitor. Crizanlizumab, marketed by Novartis, is approved for the reduction in the frequency of vasoocclusive crises. L-glutamine, marketed by Emmaus Life Sciences, Inc., is approved to reduce severe complications associated with the disorder.

Blood transfusions can be utilized to decrease the sickling of RBCs. While blood transfusions can be critically important to the management of SCD, there are a number of limitations associated with this therapeutic approach, including limited patient access and serious complications such as iron overload. The only potentially curative treatment currently approved for severe SCD is bone marrow transplantation. However, this treatment option is not commonly used given the difficulties of finding a suitable matched donor and the risks associated with the treatment, which include an approximately 5% mortality rate. Bone marrow transplantation is more commonly offered to pediatric patients with available sibling-matched donors.

FTX-6058 could face competition from a number of different therapeutic approaches in development for patients with SCD. Novo Nordisk A/S is evaluating EPI01, a small molecule designed to increase production of HbF, which has completed a Phase 1 clinical trial. Imara, Inc. is evaluating IMR-687, a PDE9 inhibitor, in Phase 2a and Phase 2b clinical trials in patients with sickle cell anemia. Agios Pharmaceuticals, Inc., is evaluating mitapivat, a PKR activator, in a Phase 2/3 clinical trial in patients with SCD. Forma Therapeutics Holdings, Inc., is evaluating FT-4202, a PKR activator, in a Phase 2/3 clinical trial. Global Blood Therapeutics, Inc. is evaluating GBT-601, an HbS polymerization inhibitor, that is anticipated to initiate a Phase 2 study by mid-2022 as well as inclacumab, a P-selectin inhibitor that is being evaluated in two Phase 3 trials. Takeda Pharmaceutical Company Limited, is evaluating TAK-755, recombinant ADAMTS13 protein, in a Phase 1 clinical trial in participants with baseline health SCD and SCD with acute vaso-occlusive crisis. Pfizer, is evaluating PF-06755347, an E-selectin antagonist, in a Phase 1 clinical trial. CRISPR Therapeutics AG (in collaboration with Vertex Pharmaceuticals Incorporated, or Vertex), is evaluating CTX001, a gene therapy, in a Phase 1/2/3 clinical trial. CRISPR Therapeutics AG and Vertex plan to file a BLA/MAA in Q4 2022. Aruvant Sciences, Inc. is evaluating ARU-1801, a gene therapy, in a Phase 1/2 clinical trial. CSL Behring, is evaluating CSL200 CAL-H, a gene therapy, in a Phase 1 clinical trial. Sangamo Therapeutics Inc., or Sangamo is developing SAR445136, a gene editing cell therapy that modifies cells to produce functional RBCs using HbF, in a Phase 1/2 clinical trial. bluebird is evaluating lovo-cel, a gene therapy, in a Phase 3 clinical trial. There are also several other gene editing approaches being evaluated by Intellia Therapeutics, Inc. (in collaboration with Novartis), Editas Medicine, Inc., and Beam Therapeutics.

### ß-thalassemia

The current standard of care for many patients with ß-thalassemia is frequent blood transfusions to manage anemia. The only potentially curative therapy for ß-thalassemia is allogeneic hematopoietic stem cell transplant, which is associated with risks of complications, including mortality, and is limited to patients with a suitable donor. The European Commission

granted conditional marketing authorization for ZYNTEGLO, a gene therapy developed by bluebird, for the treatment of adult and adolescent patients with transfusion-dependent ß-thalassemia and with certain genotypes, in Europe in June 2019. However, in August 2021, bluebird announced plans to end commercial operations in Europe and has decided to focus on the U.S. market. The FDA accepted the BLA for betibeglogene autotemcel for priority review in November 2021, with a PDUFA goal date of May 20, 2022. Acceleron in collaboration with Celgene, received FDA and EMA approval for luspatercept, an erythroid maturation agent for the treatment of adult patients with anemia associated with ß-thalassemia and who require frequent transfusions. There are also multiple other experimental approaches to treat ß-thalassemia being explored in clinical trials, including approaches that use small molecule, gene therapy and gene editing approaches. Despite ongoing efforts to develop new therapies for ß-thalassemia, we believe there is still a high unmet need that could be addressed by a small molecule, oral therapy to treatment the disease by increasing HbF.

FTX-6058 could face competition from a number of different therapeutic approaches in development for patients with transfusion-dependent ß-thalassemia.

Bellicum Pharmaceuticals, Inc. is conducting a Phase 1/2 clinical trial to evaluate a modified donor T cell therapy to be used in conjunction with hematopoietic stem cell transplant Imara, Inc. is evaluating IMR-687, a PDE9 inhibitor, in a Phase 2b clinical trial in patients with ß-thalassemia. Agios Pharmaceuticals, Inc., intends to evaluate mitapivat, a PKR activator, in two Phase 3 clinical trials planned for 2021 in patients with non-transfusion dependent and transfusion-dependent ß-thalassemia. Forma Therapeutics Holdings, Inc., intends to evaluate FT-4202, a PKR activator, in a Phase 2 clinical trial in non-transfusion and transfusion-dependent ß-thalassemia. Ionis Pharmaceuticals, Inc., is evaluating IONIS TMPRSS6-LRx, an ASO therapy targeting TMPRSS6, in a Phase 2 clinical trial of non-transfusion dependent β-thalassemia intermedia. Silence Therapeutics is investigating SLN124, an siRNA therapy targeting TMPRSS6, in a Phase 1 healthy volunteer study. Orchard Therapeutics plc is conducting Phase 2 clinical trials of OTL-300, an autologous *ex vivo* gene therapy for the treatment of transfusion-dependent ß-thalassemia. Sangamo, is conducting a Phase 1/2 clinical trial of ST-400, which uses a genome-edited cell therapy approach designed to produce functional RBCs using HbF. CRISPR Therapeutics AG, in collaboration with Vertex, is conducting a Phase 1/2 clinical trial of CTX001, which uses a gene editing approach to upregulate the expression of HbF, in patients with transfusion-dependent ß-thalassemia. CRISPR Therapeutics AG and Vertex plan to file a BLA/MAA in Q4 2022.

## Government Regulation and Product Approvals

Government authorities in the United States at the federal, state and local level, and in other countries and jurisdictions, including the European Union, extensively regulate, among other things, the research, development, testing, manufacture, pricing, reimbursement, quality control, approval, packaging, storage, recordkeeping, labeling, advertising, promotion, distribution, marketing, post-approval monitoring and reporting, and import and export of biopharmaceutical products. The processes for obtaining marketing approvals in the United States and in foreign countries and jurisdictions, along with compliance with applicable statutes and regulations and other regulatory authorities, require the expenditure of substantial time and financial resources.

### *Approval and Regulation of Drugs in the United States*

In the United States, drug products are regulated under the Federal Food, Drug and Cosmetic Act, or FDCA, and applicable implementing regulations and guidance. The failure of an applicant to comply with the applicable regulatory requirements at any time during the product development process, including non-clinical testing, clinical testing, the approval process or post-approval process, may result in delays to the conduct of a study, regulatory review and approval and/or administrative or judicial sanctions.

An applicant seeking approval to market and distribute a new drug in the United States generally must satisfactorily complete each of the following steps before the product candidate will be approved by the FDA:

- preclinical testing including laboratory tests, animal studies and formulation studies, which must be performed in accordance with the FDA's good laboratory practice, or GLP, regulations and standards;

- submission to the FDA of an IND for human clinical testing, which must become effective before human clinical trials may begin;

- approval by an independent institutional review board, or IRB, representing each clinical site before each clinical trial may be initiated;

- performance of adequate and well-controlled human clinical trials to establish the safety, potency and purity of the product candidate for each proposed indication, in accordance with current good clinical practices, or GCP;

30

- preparation and submission to the FDA of a new drug application, or NDA, for a drug product which includes not only the results of the clinical trials, but also, detailed information on the chemistry, manufacture and quality controls for the product candidate and proposed labelling for one or more proposed indication(s);

- review of the product candidate by an FDA advisory committee, where appropriate or if applicable;

- satisfactory completion of an FDA inspection of the manufacturing facility or facilities, including those of third parties, at which the product candidate or components thereof are manufactured to assess compliance with current good manufacturing practices, or cGMP, requirements and to assure that the facilities, methods and controls are adequate to preserve the product's identity, strength, quality and purity;

- satisfactory completion of any FDA audits of the non-clinical and clinical trial sites to assure compliance with GCP and the integrity of clinical data in support of the NDA;

- payment of user fees and securing FDA approval of the NDA to allow marketing of the new drug product; and

- compliance with any post-approval requirements, including the potential requirement to implement a Risk Evaluation and Mitigation Strategy, or REMS, and the potential requirement to conduct any post-approval studies required by the FDA.

*Preclinical Studies*

Before an applicant begins testing a product candidate with potential therapeutic value in humans, the product candidate enters the preclinical testing stage, including *in vitro* and animal studies to assess the safety and activity of the drug for initial testing in humans and to establish a rationale for therapeutic use. Preclinical tests include laboratory evaluations of product chemistry, formulation and stability, as well as other studies to evaluate, among other things, the toxicity of the product candidate. The conduct of the preclinical tests and formulation of the compounds for testing must comply with federal regulations and requirements, including GLP regulations and standards. The results of the preclinical tests, together with manufacturing information, analytical data, any available clinical data or literature and plans for clinical trials, among other things, are submitted to the FDA as part of an IND. Some long-term preclinical testing, such as animal tests of reproductive adverse events and carcinogenicity and long-term toxicity studies may continue after the IND is submitted.

*The IND and IRB Processes*

Clinical trials involve the administration of the investigational product to human subjects under the supervision of qualified investigators in accordance with GCP requirements, which include, among other things, the requirement that all research subjects provide their voluntary informed consent in writing before their participation in any clinical trial. Clinical trials are conducted under written study protocols detailing, among other things, the inclusion and exclusion criteria, the objectives of the study, the parameters to be used in monitoring safety and the effectiveness criteria to be evaluated. A protocol for each clinical trial and any subsequent protocol amendments must be submitted to the FDA as part of the IND.

An IND is an exemption from the FDCA that allows an unapproved product candidate to be shipped in interstate commerce for use in an investigational clinical trial and a request for FDA authorization to administer such investigational product to humans. Such authorization must be secured prior to interstate shipment and administration of any product candidate that is not the subject of an approved NDA. In support of a request for an IND, applicants must submit a protocol for each clinical trial, and any subsequent protocol amendments must be submitted to the FDA as part of the IND. The FDA requires a 30-day waiting period after the filing of each IND before clinical trials may begin. This waiting period is designed to allow the FDA to review the IND to determine, among other things, whether human research subjects will be exposed to unreasonable health risks. At any time during this 30-day period, the FDA may raise concerns or questions about the conduct of the trials as outlined in the IND and impose a clinical hold or partial clinical hold. In these cases, the IND sponsor and the FDA must resolve any outstanding concerns before clinical trials can begin.

Following commencement of a clinical trial under an IND, the FDA may also place a clinical hold or partial clinical hold on that trial. Clinical holds are imposed by the FDA whenever there is concern for patient safety and may be a result of new data, findings, or developments in clinical, nonclinical, and/or chemistry, manufacturing, and controls areas. A clinical hold is an order issued by the FDA to the sponsor to delay a proposed clinical investigation or to suspend an ongoing investigation. A partial clinical hold is a delay or suspension of only part of the clinical work requested under the IND. For example, a specific protocol or part of a protocol may not be allowed to proceed, while other protocols may be allowed. No more than 30 days after imposition of a clinical hold or partial clinical hold, the FDA will provide the sponsor a written explanation of the basis for the hold. Following issuance of a clinical hold or partial clinical hold, a clinical trial may only

31

resume after the FDA has so notified the sponsor. The FDA will base that determination on information provided by the sponsor correcting the deficiencies previously cited or otherwise satisfying the FDA that the clinical trial can proceed.

A sponsor may choose, but is not required, to conduct a foreign clinical study under an IND. When a foreign clinical study is conducted under an IND, all FDA IND requirements must be met unless waived. When a foreign clinical study is not conducted under an IND, the sponsor must ensure that the study complies with certain regulatory requirements, including GCP requirements, of the FDA in order to use the study as support for an IND or application for marketing approval. The GCP requirements encompass both ethical and data integrity standards for clinical studies. The FDA's regulations are intended to help ensure the protection of human subjects enrolled in non-IND foreign clinical studies, as well as the quality and integrity of the resulting data. They further help ensure that non-IND foreign studies are conducted in a manner comparable to that required for IND studies.

In addition to the foregoing IND requirements, an IRB representing each institution participating in the clinical trial must review and approve the plan for any clinical trial before it commences at that institution, and the IRB must conduct continuing review and reapprove the study at least annually. The IRB must review and approve, among other things, the study protocol and informed consent information to be provided to study subjects. An IRB must operate in compliance with FDA regulations. An IRB can suspend or terminate approval of a clinical trial at its institution, or an institution it represents, if the clinical trial is not being conducted in accordance with the IRB's requirements, the protocol, or other requirements or if the product candidate has been associated with unexpected serious harm to patients.

Additionally, some trials are overseen by an independent group of qualified experts organized by the trial sponsor, known as a data safety monitoring board or committee. This group provides authorization as to whether or not a trial may move forward at designated check points based on access that only the group maintains to available data from the study.

Suspension or termination of development during any phase of clinical trials can occur for many reasons, including if the FDA, an IRB, a data safety monitoring board, or we determine that the participants or patients are being exposed to an unacceptable health risk. Other reasons for suspension or termination may be made by us based on factors such as evolving business objectives and/or the competitive environment.

Information about clinical trials must be submitted within specific timeframes to the NIH for public dissemination on its ClinicalTrials.gov website. Similar requirements for posting clinical trial information are present in the European Union (EudraCT) website: https://eudract.ema.europa.eu/ and other countries, as well.

*Expanded Access to an Investigational Drug for Treatment Use*

Expanded access, sometimes called "compassionate use," is the use of investigational new drug products outside of registrational clinical trials to treat patients with serious or immediately life-threatening diseases or conditions when there are no comparable or satisfactory alternative treatment options. The rules and regulations related to expanded access are intended to improve access to investigational drugs for patients who may benefit from investigational therapies that do not conflict with registrational trials. FDA regulations allow access to investigational drugs under an IND by the company or the treating physician for treatment purposes on a case-by-case basis for: individual patients (single-patient IND applications for treatment in emergency settings and non-emergency settings); intermediate-size patient populations; and larger populations for use of the drug under a treatment protocol or Treatment IND Application.

When considering an IND application for expanded access to an investigational product, the FDA will determine suitability when all of the following criteria apply: patient(s) have a serious or immediately life-threatening disease or condition, and there is no comparable or satisfactory alternative therapy to diagnose, monitor, or treat the disease or condition; the potential patient benefit justifies the potential risks of the treatment and the potential risks are not unreasonable in the context or condition to be treated; and the expanded use of the investigational drug for the requested treatment will not interfere with the initiation, conduct, or completion of clinical investigations that could support marketing approval of the product or otherwise compromise the potential development of the product.

There is no obligation for a sponsor to make its drug products available for expanded access; however, sponsor must make its expanded access policy publicly available upon the earlier of initiation of a Phase 2 or Phase 3 clinical trial; or 15 days after the drug or biologic receives designation as a breakthrough therapy, fast track product, or regenerative medicine advanced therapy.

32

*Human Clinical Trials in Support of an NDA*

Clinical trials involve the administration of the investigational product candidate to human subjects under the supervision of a qualified investigator in accordance with GCP requirements, which include, among other things, the requirement that all research subjects provide their informed consent in writing before their participation in any clinical trial. Clinical trials are conducted under written clinical trial protocols detailing, among other things, the objectives of the study, inclusion and exclusion criteria, the parameters to be used in monitoring safety and the effectiveness criteria to be evaluated.

Human clinical trials are typically conducted in three sequential phases, but the phases may overlap or be combined. Additional studies may also be required after approval.

*Phase 1* clinical trials are initially conducted in a limited population to test the product candidate for safety, including adverse effects, dose tolerance, absorption, metabolism, distribution, excretion and pharmacodynamics in healthy humans or in patients. During Phase 1 clinical trials, information about the investigational drug product's PK and pharmacological effects may be obtained to permit the design of scientifically valid Phase 2 clinical trials.

*Phase 2* clinical trials are generally conducted in a limited patient population to identify possible adverse effects and safety risks, evaluate the efficacy of the product candidate for specific targeted indications and determine dose tolerance and optimal dosage. Multiple Phase 2 clinical trials may be conducted by the sponsor to obtain information prior to beginning larger and more costly Phase 3 clinical trials. Phase 2 clinical trials are well controlled, closely monitored and conducted in a limited patient population.

*Phase 3* clinical trials proceed if the Phase 2 clinical trials demonstrate that a dose range of the product candidate is potentially effective and has an acceptable safety profile. Phase 3 clinical trials are undertaken within an expanded patient population to further evaluate dosage, provide substantial evidence of clinical efficacy and further test for safety in an expanded and diverse patient population at multiple, geographically dispersed clinical trial sites. A well-controlled, statistically robust Phase 3 clinical trial that is designed to deliver the data that regulatory authorities will use to decide whether or not to approve, and, if approved, how to appropriately label a drug, is referred to as "pivotal."

In some cases, the FDA may approve an NDA for a product candidate but require the sponsor to conduct additional clinical trials to further assess the product candidate's safety and effectiveness after approval. Such post-approval trials are typically referred to as Phase 4 clinical trials. These studies are used to gain additional experience from the treatment of a larger number of patients in the intended treatment group.

IND annual reports detailing, among other things, the results of the clinical trials must be submitted to the FDA and IND safety reports must be submitted to the FDA for any of the following: serious and unexpected suspected adverse reactions; findings from other studies or animal or *in vitro* testing that suggest a significant risk in humans exposed to the product; and any clinically important increase in the case of a serious suspected adverse reaction over that listed in the protocol or investigator brochure. Phase 1, Phase 2 and Phase 3 clinical trials may not be completed successfully within any specified period, or at all. The FDA will typically inspect one or more clinical sites to assure compliance with GCP and the integrity of the clinical data submitted.

Concurrent with clinical trials, companies often complete additional animal studies. They must also develop additional information about the chemistry and physical characteristics of the drug as well as finalize a process for manufacturing the product in commercial quantities in accordance with cGMP requirements. The manufacturing process must be capable of consistently producing quality batches of the drug candidate and, among other things, must develop methods for testing the identity, strength, quality, purity, and potency of the final drug. Additionally, appropriate packaging must be selected and tested and stability studies must be conducted to demonstrate that the drug candidate does not undergo unacceptable deterioration over its shelf life.

*Pediatric Studies*

Under the Pediatric Research Equity Act of 2003, or PREA, an NDA or supplement thereto must contain data that are adequate to assess the safety and effectiveness of the product for the claimed indications in all relevant pediatric subpopulations and to support dosing and administration for each pediatric subpopulation for which the product is safe and effective. Sponsors must also submit pediatric study plans that contain an outline of the proposed pediatric study or studies the applicant plans to conduct, including study objectives and design, any deferral or waiver requests and other information required by regulation. The applicant, the FDA, and the FDA's internal review committee must then review the information submitted, consult with each other and agree upon a final plan. The FDA or the applicant may request an amendment to the plan at any time.

The FDA may, on its own initiative or at the request of the applicant, grant deferrals for submission of some or all pediatric data until after approval of the product for use in adults, or grant full or partial waivers from the pediatric data

33

requirements. The FDA maintains a list of diseases that are exempt from the requirements of PREA, due to low prevalence of disease in the pediatric population, and product candidates that have received orphan drug designation are generally exempt from PREA requirements, although orphan-designated drugs intended for treatment of certain molecularly targeted cancer indications are not eligible for the exemption.

*Review and Approval of an NDA*

In order to obtain approval to market a drug product in the United States, a marketing application must be submitted to the FDA that provides sufficient data establishing the safety and effectiveness of the proposed drug product for its intended indication. The application includes all relevant data available from pertinent preclinical and clinical trials, including negative or ambiguous results as well as positive findings, together with detailed information relating to the product's chemistry, manufacturing, controls and proposed labeling, among other things. Data can come from company-sponsored clinical trials intended to test the safety and effectiveness of a use of a product, or from a number of alternative sources, including studies initiated by independent investigators. To support marketing approval, the data submitted must be sufficient in quality and quantity to establish the safety, purity and potency of the drug product to the satisfaction of the FDA.

The NDA is a vehicle through which applicants formally propose that the FDA approve a new drug product for marketing and sale in the United States for one or more indications. Every new non-biologic drug product candidate must be the subject of an approved NDA before it may be commercialized in the United States. BLAs are submitted for approval of biologic products. Under federal law, the submission of most NDAs is subject to an application user fee, which for federal fiscal year 2022 is $3,117,218 for an application requiring clinical data. The sponsor of an approved NDA is also subject to an annual program fee, which for fiscal year 2022 is $369,413. Certain exceptions and waivers are available for some of these fees, such as an exception from the application fee for products with orphan designation, an exception from the program fee when the program does not engage in manufacturing the drug during a particular fiscal year and a waiver for certain small businesses.

The FDA conducts a preliminary review of the application, generally within 60 calendar days of its receipt, and strives to inform the sponsor within 74 days whether the application is sufficiently complete to permit substantive review. The FDA may request additional information rather than accept the application for filing. In this event, the application must be resubmitted with the additional information. The resubmitted application is also subject to review before the FDA accepts it for filing. Under certain circumstances, the FDA may determine the application is not sufficiently complete to permit a substantive review and will issue a refuse to file letter. Once the submission is accepted for filing, the FDA begins an in-depth substantive review. The FDA has agreed to specified performance goals in the review process of NDAs. Under that agreement, 90% of applications seeking approval of New Molecular Entities, or NMEs, are meant to be reviewed within ten months from the date on which the FDA accepts the application for filing, and 90% of applications for NMEs that have been designated for Priority Review are meant to be reviewed within six months of the filing date. The review process and the Prescription Drug User Fee Act, or PDUFA, goal date may be extended by the FDA to consider new information or clarification provided by the applicant, to address a deficiency identified by the FDA in the original submission, or for other reasons.

Before approving an application, the FDA typically will inspect the facility or facilities where the product is being or will be manufactured. These pre-approval inspections may cover all facilities associated with an NDA submission, including component manufacturing, finished product manufacturing and control testing laboratories. The FDA will not approve an application unless it determines that the manufacturing processes and facilities are in compliance with cGMP requirements and adequate to assure consistent production of the product within required specifications. Additionally, before approving an NDA, the FDA will typically inspect one or more clinical sites to assure compliance with GCP.

The FDA may refer an application for a novel product to an advisory committee or explain why such referral was not made. Typically, an advisory committee is a panel of independent experts, including clinicians and other scientific experts, that review, evaluate and provide a recommendation as to whether the application should be approved and under what conditions. The FDA is not bound by the recommendations of an advisory committee, but the FDA considers such recommendations carefully when making decisions.

*Fast Track, Breakthrough Therapy, Priority Review*

The FDA has certain programs designed to expedite the development and review of product candidates intended to address an unmet medical need in the treatment of a serious or life-threatening disease or condition. These programs include Fast Track designation, Breakthrough Therapy designation, Priority Review designation and Regenerative Medicine Advanced Therapy designation. Sponsors must request these designations at appropriate points in the development process.

34

The FDA may designate a product for Fast Track review if it is intended, whether alone or in combination with one or more other products, for the treatment of a serious or life-threatening disease or condition and it demonstrates the potential to address unmet medical needs for such a disease or condition. For Fast Track products, sponsors may have greater interaction with the FDA, and the FDA may initiate review of sections of a Fast Track product's application before the application is complete, in a process called rolling review. The sponsor must also provide, and the FDA must approve, a schedule for the submission of the remaining information, and the sponsor must pay applicable user fees. However, the FDA's PDUFA goal for reviewing a Fast Track application does not begin until the last section of the application is submitted. In addition, the Fast Track designation may be withdrawn if the FDA believes that the designation is no longer supported by data emerging in the clinical trial process or for the other reasons.

A product may be designated as a Breakthrough Therapy if it is intended, either alone or in combination with one or more other products, to treat a serious or life-threatening disease or condition and preliminary clinical evidence indicates that the product may demonstrate substantial improvement over existing therapies on one or more clinically significant endpoints, such as substantial treatment effects observed early in clinical development. A product that receives Breakthrough Therapy Designation is eligible for all of the features of Fast Track Designation, and additionally is eligible for intensive guidance throughout the development process and a commitment to involve senior staff.

The FDA may designate a product for Priority Review if it treats a serious condition and, if approved, would provide a significant improvement in safety or effectiveness. The FDA determines, on a case-by-case basis, whether the proposed product represents a significant improvement when compared with other available therapies. Significant improvement may be illustrated by evidence of increased effectiveness in the treatment of a condition, elimination or substantial reduction of a treatment-limiting product reaction, documented enhancement of patient compliance that may lead to improvement in serious outcomes, and evidence of safety and effectiveness in a new subpopulation. A Priority Review designation is intended to direct overall attention and resources to the evaluation of such applications and to shorten the FDA's goal for taking action on a marketing application from ten months to six months.

*Accelerated Approval Pathway*

The FDA may grant accelerated approval to a product for a serious or life-threatening condition that provides meaningful therapeutic advantage to patients over existing treatments based upon a determination that the product has an effect on a surrogate endpoint that is reasonably likely, based on epidemiologic, therapeutic, pathophysiologic, or other evidence, to predict clinical benefit. The FDA may also grant accelerated approval for such a condition when the product has an effect on an intermediate clinical endpoint that can be measured earlier than an effect on irreversible morbidity or mortality, or IMM, and that is reasonably likely to predict an effect on IMM or other clinical benefit, taking into account the severity, rarity or prevalence of the condition and the availability or lack of alternative treatments. Products granted accelerated approval must meet the same statutory standards for safety and effectiveness as those granted traditional approval.

For the purposes of accelerated approval, a surrogate endpoint is a marker, such as a laboratory measurement, radiographic image, physical sign, efficacy biomarker or other measure that is thought to predict clinical benefit but is not itself a measure of clinical benefit. Surrogate endpoints can often be measured more easily or more rapidly than clinical endpoints.

The accelerated approval pathway is most often used in settings in which the course of a disease is long and an extended period of time is required to measure the intended clinical benefit of a product, even if the effect on the surrogate or intermediate clinical endpoint occurs rapidly. The benefit of accelerated approval derives from the potential to receive approval based on surrogate endpoints sooner than possible for trials with clinical or survival endpoints, rather than deriving from any explicit shortening of the FDA approval timeline, as is the case with Priority Review.

The accelerated approval pathway is contingent on a sponsor's agreement to conduct, in a diligent manner, additional post-approval confirmatory studies to verify and describe the product's clinical benefit. As a result, a product candidate approved on this basis is subject to rigorous post-marketing compliance requirements, including the completion of Phase 4 or post-approval clinical trials to confirm the effect on the clinical endpoint. Failure to conduct required post-approval studies, or to confirm a clinical benefit during post-marketing studies, would allow the FDA to initiate expedited proceedings to withdraw approval of the product. In addition, for products being considered for accelerated approval, the FDA generally requires, unless otherwise informed by the Agency, that all advertising and promotional materials intended for dissemination or publication within 120 days of marketing approval be submitted to the agency for review during the pre-approval review period.

**Item 1A. Risk Factors.**

Our future operating results could differ materially from the results described in this Annual Report on Form 10-K due to the risks and uncertainties described below. You should consider carefully the following information about risks below in evaluating our business. If any of the following risks actually occur, our business, financial conditions, results of operations and future growth prospects would likely be materially and adversely affected. In these circumstances, the market price of our common stock would likely decline. In addition, we cannot assure investors that our assumptions and expectations will prove to be correct. Important factors could cause our actual results to differ materially from those indicated or implied by forward-looking statements. See "Cautionary Note Regarding Forward-Looking Statements" on page i of this Annual Report on Form 10-K for a discussion of some of the forward-looking statements that are qualified by these risk factors. Factors that could cause or contribute to such differences include those factors discussed below.

**Risks Related to our Financial Position and Need for Additional Capital**

***We have incurred significant losses since our inception. We expect to incur losses over the next several years and may never achieve or maintain profitability.***

Since inception, we have incurred significant operating losses. Our net loss was $80.8 million for the year ended December 31, 2021 and $70.8 million for the year ended December 31, 2020. As of December 31, 2021, we had an accumulated deficit of $302.5 million. To date, we have funded our operations primarily from the sale of shares of our common stock in public offerings, a private placement, and in "at-the-market" offerings, or the ATM Offering, through issuances of convertible preferred stock, and from upfront payments received under our collaboration and license agreements. We have devoted substantially all of our financial resources and efforts to research and development, including clinical trials and preclinical studies. We are still in the early stages of development of our product candidates, and we have not completed development of any product candidates. We expect to continue to incur significant expenses and operating losses over the next several years. Our net losses may fluctuate significantly from quarter to quarter and year to year. We anticipate that our expenses will increase substantially as we:

- continue our clinical development of losmapimod and FTX-6058;

- continue our ongoing preclinical studies;

- advance clinical-stage product candidates into later stage trials, such as a Phase 3 clinical trial of losmapimod for the treatment of FSHD;

- pursue the discovery of drug targets for other genetically-defined rare diseases and the subsequent development of any resulting product candidates;

- seek regulatory approvals for any product candidates that successfully complete clinical trials;

- scale up our manufacturing processes and capabilities, or arrange for a third party to do so on our behalf, to support our clinical trials of our product candidates and commercialization of any of our product candidates for which we may obtain marketing approval;

- establish a sales, marketing and distribution infrastructure to commercialize any products for which we may obtain regulatory approval;

- acquire or in-license products, product candidates, technologies and/or data referencing rights;

- make any milestone payments to affiliates of GSK, under our right of reference and license agreement with GSK upon the achievement of specified clinical or regulatory milestones;

- maintain, expand, enforce, defend and protect our intellectual property;

- hire additional clinical, quality control and scientific personnel; and

- add operational, financial and management information systems and personnel, including personnel to support our product development and planned future commercialization efforts and our operations as a public company.

To become and remain profitable, we must succeed in developing, and eventually commercializing, a product or products that generate significant revenue. The ability to achieve this success will require us to be effective in a range of challenging activities, including completing preclinical testing and clinical trials of our product candidates, discovering additional product candidates, obtaining regulatory approval for these product candidates and manufacturing, marketing and selling any products for which we may obtain regulatory approval. We are only in the preliminary stages of most of these activities. We may never succeed in these activities and, even if we do, may never generate revenues that are significant enough to achieve profitability. Because of the numerous risks and uncertainties associated with pharmaceutical product development, we are unable to accurately predict the timing or amount of increased expenses or when, or if, we will be able to achieve profitability. Our expenses will increase if, among other things:

- we are required by the FDA, the EMA, or other regulatory authorities to perform trials or studies in addition to, or different than, those expected;

- there are any delays in completing our clinical trials or the development of any of our product candidates; or

- there are any third-party challenges to our intellectual property or we need to defend against any intellectual property-related claim.

Even if we do achieve profitability, we may not be able to sustain or increase profitability on a quarterly or annual basis. Our failure to become and remain profitable would depress the value of our company and could impair our ability to raise capital, expand our business, maintain our research and development efforts, diversify our pipeline of product candidates or even continue our operations. A decline in the value of our company could also cause our stockholders to lose all or part of their investment.

***We will need substantial additional funding. If we are unable to raise capital when needed, we could be forced to delay, reduce or eliminate our product development programs or commercialization efforts.***

We expect to devote substantial financial resources to our ongoing and planned activities, particularly as we continue our ongoing and planned clinical trials of losmapimod and FTX-6058, continue research and development and initiate additional clinical trials of, and seek regulatory approval for, these and other product candidates. We expect our expenses to increase substantially in connection with our ongoing activities, particularly as we advance our preclinical activities and clinical trials. In addition, if we obtain regulatory approval for any of our product candidates, we expect to incur significant commercialization expenses related to product manufacturing, sales, marketing and distribution. Furthermore, we will incur additional costs associated with operating as a public company. Accordingly, we will need to obtain substantial additional funding in connection with our continuing operations. If we are unable to raise capital when needed or on acceptable terms, we could be forced to delay, reduce or eliminate our research and development programs or any future commercialization efforts.

Our future capital requirements will depend on many factors, including:

- the progress, costs and results of our ongoing clinical trials of losmapimod and FTX-6058;

- additional planned clinical trials, such as our planned Phase 1b clinical trial of FTX-6058 in select hemoglobinopathies, including ß-thalassemia, and plans for a Phase 3 clinical trial of losmapimod for the treatment of FSHD;

- the scope, progress, costs and results of discovery research, preclinical development, laboratory testing and clinical trials for our current product candidates in additional indications or for any future product candidates that we may pursue;

- the impact of the ongoing COVID-19 pandemic on our business and operations;

- the number of and development requirements for other product candidates that we pursue;

- the costs, timing and outcome of regulatory review of our product candidates;

- our ability to enter into contract manufacturing arrangements for supply of active pharmaceutical ingredient, or API, and manufacture of our product candidates and the terms of such arrangements;

- the success of our collaborations with Acceleron and MyoKardia;

- our ability to establish and maintain additional strategic collaborations, licensing or other arrangements and the financial terms of such arrangements;

- the payment or receipt of milestones, royalties and other collaboration-based revenues, if any;

- the costs and timing of future commercialization activities, including product manufacturing, sales, marketing and distribution, for any of our product candidates for which we may receive marketing approval;

- the amount and timing of revenue, if any, received from commercial sales of our product candidates for which we receive marketing approval;

- the costs and timing of preparing, filing and prosecuting patent applications, maintaining and enforcing our intellectual property and proprietary rights and defending any intellectual property-related claims; and

- the extent to which we acquire or in-license other products, product candidates, technologies or data referencing rights.

As of December 31, 2021, we had cash, cash equivalents, and marketable securities of approximately $218.2 million. We believe that our cash, cash equivalents, and marketable securities as of December 31, 2021 will enable us to fund our operating expenses and capital expenditure requirements into 2024. However, we have based this estimate on assumptions that may prove to be wrong, and our operating plan may change as a result of many factors currently unknown to us. As a result, we could deplete our capital resources sooner than we currently expect.

Identifying potential product candidates and conducting preclinical testing and clinical trials is a time-consuming, expensive and uncertain process that takes years to complete, and we may never generate the necessary data or results required to obtain regulatory approval and achieve product sales. In addition, our product candidates, if approved, may not achieve commercial success. Commercial revenues, if any, will not be derived unless and until we can achieve sales of products, which we do not anticipate for many years, if at all. Accordingly, we will need to continue to rely on additional financing to achieve our business objectives. Adequate additional financing may not be available to us on acceptable terms, or at all. In addition, we may seek additional capital due to favorable market conditions or strategic considerations, even if we believe we have sufficient funds for our current or future operating plans. If adequate funds are not available to us on a timely basis, we may be required to delay, limit, reduce or terminate preclinical studies, clinical trials or other development activities for one or more of our product candidates or discovery stage programs or delay, limit, reduce or terminate our establishment of sales and marketing capabilities or other activities that may be necessary to commercialize our product candidates.

***Raising additional capital may cause dilution to our stockholders, restrict our operations or require us to relinquish rights to our technologies or product candidates.***

Until such time, if ever, as we can generate substantial product revenues, we expect to finance our cash needs through a combination of equity offerings, debt financings, collaborations, strategic alliances and marketing, distribution or licensing arrangements. We do not have any committed external source of funds. To the extent that we raise additional capital through the sale of equity or convertible debt securities, our stockholders' ownership interests will be diluted, and the terms of these securities may include liquidation or other preferences that adversely affect our stockholders' rights as common stockholders. Debt financing and preferred equity financing, if available, may involve agreements that include covenants limiting or restricting our ability to take specific actions, such as incurring additional debt, selling or licensing our assets, making capital expenditures or declaring dividends.

If we raise additional funds through collaborations, strategic alliances or marketing, distribution or licensing arrangements with third parties, we may have to relinquish valuable rights to our technologies, future revenue streams, research programs or product candidates or grant licenses on terms that may not be favorable to us. If we are unable to raise additional funds through equity or debt financings when needed, we may be required to delay, limit, reduce or terminate our product development or future commercialization efforts or grant rights to develop and market product candidates that we would otherwise prefer to develop and market ourselves.

***Our limited operating history may make it difficult for stockholders to evaluate the success of our business to date and to assess our future viability.***

We commenced activities in 2015 and are an early-stage company. Our operations to date have been limited to organizing and staffing our company, business planning, raising capital, establishing our intellectual property, building our discovery platform, identifying drug targets and potential product candidates, in-licensing assets, producing drug substance and drug product material for use in clinical trials and conducting preclinical studies and conducting clinical trials. We have not yet demonstrated our ability to successfully develop any product candidate, obtain regulatory approvals, manufacture a commercial scale product or arrange for a third party to do so on our behalf, or conduct sales and marketing activities necessary for successful product commercialization. Consequently, any predictions stockholders make about our future success or viability may not be as accurate as they could be if we had a longer operating history or a history of successfully developing and commercializing products.

In addition, as our business grows, we may encounter unforeseen expenses, difficulties, complications, delays and other known and unknown factors. We will need to transition at some point from a company with a research and development focus to a company capable of supporting commercial activities. We may not be successful in such a transition.

We expect our financial condition and operating results to fluctuate significantly from quarter-to-quarter and year-to-year due to a variety of factors, many of which are beyond our control. Accordingly, stockholders should not rely upon the results of any quarterly or annual periods as indications of future operating performance.

***The ongoing COVID-19 pandemic has and may continue to affect our ability to initiate and complete current or future preclinical studies or clinical trials, disrupt regulatory activities or have other adverse effects on our business and operations. In addition, this pandemic may continue to adversely impact economies worldwide, which could result in adverse effects on our business and operations.***

In light of the COVID-19 pandemic, we and our CMOs and contract research organizations, or CROs, may face disruptions that may affect our ability to initiate and complete preclinical studies or clinical trials, including disruptions in procuring items that are essential for our research and development activities, including, for example, raw materials and API used in the manufacturing of our product candidates, and laboratory supplies for our current and future preclinical studies and clinical trials, in each case, for which there may be shortages because of ongoing efforts to address the pandemic. We and our CMOs and CROs, may face disruptions related to our planned and ongoing clinical trials or future clinical trials arising from delays in IND-enabling studies, manufacturing disruptions, and the ability to obtain necessary institutional review board or other necessary site approvals, as well as enrollment and other delays at clinical trial sites. For example, in response to the COVID-19 pandemic, the clinical trial sites for our ReDUX4 clinical trial temporarily postponed trial-related activities, impacting our clinical trial execution plans. We may also face difficulties recruiting or retaining patients for our planned and ongoing clinical trials if patients are affected by the virus or are fearful of visiting or traveling to clinical trial sites because of the pandemic. In addition, since the beginning of the COVID-19 pandemic, three vaccines for COVID-19 have received Emergency Use Authorization by the FDA and one of those later received marketing approval. Additional vaccines may be authorized or approved in the future. The resultant demand for vaccines and potential for manufacturing facilities and materials to be commandeered under the Defense Production Act of 1950, or equivalent foreign legislation, may make it more difficult to obtain materials or manufacturing slots for the products needed for our clinical trials, which could lead to further delays in these trials. The response to the ongoing COVID-19 pandemic may redirect resources with respect to regulatory and intellectual property matters in a way that would adversely impact our ability to progress regulatory approvals and protect our intellectual property. In addition, we may face impediments to regulatory meetings and approvals due to measures intended to limit in-person interactions.

Additionally, the impact of the ongoing COVID-19 pandemic in Massachusetts resulted in a temporary reduction in workforce presence at our Cambridge research facility. While we increased workforce presence at our facilities starting in the second quarter of 2020, not all employees have returned to our facility and we cannot be certain that we will not be required to close our facilities in the future as a result of the ongoing COVID-19 pandemic. A closure of our facility may substantially impact our discovery and translational activities and may delay the experimentation needed to identify novel drug targets, prosecute such targets, identify development candidates for such targets and identify biomarkers that inform the potential clinical development paths for such targets. Moreover, discovery and implementation of clinical biomarker assays for ongoing clinical trials may be delayed. Furthermore, any negative impact that the ongoing pandemic has on the ability of our CROs to deliver data sets and execute on experimentation could cause substantial delays for our discovery activities and materially impact our ability to fuel our pipeline with new product candidates.

The ongoing COVID-19 pandemic has already caused significant disruptions in the financial markets, and may continue to cause such disruptions, which could impact our ability to raise additional funds through public offerings and may also impact the volatility of our stock price and trading in our stock. Moreover, it is possible the pandemic will continue to significantly impact economies worldwide, which could result in adverse effects on our business and operations. We cannot be certain what the overall impact of the ongoing COVID-19 pandemic will be on our business. The extent of the impact of COVID-19 on our business, financial condition, results of operations and prospects will depend on future developments that are highly uncertain, including as a result of new information that may emerge concerning COVID-19 or any variant strains of the virus and actions to be taken to contain or mitigate the impact of COVID-19, including the supply, distribution and effectiveness of vaccines.

***Changes in tax laws or in their implementation or interpretation may adversely affect our business and financial condition.***

The rules dealing with U.S. federal, state, and local income taxation are constantly under review by persons involved in the legislative process and by the Internal Revenue Service and the U.S. Treasury Department. Changes to tax laws (which changes may have retroactive application), including with respect to net operating losses and research and development tax credits, could adversely affect us or holders of our common stock. In recent years, many such changes have been made and changes are likely to continue to occur in the future. Future changes in tax laws could have a material adverse effect on our

54

business, cash flow, financial condition or results of operations. We urge investors to consult with their legal and tax advisers regarding the implications of potential changes in tax laws on an investment in our common stock.

***Our ability to use our net operating losses and research and development tax credit carryforwards to offset future taxable income may be subject to certain limitations.***

As of December 31, 2021, we had federal and state net operating loss carryforwards of $245.8 million and $244.0 million, respectively, which begin to expire in 2036. Approximately $214.8 million of the federal net operating losses can be carried forward indefinitely. As of December 31, 2021, we also had federal orphan drug credits of $6.7 million, which begin to expire in 2040. As of December 31, 2021, we also had federal and state research and development tax credit carryforwards of $6.1 million and $3.3 million, respectively, which begin to expire in 2035 and 2030, respectively. These net operating loss and tax credit carryforwards could expire unused and be unavailable to offset future income tax liabilities.

In general, under Section 382 of the U.S. Internal Revenue Code of 1986, as amended, or the Code, and corresponding provisions of state law, a corporation that undergoes an "ownership change," which is generally defined as a greater than 50% change, by value, in its equity ownership by certain stockholders over a three-year period, is subject to limitations on its ability to utilize its pre-change net operating losses and research and development tax credit carryforwards to offset future taxable income. We have not conducted a study to assess whether any such ownership changes have occurred. We may have experienced such ownership changes in the past and may experience such ownership changes in the future (which may be outside our control). As a result, if, and to the extent that, we earn net taxable income, our ability to use our pre-change net operating losses and research and development tax credit carryforwards to offset such taxable income may be subject to limitations. Our net operating losses or credits may also be impaired under state law.

We have a history of cumulative losses and anticipate that we will continue to incur significant losses in the foreseeable future; thus, we do not know whether or when we will generate taxable income necessary to utilize our net operating losses or research and development tax credit carryforwards.

**Risks Related to the Discovery and Development of our Product Candidates**

***We are early in our development efforts, and we only have two product candidates in clinical trials. If we are unable to commercialize our product candidates or experience significant delays in doing so, our business will be materially harmed.***

We are early in our development efforts, and we have advanced only two product candidates into clinical trials, losmapimod for the treatment of FSHD, and FTX-6058 for the treatment of SCD and select hemoglobinopathies. We have invested substantially all of our efforts and financial resources in our proprietary product engine to identify and validate cellular drug targets that can potentially modulate gene expression to address the root cause of genetically-defined rare diseases. Our ability to generate product revenues, which we do not expect will occur for many years, if ever, will depend heavily on the successful development, regulatory approval and eventual commercialization of our product candidates. The success of our product candidates will depend on several factors, including the following:

- successfully completing preclinical studies and clinical trials;

- allowance by the FDA or other regulatory agencies of the INDs, clinical trial applications, or CTAs, or other regulatory filings for losmapimod, FTX-6058 and future product candidates;

- expanding and maintaining a workforce of experienced scientists and others to continue to develop our product candidates;

- applying for and receiving marketing approvals from applicable regulatory authorities;

- obtaining and maintaining intellectual property protection and regulatory exclusivity for our product candidates;

- making arrangements with third-party manufacturers for, or establishing, commercial manufacturing capabilities;

- establishing sales, marketing and distribution capabilities and successfully launching commercial sales of the products, if and when approved, whether alone or in collaboration with others;

- acceptance of the products, if and when approved, by patients, the medical community and third-party payors;

- effectively competing with other therapies;

- obtaining and maintaining coverage, adequate pricing and adequate reimbursement from third-party payors, including government payors;

- maintaining, enforcing, defending and protecting our rights in our intellectual property portfolio;

- not infringing, misappropriating or otherwise violating others' intellectual property or proprietary rights; and

55

- maintaining a continued acceptable safety profile of the products following receipt of any regulatory approvals.

If we do not achieve one or more of these factors in a timely manner or at all, we could experience significant delays or an inability to successfully develop and commercialize our product candidates, which would materially harm our business.

***We may not be successful in our efforts to use our product engine to build a pipeline of product candidates.***

A key element of our strategy is to use our proprietary product engine to identify and validate cellular drug targets that can potentially modulate gene expression to address the root cause of genetically-defined rare diseases, with an initial focus on identifying small molecules specific to the identified cellular target. Even if we are successful in identifying drug targets and potential product candidates, such candidates that we identify may not be suitable for clinical development, including as a result of being shown to have harmful side effects or other characteristics that indicate that they are unlikely to receive marketing approval and achieve market acceptance. Identifying, developing, obtaining regulatory approval for and commercializing additional product candidates will require substantial additional funding and is prone to the risks of failure inherent in product development. We cannot provide stockholders any assurance that we will be able to successfully identify additional product candidates with our product engine, including as a result of our collaborations with Acceleron and MyoKardia, advance any additional product candidates through the development process or successfully commercialize any such additional product candidates. Regulatory authorities have substantial discretion in the approval process and may cause delays in the approval or rejection of an application. As a result of these factors, it is difficult for us to predict the time and cost of product candidate development. There can be no assurance that any development problems we experience in the future related to our proprietary product engine or any of our research or development programs will not cause significant delays or unanticipated costs, or that such development problems can be solved. If we do not successfully identify, develop, obtain regulatory approval for and commercialize product candidates based upon our technological approach, we will not be able to generate product revenues.

***Clinical drug development involves a lengthy and expensive process, with an uncertain outcome. The results of preclinical studies and early clinical trials may not be predictive of future results. We may incur additional costs or experience delays in completing, or ultimately be unable to complete, the development and commercialization of our product candidates.***

We have two product candidates in clinical development. The risk of failure for each of our product candidates is high. It is impossible to predict when or if any of our product candidates will prove effective or safe in humans or will receive regulatory approval. Before obtaining marketing approval from regulatory authorities for the sale of any product candidate, we must complete preclinical development and then conduct extensive clinical trials to demonstrate the safety and efficacy of our product candidates in humans. We have not yet completed a pivotal clinical trial of any product candidate. Clinical trials may fail to demonstrate that our product candidates are safe for humans and effective for indicated uses. Even if the clinical trials are successful, changes in marketing approval policies during the development period, changes in or the enactment or promulgation of additional statutes, regulations or guidance or changes in regulatory review for each submitted product application may cause delays in the approval or rejection of an application.

Before we can commence clinical trials for a product candidate, we must complete extensive preclinical testing and studies that support our planned INDs and other regulatory filings in the United States and abroad. We cannot be certain of the timely completion or outcome of our preclinical testing and studies and cannot predict if the FDA or other regulatory agencies will accept our proposed clinical programs or if the outcome of our preclinical testing and studies will ultimately support the further development of our current or future product candidates. As a result, we cannot be sure that we will be able to submit INDs or similar applications for our preclinical programs on the timelines we expect, if at all, and we cannot be sure that submission of INDs or similar applications will result in the FDA or other regulatory authorities allowing clinical trials to begin. Furthermore, product candidates are subject to continued preclinical safety studies, which may be conducted concurrent with our clinical testing. The outcomes of these safety studies may delay the launch of or enrollment in future clinical trials and could impact our ability to continue to conduct our clinical trials.

Clinical testing is expensive, difficult to design and implement, can take many years to complete and is uncertain as to outcome. We cannot guarantee that any clinical trials will be conducted as planned or completed on schedule, or at all. A failure of one or more clinical trials can occur at any stage of testing, which may result from a multitude of factors, including, but not limited to, flaws in study design, dose selection issues, placebo effects, patient enrollment criteria and failure to demonstrate favorable safety or efficacy traits. The outcome of preclinical testing and early clinical trials may not be predictive of the success of later clinical trials, and preliminary or interim results of a clinical trial do not necessarily predict final results. For example, our product candidates may fail to show the desired safety and efficacy in clinical development despite positive results in preclinical studies or having successfully advanced through initial clinical trials. A lack of clinical benefit may be due to insufficient dosing or for other reasons. Many companies in the pharmaceutical and biotechnology industries have suffered significant setbacks in late-stage clinical trials even after achieving promising results in preclinical testing and earlier-stage clinical trials, and we cannot be certain that we will not face similar setbacks. Moreover, preclinical and clinical data are often susceptible to varying interpretations and analyses, and many companies that have believed their

56

product candidates performed satisfactorily in preclinical studies and clinical trials have nonetheless failed to obtain marketing approval of their products. Furthermore, the failure of any of our product candidates to demonstrate safety and efficacy in any clinical trial could negatively impact the perception of our other product candidates and/or cause the FDA or other regulatory authorities to require additional testing before approving any of our product candidates.

As described in Item 1 "Business—Licenses and Collaborations--Right of Reference and License Agreement with GlaxoSmithKline" of this Annual Report on Form 10-K, we have entered into a right of reference and license agreement, as amended, with affiliates of GSK. Although losmapimod was originally evaluated by GSK in nearly 3,600 subjects, GSK did not evaluate losmapimod in FSHD or in any other muscular dystrophy, and most of the subjects in these trials were given a dose that was lower than our planned dosage of 15 mg of losmapimod twice per day. Accordingly, the safety data generated from GSK's clinical trials of losmapimod may not be predictive or indicative of the results of our clinical trials. Similarly, while we believe the safety data from GSK's clinical trials may, in part, support the safety database for losmapimod, GSK evaluated a limited number of subjects at a dose of 15 mg twice daily.

We may experience numerous unforeseen events during, or as a result of, clinical trials that could delay or prevent our ability to receive marketing approval or commercialize our product candidates, including:

- regulators or institutional review boards, or IRBs, may not authorize us or our investigators to commence a clinical trial or conduct a clinical trial at a prospective trial site;

- we may experience delays in reaching, or fail to reach, agreement on acceptable clinical trial contracts or clinical trial protocols with prospective trial sites;

- regulators may decide the design of our clinical trials is flawed, for example if our trial protocol does not evaluate treatment effects in trial subjects for a sufficient length of time;

- clinical trials of our product candidates may produce negative or inconclusive results, and we may decide, or regulators may require us, to conduct additional clinical trials or abandon product development programs;

- we may be unable to establish clinical endpoints that applicable regulatory authorities would consider clinically meaningful, or, if we seek accelerated approval, biomarker efficacy endpoints that applicable regulatory authorities would consider likely to predict clinical benefit;

- preclinical testing may produce results based on which we may decide, or regulators may require us, to conduct additional preclinical studies before we proceed with certain clinical trials, limit the scope of our clinical trials, halt ongoing clinical trials or abandon product development programs;

- the number of patients required for clinical trials of our product candidates may be larger than we anticipate, enrollment in these clinical trials may be slower than we anticipate or participants may drop out of these clinical trials at a higher rate than we anticipate;

- our third-party contractors may fail to comply with regulatory requirements or meet their contractual obligations to us in a timely manner, or at all;

- we may decide, or regulators or IRBs may require us, to suspend or terminate clinical trials of our product candidates for various reasons, including noncompliance with regulatory requirements or a finding that the participants are being exposed to unacceptable health risks;

- regulators or IRBs may require us to perform additional or unanticipated clinical trials to obtain approval or we may be subject to additional post-marketing testing requirements to maintain regulatory approval;

- regulators may revise the requirements for approving our product candidates, or such requirements may not be as we anticipate;

- the cost of clinical trials of our product candidates may be greater than we anticipate;

- the supply or quality of our product candidates or other materials necessary to conduct clinical trials of our product candidates may be insufficient or inadequate;

- our product candidates may have undesirable side effects or other unexpected characteristics, causing us or our investigators, regulators or IRBs to suspend or terminate the trials;

- unforeseen global instability, including political instability or instability from an outbreak of pandemic or contagious disease, such as the ongoing COVID-19 pandemic, in or around the countries in which we conduct our clinical trials, could delay the commencement or rate of completion of our clinical trials; and

- regulators may withdraw their approval of a product or impose restrictions on its distribution, such as in the form of a risk evaluation and mitigation strategy, or REMS.

For example, in response to the ongoing COVID-19 pandemic, the clinical trial sites for our ReDUX4 trial temporarily postponed trial-related activities, impacting our clinical trial execution plans, and we cannot be certain that we will not face other postponements or similar difficulties in the future.

If we are required to conduct additional clinical trials or other testing of our product candidates beyond those that we currently contemplate, if we are unable to successfully complete clinical trials of our product candidates or other testing, if the results of these trials or tests are not positive or are only modestly positive or if there are safety concerns, we may:

- be delayed in obtaining marketing approval for our product candidates;

- not obtain marketing approval at all;

- obtain approval for indications or patient populations that are not as broad as intended or desired;

- obtain approval with labeling or a REMS that includes significant use or distribution restrictions or safety warnings;

- be subject to additional post-marketing testing requirements; or

- have the product removed from the market after obtaining marketing approval.

Our product development costs will also increase if we experience delays in testing or in obtaining marketing approvals. We do not know whether any of our preclinical studies or clinical trials will begin as planned, will need to be restructured or will be completed on schedule, or at all. We may also determine to change the design or protocol of one or more of our clinical trials, including to add additional patients or arms, which could result in increased costs and expenses and/or delays. Significant preclinical study or clinical trial delays also could shorten any periods during which we may have the exclusive right to commercialize our product candidates or allow our competitors to bring products to market before we do and impair our ability to successfully commercialize our product candidates and may harm our business and results of operations.

*Because we are developing some of our product candidates for the treatment of diseases in which there is limited clinical experience and, in some cases, using new endpoints or methodologies, the FDA or other regulatory authorities may not consider the endpoints of our clinical trials to predict or provide clinically meaningful results.*

There are currently no therapies approved to treat FSHD, and there may be no therapies approved to treat the underlying causes of diseases that we attempt to address or may address in the future. As a result, the design and conduct of a clinical trial or trials of the product candidates for the treatment of these diseases may take longer, be more costly or be less effective as part of the novelty of development in these diseases. In some cases, we may use new or novel endpoints or methodologies, such as RWS, which has not been proven for registration to our knowledge. The FDA or other regulatory authorities have indicated support for RWS as a primary endpoint with additional supportive data but may not consider the endpoints of our clinical trial(s) to provide clinically meaningful results, even where we believe such results are clinically meaningful. For example, we have met with regulators to discuss the design of our future clinical trial and registration strategy for losmapimod for FSHD, including our proposed endpoints for REACH, but the regulators may require additional data to support the RWS functional primary endpoint for full approval.

Even if the FDA does find our primary endpoint to be sufficiently validated and clinically meaningful, we may not achieve the pre-specified endpoint to a magnitude, duration or degree of statistical significance in any pivotal or other clinical trials we may conduct for our product candidates. Further, even if we do meet the primary endpoint, our trials may produce results that are unpredictable or inconsistent with the results of the other, more traditional efficacy endpoints in the trials. The FDA also could ascribe substantial weight to other efficacy endpoints when interpreting the clinical trial data, such that even if we achieve statistically significant results on our primary endpoint, the FDA may regard the failure to show a statistically significant effect on our secondary efficacy endpoints as raising questions about the efficacy of the drug. The FDA also weighs the benefits of a product against its risks and the FDA may view the efficacy results in the context of safety as not being supportive of approval. Other regulatory authorities in Europe and other countries may make similar findings with respect to these endpoints.

58

***If we experience delays or difficulties in the enrollment of patients in clinical trials, our receipt of necessary regulatory approvals could be delayed or prevented.***

Identifying and qualifying patients to participate in clinical trials for our product candidates is critical to our success. Successful and timely completion of clinical trials will require that we enroll a sufficient number of patients who remain in the trial until its conclusion. We may not be able to initiate or continue clinical trials for our product candidates if we are unable to locate and enroll a sufficient number of eligible patients to participate in these trials as required by the FDA or similar regulatory authorities outside of the United States. Because of our primary focus on genetically-defined rare diseases, we may have difficulty enrolling a sufficient number of eligible patients.

Patient enrollment is affected by a variety of other factors, including:

- the prevalence and severity of the disease under investigation;
- the eligibility criteria for the trial in question;
- the perceived risks and benefits of the product candidate under trial;
- the requirements of the trial protocols, including invasive procedures such as muscle biopsies;
- the availability of existing treatments for the indications for which we are conducting clinical trials;
- the ability to recruit clinical trial investigators with the appropriate competencies and experience;
- the efforts to facilitate timely enrollment in clinical trials;
- the patient referral practices of physicians;
- the ability to monitor patients adequately during and after treatment;
- the proximity and availability of clinical trial sites for prospective patients;
- the conduct of clinical trials by competitors for product candidates that treat the same indications as our product candidates;
- the ability to identify specific patient populations for biomarker-defined trial cohort(s); and
- the cost to, or lack of adequate compensation for, prospective patients.

Our inability to locate and enroll a sufficient number of patients for our clinical trials would result in significant delays, could require us to abandon one or more clinical trials altogether and could delay or prevent our receipt of necessary regulatory approvals.

Enrollment delays in our clinical trials may result in increased development costs for our product candidates, which would cause the value of our company to decline and limit our ability to obtain additional financing.

***If serious adverse events or unacceptable side effects are identified during the development of our product candidates, we may need to abandon or limit our development of some of our product candidates.***

If our product candidates are associated with serious adverse events or undesirable side effects in clinical trials or have characteristics that are unexpected in clinical trials or preclinical testing, we may need to abandon their development or limit development to more narrow uses or subpopulations in which the serious adverse events, undesirable side effects or other characteristics are less prevalent, less severe or more acceptable from a risk-benefit perspective. In pharmaceutical development, many compounds that initially show promise in early-stage or clinical testing are later found to cause side effects that delay or prevent further development of the compound.

Additionally, if results of our clinical trials reveal unacceptable side effects, we, the FDA or the IRBs at the institutions in which our studies are conducted could suspend or terminate our clinical trials or the FDA or comparable foreign regulatory authorities could order us to cease clinical trials or deny approval of our product candidates for any or all targeted indications. Treatment-related side effects could also affect patient recruitment or the ability of enrolled patients to complete any of our clinical trials. If we elect or are forced to suspend or terminate any clinical trial of our product candidates, the commercial prospects of such product candidate will be harmed, and our ability to generate product revenue from such product candidate will be delayed or eliminated. Any of these occurrences could materially harm our business.

***If any of our product candidates receives marketing approval and we, or others, later discover that the drug is less effective than previously believed or causes undesirable side effects that were not previously identified, our ability to market the drug could be compromised.***

Clinical trials of our product candidates are conducted in carefully defined subsets of patients who have agreed to enter into clinical trials. Consequently, it is possible that our clinical trials may indicate an apparent positive effect of a product candidate that is greater than the actual positive effect, if any, or alternatively fail to identify undesirable side effects. If one or more of our product candidates receives regulatory approval, and we, or others, later discover that they are less effective than previously believed, or cause undesirable side effects, a number of potentially significant negative consequences could result, including:

- withdrawal or limitation by regulatory authorities of approvals of such product;

- seizure of the product by regulatory authorities;

- recall of the product;

- restrictions on the marketing of the product or the manufacturing process for any component thereof;

- requirement by regulatory authorities of additional warnings on the label, such as a "black box" warning or contraindication;

- requirement that we implement a REMS or create a medication guide outlining the risks of such side effects for distribution to patients;

- commitment to expensive post-marketing studies as a prerequisite of approval by regulatory authorities of such product;

- the product may become less competitive;

- initiation of regulatory investigations and government enforcement actions;

- initiation of legal action against us to hold us liable for harm caused to patients; and

- harm to our reputation and resulting harm to physician or patient acceptance of our products.

Any of these events could prevent us from achieving or maintaining market acceptance of a particular product candidate, if approved, and could significantly harm our business, financial condition, and results of operations.

***We may expend our limited resources to pursue a particular product candidate or indication and fail to capitalize on product candidates or indications that may be more profitable or for which there is a greater likelihood of success.***

Because we have limited financial and managerial resources, we are focusing our research and development efforts on rare neuromuscular, muscular, hematologic and central nervous system disorders. As a result, we may forego or delay pursuit of opportunities with other product candidates or for other indications that later prove to have greater commercial potential. Our resource allocation decisions may cause us to fail to capitalize on viable commercial products or profitable market opportunities. Our spending on current and future research and development programs and product candidates for specific indications may not yield any commercially viable products. If we do not accurately evaluate the commercial potential or target market for a particular product candidate, we may relinquish valuable rights to that product candidate through collaboration, licensing or other royalty arrangements in cases in which it would have been more advantageous for us to retain sole development and commercialization rights to such product candidate. Failure to allocate resources or capitalize on strategies in a successful manner will have an adverse impact on our business.

***We are conducting clinical trials of losmapimod in patients with FSHD in Europe and Canada and currently plan to conduct additional clinical trials for our product candidates at sites outside the United States, and the FDA may not accept data from trials conducted in such locations.***

We are currently conducting an open label extension of our Phase 2b clinical trial and of our Phase 2 open label clinical trial of losmapimod in patients with FSHD in Europe and Canada. We may also conduct additional clinical trials outside the United States. Although the FDA may accept data from clinical trials conducted outside the United States, acceptance of these data is subject to conditions imposed by the FDA. For example, the clinical trial must be well designed and conducted and be performed by qualified investigators in accordance with ethical principles. The trial population must also adequately represent the U.S. population, and the data must be applicable to the U.S. population and U.S. medical practice in ways that the FDA deems clinically meaningful. In addition, while these clinical trials are subject to the applicable local laws, FDA acceptance of the data will depend on its determination that the trials also complied with all applicable U.S. laws and regulations, including GCP, and FDA's ability to validate the data. If the FDA does not accept the data from any trial that we

conduct outside the United States, it would likely result in the need for additional trials, which would be costly and time-consuming and could delay or permanently halt our development of the applicable product candidates.

**Risks Related to the Commercialization of our Product Candidates**

***Even if any of our product candidates receives marketing approval, it may fail to achieve the degree of market acceptance by physicians, patients, third-party payors and others in the medical community necessary for commercial success, and the market opportunity for any of our product candidates, if approved, may be smaller than we estimate.***

If any of our product candidates receives marketing approval, it may nonetheless fail to gain sufficient market acceptance by physicians, patients, third-party payors and others in the medical community. Efforts to educate the medical community and third-party payors on the benefits of our product candidates may require significant resources and may not be successful. If our product candidates do not achieve an adequate level of acceptance, we may not generate significant product revenues and we may not become profitable. The degree of market acceptance of our product candidates, if approved for commercial sale, will depend on a number of factors, including:

- the efficacy and potential advantages of our product candidates compared to the advantages and relative risks of alternative treatments;

- the effectiveness of sales and marketing efforts;

- the cost of treatment in relation to alternative treatments, including any similar generic treatments;

- our ability to offer our products, if approved, for sale at competitive prices;

- the clinical indications for which the product is approved;

- the convenience and ease of administration compared to alternative treatments;

- the willingness of the target patient population to try new therapies and of physicians to prescribe these therapies;

- the strength of marketing and distribution support;

- the timing of market introduction of competitive products;

- the availability of third-party coverage and adequate reimbursement, and patients' willingness to pay out of pocket for required co-payments or in the absence of third-party coverage or adequate reimbursement;

- the prevalence and severity of any side effects; and

- any restrictions on the use of our products, if approved, together with other medications.

Our assessment of the potential market opportunity for our product candidates is based on industry and market data that we obtained from industry publications and research, surveys and studies conducted by third parties, one of which we commissioned. Industry publications and third-party research, surveys and studies generally indicate that their information has been obtained from sources believed to be reliable, although they do not guarantee the accuracy or completeness of such information. While we believe these industry publications and third-party research, surveys and studies are reliable, we have not independently verified such data. Our estimates of the potential market opportunities for our product candidates include several key assumptions based on our industry knowledge, industry publications and third-party research, surveys and studies, which may be based on a small sample size and fail to accurately reflect market opportunities. While we believe that our internal assumptions are reasonable, no independent source has verified such assumptions. If any of our assumptions or estimates, or these publications, research, surveys or studies prove to be inaccurate, then the actual market for any of our product candidates may be smaller than we expect, and as a result our product revenue may be limited and it may be more difficult for us to achieve or maintain profitability.

***If we are unable to establish sales, marketing and distribution capabilities or enter into sales, marketing and distribution agreements with third parties, we may not be successful in commercializing our product candidates if and when they are approved.***

We do not have a sales or marketing infrastructure and have no experience in the sale, marketing or distribution of pharmaceutical products. To achieve commercial success for any product for which we have obtained marketing approval, we will need to establish a sales, marketing and distribution organization, either ourselves or through collaborations or other arrangements with third parties.

In the future, we expect to build a focused, specialty sales and marketing infrastructure to market some of our product candidates in the United States, if and when they are approved. There are risks involved with establishing our own sales, marketing and distribution capabilities. For example, recruiting and training a sales force is expensive and time-consuming and could delay any product launch. If the commercial launch of a product candidate for which we recruit a sales force and establish marketing capabilities is delayed or does not occur for any reason, we would have prematurely or unnecessarily incurred these commercialization expenses. These efforts may be costly, and our investment would be lost if we cannot retain or reposition our sales and marketing personnel.

Factors that may inhibit our efforts to commercialize our products on our own include:

- our inability to recruit, train and retain adequate numbers of effective sales, marketing, coverage or reimbursement, customer service, medical affairs and other support personnel;

- the inability of sales personnel to obtain access to physicians or persuade adequate numbers of physicians to prescribe any future products;

- the inability of reimbursement professionals to negotiate arrangements for formulary access, reimbursement and other acceptance by payors;

- the inability to price our products at a sufficient price point to ensure an adequate and attractive level of profitability;

- restricted or closed distribution channels that make it difficult to distribute our products to segments of the patient population;

- the lack of complementary products to be offered by sales personnel, which may put us at a competitive disadvantage relative to companies with more extensive product lines; and

- unforeseen costs and expenses associated with creating an independent sales and marketing organization.

If we are unable to establish our own sales, marketing and distribution capabilities and we enter into arrangements with third parties to perform these services, our product revenues and our profitability, if any, are likely to be lower than if we were to market, sell and distribute any products that we develop ourselves. In addition, we may not be successful in entering into arrangements with third parties to sell, market and distribute our product candidates or may be unable to do so on terms that are acceptable to us. We likely will have little control over such third parties, and any of them may fail to devote the necessary resources and attention to sell and market our products effectively. If we do not establish sales, marketing and distribution capabilities successfully, either on our own or in collaboration with third parties, we will not be successful in commercializing our product candidates.

***We face substantial competition, which may result in others discovering, developing or commercializing products before or more successfully than we do.***

The development and commercialization of new drug products is highly competitive. We face competition with respect to our current product candidates, and will face competition with respect to any product candidates that we may seek to develop or commercialize in the future, from major pharmaceutical companies, specialty pharmaceutical companies and biotechnology companies worldwide. There are a number of large pharmaceutical and biotechnology companies that currently market and sell products or are pursuing the development of products for the treatment of many of the disease indications for which we are developing our product candidates. Some of these competitive products and therapies are based on scientific approaches that are the same as or similar to our approach, and others are based on entirely different approaches. Potential competitors also include academic institutions, government agencies and other public and private research organizations that conduct research, seek patent protection and establish collaborative arrangements for research, development, manufacturing and commercialization.

For example, we are aware of several product candidates in clinical development that could be competitive with product candidates that we may successfully develop and commercialize. bluebird, Aruvant Sciences, Inc., Novo Nordisk A/S, Imara, Inc., Agios Pharmaceuticals, Inc., Forma Therapeutics Holdings, Inc., Global Blood Therapeutics, Inc., Takeda Pharmaceutical Company Limited, Pfizer, Inc., CSL Behring, Intellia Therapeutics, Inc., Editas Medicine, Inc., Sangamo Therapeutics Inc., or Sangamo (in collaboration with Bioverativ Inc.) and CRISPR Therapeutics AG (in collaboration with Vertex Pharmaceuticals, Inc.) are developing therapeutic approaches for patients with SCD. Acceleron (in collaboration with Celgene), Bellicum Pharmaceuticals, Inc., Silence Therapeutics plcImara Inc., Agios Pharmaceuticals, Inc., Forma Therapeutics Holdings, Inc., Ionis Pharmaceuticals, Inc., Orchard Therapeutics plc, Sangamo (in collaboration with

Bioverativ, Inc.) and CRISPR Therapeutics AG (in collaboration with Vertex Pharmaceuticals, Inc.) are developing therapeutic approaches for patients with ß-thalassemia.

Our commercial opportunity could be reduced or eliminated if our competitors develop and commercialize products that are safer, more effective, have fewer or less severe side effects, are more convenient or are less expensive than any products that we may develop. Our competitors also may obtain FDA or other regulatory approval for their products more rapidly than we may obtain approval for ours, which could result in our competitors establishing a strong market position before we are able to enter the market. In addition, our ability to compete may be affected in many cases by insurers or other third-party payors seeking to encourage the use of generic products. If our product candidates achieve marketing approval, we expect that they will be priced at a significant premium over competitive generic products.

Many of the companies against which we are competing or against which we may compete in the future have significantly greater financial resources and expertise in research and development, manufacturing, preclinical testing, conducting clinical trials, obtaining regulatory approvals and marketing approved products than we do.

Mergers and acquisitions in the pharmaceutical and biotechnology industries may result in even more resources being concentrated among a smaller number of our competitors. Smaller and other early-stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large and established companies. These third parties compete with us in recruiting and retaining qualified scientific and management personnel, establishing clinical trial sites and patient registration for clinical trials, as well as in acquiring technologies complementary to, or necessary for, our programs.

*If the market opportunities for our product candidates are smaller than we believe they are, our revenue may be adversely affected, and our business may suffer. Because certain of the target patient populations of our product candidates are small, and the addressable patient population even smaller, we must be able to successfully identify patients and capture a significant market share to achieve profitability and growth.*

We primarily focus our research and product development on treatments for genetically-defined rare diseases. Given the small number of patients who have the rare diseases that we are targeting, it is critical to our ability to grow and become profitable that we continue to successfully identify patients with these rare diseases. Our projections of both the number of people who have these diseases, as well as the subset of people with these diseases who have the potential to benefit from treatment with our product candidates, are based on our beliefs and estimates. These estimates have been derived from a variety of sources, including the scientific literature, surveys of clinics, patient foundations or market research that we conducted, and may prove to be incorrect or contain errors. New studies may change the estimated incidence or prevalence of these diseases. The number of patients may turn out to be lower than expected. The effort to identify patients with diseases we seek to treat is in early stages, and we cannot accurately predict the number of patients for whom treatment might be possible. Additionally, the potentially addressable patient population for each of our product candidates may be limited or may not be amenable to treatment with our product candidates, and new patients may become increasingly difficult to identify or gain access to, which would adversely affect our results of operations and our business. Further, even if we obtain significant market share for our product candidates, because the potential target populations for many of the indications we are evaluating are very small, we may never achieve profitability despite obtaining such significant market share.

The target patient populations for some of the indications we are evaluating are relatively small, and there is currently no standard of care treatment directed at some of our target indications, such as FSHD. As a result, the pricing and reimbursement of our product candidates, if approved, is uncertain, but must be adequate to support commercial infrastructure. If we are unable to obtain adequate levels of reimbursement, our ability to successfully market and sell our product candidates will be adversely affected.

*We rely, and expect to continue to rely, on CMOs to manufacture our product candidates. If we are unable to enter into such arrangements as expected or if such organizations do not meet our supply requirements, development and/or commercialization of our product candidates may be delayed.*

We do not have any manufacturing facilities and rely, and expect to continue to rely, on third parties to manufacture clinical supplies of our product candidates and we expect to rely on third parties to manufacture commercial supplies of our products, if and when approved for marketing by applicable regulatory authorities, as well as for packaging, sterilization, storage, distribution and other production logistics. If we are unable to enter into such arrangements on the terms or timeline we expect, development and/or commercialization of our product candidates may be delayed.

If these third parties do not successfully carry out their contractual duties, meet expected deadlines or manufacture our product candidates in accordance with regulatory requirements, if there are disagreements between us and such parties or if such parties are unable to expand capacities to support commercialization of any of our product candidates for which we obtain marketing approval, we may not be able to fulfill, or may be delayed in producing sufficient product candidates to

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Fulcrum Therapeutics, Inc.

Date: March 3, 2022

By: _____ /s/ Bryan Stuart

Bryan Stuart
President and Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this report has been signed below by the following persons on behalf of the registrant in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ Bryan Stuart<br>Bryan Stuart | President and Chief Executive Officer, Director (Principal Executive Officer) | March 3, 2022 |
| /s/ Esther Rajavelu<br>Esther Rajavelu | Chief Financial Officer (Principal Financial Officer) | March 3 2022 |
| /s/ Peter Thomson<br>Peter Thomson | Vice President, Finance & Accounting (Principal Accounting Officer) | March 3, 2022 |
| /s/ Kate Haviland<br>Kate Haviland | Chair of the Board | March 3, 2022 |
| /s/ Sonja Banks<br>Sonja Banks | Director | March 3, 2022 |
| /s/ James J. Collins<br>James J. Collins Ph.D. | Director | March 3, 2022 |
| /s/ Katina Dorton<br>Katina Dorton | Director | March 3, 2022 |
| /s/ Alan Ezekowitz<br>Alan Ezekowitz, MBChB, D. Phil | Director | March 3, 2022 |
| /s/ James Geraghty<br>James Geraghty | Director | March 3, 2022 |
| /s/ Robert J. Gould<br>Robert J. Gould, Ph.D. | Director | March 3, 2022 |
| /s/ Mark Levin<br>Mark Levin | Director | March 3, 2022 |