**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| GERALD CELANO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>FULCRUM THERAPEUTICS, INC., BRYAN STUART, ROBERT J. GOULD, CHRISTOPHER MORABITO, and JUDITH DUNN,<br><br>Defendants. | No. 1:23-cv-11125-IT<br><br>**CLASS ACTION**<br><br>Hon. Indira Talwani<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT** |

**<u>TABLE OF CONTENTS</u>**

**Page**

**Cases**

I. INTRODUCTION ......................................................................................................1

II. FACTS .....................................................................................................................3

      A. Company Background....................................................................................3

      B. FDA Oversight Of New Drug Candidates ...................................................4

      C. Development Of FTX-6058 ..........................................................................4

      D. Defendants Work Closely With The FDA On FTX-6058 ..............................6

      E. After Communicating with the FDA, Defendants Take Internal Action ...........7

III. ARGUMENT............................................................................................................8

      A. The CAC States A Claim for Violations Of Section 10(b) and
      Rule 10b-5 of the Exchange Act....................................................................8

            1. The Court Should Decline To Consider Defendants' Extraneous
            Materials ..............................................................................................8

            2. The CAC Adequately Pleads Falsity ................................................10

                a. Defendants' Statements Regarding Present Health And Safety
                Outcomes Are Actionable...............................................................10

                 b. Defendants' Statements Regarding Current Development
                 Are Actionable................................................................................12

                 c. Defendants' Statements Regarding The Current Status And
                 Positioning Of FTX-6058 Are Actionable....................................14

                 d. Defendants Had A Duty To Disclose Under Item 303 ..............15

             3. The CAC Pleads A Strong Inference of Scienter................................16

                a. The PSLRA Does Not Require A Smoking Gun.......................16

b. Defendants Had Access To Information That Their Statements Were False ........................................................................17

c. The FE Statements Support A Strong Inference of Scienter......19

d. That Developing FTX-6058 Was A Core Operation Of Fulcrum Supports An Inference of Scienter................................................22

e. Numerous High-Level Resignations Support An Inference Of Scienter ............................................................................23

f. That Defendants Held Themselves Out To Investors As Knowledgeable Of The Facts They Misrepresented Supports An Inference Of Scienter ................................................................24

g. The CAC Sufficiently Alleges Motive And Opportunity ..........25

h. No Competing, Nonculpable Inference ....................................26

i. The CAC Adequately Alleges Corporate Scienter ....................27

4. The CAC Adequately Pleads Loss Causation....................................28

B. The CAC States a Claim for Violations of Section 20(a) of the Exchange Act..............................................................................................30

IV. CONCLUSION............................................................................................30

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008)........................................................................................30

*Affiliated Ute Citizens v. United States*,
406 U.S. 128 (1972)....................................................................................................1

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
572 F.3d 221 (5th Cir. 2009) ....................................................................................28

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)........................................................................17, 18, 22

*Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*,
267 F.3d 30 (1st Cir. 2001)..........................................................................................9

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988)..................................................................................................12

*Central Bank v. First Interstate Bank*,
511 U.S. 164 (1994)....................................................................................................1

*Chiarella v. United States*,
445 U.S. 222 (1980) ..................................................................................................25

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*,
632 F.3d 751 (1st Cir. 2011)................................................................................17, 26

*Collier v. Moduslink Global Solutions, Inc.*,
9 F. Supp. 3d 61 (D. Mass. 2014) ..............................................................16, 23, 24

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
22 F.4th 1 (1st Cir. 2021)..........................................................................................15

*Crowell v. Ionics, Inc.*,
343 F. Supp. 2d 1 (D. Mass. 2004) ......................................................................21, 26

*Dahhan v. OvaScience, Inc.*,
321 F. Supp. 3d 247 (D. Mass. 2018) ..................................................................16, 22

*Dirks v. S.E.C.*,
463 U.S. 646 (1983) ..................................................................................................25

*Dura Pharms., Inc. v. Broudo*,

544 U.S. 336 (2005)..................................................................................................24, 26

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
   No. 14-199-CV, 2015 WL 4491319 (2d Cir. July 24, 2015).................................8, 10

*Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*,
   778 F.3d 228 (1st Cir. 2015).................................................................................20

*Frank v. Dana Corp.*,
   646 F.3d 954 (6th Cir. 2011) ................................................................................22

*Greebel v. FTP Software, Inc.*,
   194 F.3d 185 (1st Cir. 1999).................................................................................15

*Hill v. State St. Corp.*,
   2011 WL 3420439 (D. Mass. Aug. 3, 2011) ..........................................................20

*In re Bos. Sci. Corp. Sec. Litig.*,
   686 F.3d 21 (1st Cir. 2012) .............................................................................16, 21

*In re Cabletron Sys., Inc.*,
   311 F.3d 11 (1st Cir. 2002) ..................................................... 1, 8, 10, 12, 23

*In re Credit Suisse-AOL Sec. Litig.*,
   465 F. Supp. 2d 34 (D. Mass. 2006) ................................................................24, 26

*In re Motorola Sec. Litig.*,
   505 F. Supp. 2d 501 (N.D. Ill. 2007) ....................................................................24

*In re Petrobras Sec. Litig.*,
   116 F. Supp. 3d 368 (S.D.N.Y. 2015)....................................................................15

*In re PTC Therapeutics, Inc. Sec. Litig.*,
   No. CV161124KMMAH, 2017 WL 3705801 (D.N.J. Aug. 28, 2017) ...................25

*In re Sepracor, Inc., Sec. Litig.*,
   308 F. Supp. 2d 20 (D. Mass. 2004) ......................................................................17

*In re Smith & Wesson Holding Corp. Sec. Litig*,
   604 F. Supp. 2d 332 (D. Mass. 2009).....................................................................15

*In re Sonus Networks, Inc. Sec. Litig.*,
   No. Civ.A.04-10294-DPW, 2006 WL 1308165 (D. Mass. May 10, 2006)............23

*In re Stone & Webster Inc., Sec. Litig.*,
   414 F.3d 187 (1st Cir. 2005)..............................................................................8, 14

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008)....................................................................24

iv

*In re Transkaryotic Therapies, Inc. Sec. Litig.*,
  319 F. Supp. 2d 152 (D. Mass. 2004) ....................................................................17

*Institutional Investors Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) ..................................................................................25

*Kader v. Sarepta Therapeutics, Inc.*,
  887 F.3d 48 (1st Cir. 2018)....................................................................................15

*Karth v. Keryx Biopharmaceuticals, Inc.*,
  6 F.4th 123 (1st Cir. 2021)................................................................................8, 12

*Litwin v. Blackstone Group, L.P.*,
  634 F.3d 706 (2d Cir. 2011) ..................................................................................16

*Loc. No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc.*,
  838 F.3d 76 (1st Cir. 2016)....................................................................................21

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ..................................................................................27

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
  716 F.3d 229 (1st Cir. 2013)................................................................................8, 24

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011).................................................................................1, 2, 11, 14

*Metzler Asset Mgmt. GmbH v. Kingsley*,
  928 F.3d 151 (1st Cir. 2019)..................................................................................20

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
  No. CV 06-6863, 2008 WL 7084629 (C.D. Cal. July 10, 2008) ............................22

*Miss. Pub. Emps' Ret. Sys. v. Bos. Sci. Corp.*,
  523 F.3d 75 (1st Cir. 2008)..............................................................................1, 10, 12

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
  537 F.3d 35 (1st Cir. 2008)....................................................................................20

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)..........................................................................................12, 15

*In re Sanofi-Aventis Sec. Litig.*,
  774 F. Supp. 2d 549 (S.D.N.Y. 2011) ....................................................................25

*Schaffer v. Timberland Co.*,
  924 F. Supp. 1298 (D.N.H. 1996)........................................................................9, 10

*Scritchfield v. Paolo*,
  274 F.Supp.2d 163 (D.R.I. 2003)...........................................................................15

*Sekuk Glob. Enters. v. KVH Indus.*,
    No. 04-306ML, 2005 U.S. Dist. LEXIS 16628 (D.R.I. Aug. 11, 2005) ...................................29

*Sousa v. Sonus Networks, Inc.*,
    261 F. Supp. 3d 112 (D. Mass. 2017) ..................................................................................30

*Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*,
    775 F. Supp. 2d 227 (D. Mass. 2011) ..................................................................................28

*Syncsort Inc. v. Sequential Software, Inc.*,
    50 F. Supp. 2d 318 (D.N.J. 1999) ........................................................................................15

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)......................................................................................................15, 16

*Tutor Perini Corp. v. Banc of Am. Sec. LLC*,
    No. 11-10895-NMG, 2013 U.S. Dist. LEXIS 136455 (D. Mass. July 17, 2013)................9, 30

*In re Twinlab Corp. Securities Litigation*,
    103 F. Supp. 2d 193 (E.D.N.Y. 2000) ..................................................................................26

*Washtenaw Cty. Emples. Ret. Sys. v. Avid Tech., Inc.*,
    28 F. Supp. 3d 93 (D. Mass. 2014) ............................................................................. *passim*

*Watterson v. Page*,
    987 F.2d 1 (1st Cir. 1993).......................................................................................................9

Lead Plaintiff Steven Santillanes ("Plaintiff") respectfully submits this Opposition to Defendants' Motion to Dismiss the Amended Complaint (ECF No. 35).[1]

## I.    <u>INTRODUCTION</u>

The CAC pleads a straightforward case of a company and its senior executives making highly misleading statements and omissions to investors about the safety of its lead drug candidate.  Defendants, knowing that investors had no access to the underlying data and could only trust what the Company revealed, told the market that Fulcrum's prospective sickle-cell treatment, FTX-6058, had a favorable safety profile and was on track to obtain approval from the U.S. Food and Drug Administration ("FDA").  Neither claim was true, and Defendants' decision to withhold adverse safety information rendered their positive statements "so incomplete as to mislead." *See Miss. Pub. Emps' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 85 (1st Cir. 2008); *see also In re Cabletron Sys., Inc.*, 311 F.3d 11, 36 (1st Cir. 2002) (same).

The "fundamental purpose" of the federal securities laws is "'to substitute a philosophy of full disclosure for the philosophy of *caveat emptor.*'" *Central Bank v. First Interstate Bank*, 511 U.S. 164, 171 (1994) (quoting *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151 (1972)).  SEC Rule 10b-5 implements Section 10(b) of the Exchange Act by making it unlawful, among other things, to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *See Matrixx Initiatives, Inc. v. Siracusano*, 563

---

[1] The "Defendants" are Fulcrum Therapeutics, Inc. ("Fulcrum"), Bryan Stuart ("Stuart"), Robert J. Gould ("Gould"), Christopher Morabito ("Morabito"), and Judith Dunn ("Dunn"). *See* Plaintiff's Amended Complaint for Violations of Federal Securities Laws (the "CAC") (ECF No. 27), ¶¶34-39. Defendants Stuart, Gould, Morabito, and Dunn are collectively referred to herein as the "Individual Defendants." Citations to "¶" in this memorandum refer to paragraphs in the CAC.  Citations to "Defs' Mem." refer to pages of the Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint (ECF No. 37). Emphasis is supplied unless otherwise stated.

U.S. 27, 37 (2011) (quoting 17 C.F.R. § 240.10b–5(b)).

During 2022, Fulcrum submitted preclinical data to the FDA in connection with the Company's intention to file an Investigational New Drug application (or "IND") for FTX-6058. ¶¶6, 81. However, FTX-6058 belongs to a class of drugs prone to serious adverse effects, ensuring it would attract regulatory scrutiny over safety concerns. ¶¶23, 58, 84. Defendants knew not only the safety issues from their preclinical and clinical work, but also knew this to be a focus of the FDA for this class of drugs. It was well known that safety was a concern for other drugs in the class, ¶¶82-87, and because FTX-6058 was considered an "orphan drug," ¶156, Defendants received increased and more frequent feedback from the FDA. *Id.* Nevertheless, Defendants spent the next year misleading investors that safety pitfalls affecting similar drugs did not apply to FTX-6058. The resulting market excitement, stoked by the incorrect perception that FTX-6058 was free of significant complications, pushed up Fulcrum's share price and enabled the Company to raise $125 million in a secondary offering. ¶138.

As Defendants knew, the same safety risks common to its class of drugs, including hematological malignancies, were present in FTX-6058's preclinical data (to which they, but not investors, had access). Defendants scrambled to respond, including by hiring experts specializing in hematological malignancies and laying off more than 17% of Fulcrum's workforce. None of this was disclosed to investors. Ultimately, the FDA issued a clinical hold that, as it was revealed to the market, cut the Company's stock price by more than half in one instance, and by almost a quarter in a second instance. And, even when the hold was lifted, severe restrictions were added to the trial. ¶152. Investors understood the impact of the new limitations. Fulcrum's share price did not rebound because its market appeal had been premised on the absence of safety issues that Defendants touted during the Class Period.

2

Defendants' Motion to Dismiss shows no defects in the *pleading* of Plaintiff's claims. As fully explained below, Defendants' arguments are largely based on mischaracterizing the well-pled allegations of the CAC, advancing creative factual interpretations contradicting the CAC, impermissibly raising factual disputes and defenses that have no place at the pleadings stage, and ignoring pertinent law that imposes specific obligations on the Defendants, including SEC and FDA regulations.  Further, because the CAC sufficiently alleges primary violations of Section 10(b) of the Exchange Act, Plaintiff's control person liability claims should also be sustained. Accordingly, Defendants' Motion to Dismiss should be denied.

II.    **FACTS**

A.    **Company Background**

Fulcrum is a small biopharmaceutical company with principal executive offices in Cambridge, Massachusetts. ¶¶2, 34, 65. In July 2019, Fulcrum went public and began to trade on the NASDAQ.  ¶66.  Fulcrum claims to focus on the use of gene expression to treat genetically-defined diseases, including Sickle-Cell Disease ("SCD"), a disorder of the red blood cells.  ¶¶2-3, 65, 67.  During the Class Period alleged in the CAC (March 3, 2022 through March 8, 2023), Fulcrum had just two lead product candidates. ¶¶3, 8, 67.  One of these candidates was FTX-6058 (also known as "Pociredir"), an investigational oral treatment for SCD.  ¶¶3, 8, 67. The Company's other orphan drug designee is Losmapimod, which targets muscular dystrophy.  ¶67.

After Fulcrum abandoned a tentative foray into COVID drug development, FTX-6058 became critically important to Fulcrum's business model.  ¶¶3, 8, 67.  During the past decade, drug companies have worked to develop an effective treatment for SCD.  ¶¶7, 47.  Until 2017, only two relatively basic therapies for SCD (hydroxyurea and blood transfusions) were in wide use.  ¶47.  Fulcrum's entry into the crowded and lucrative race to treat SCD thrust it into

3

competition with numerous other pharmaceutical companies in pursuit of the same prize.  ¶¶8-9, 76, 152.

In January 2021, Fulcrum raised $46 million in a secondary offering, based, in part, on its having "advanced FTX-6058 … into Phase 1 clinical development." ¶69.  Then, in August 2021, Fulcrum capitalized on the results of FTX-6058's first clinical trial through a $100 million share offering.  ¶73.  Fulcrum lacked any further drug trials beyond those slated for FTX-6058 and Losmapimod.  ¶80.  The development of FTX-6058, therefore, comprised the core function of Fulcrum at all relevant times.  ¶¶158, 164.

### B.    FDA Oversight Of New Drug Candidates

During a new drug's early preclinical development, a pharmaceutical company's primary goal is to determine if the product is reasonably safe for initial use in humans, as well as whether the compound exhibits pharmacological activity that justifies commercial development.  ¶52. When a product is identified as a viable candidate for further development, the company then focuses on collecting the data and information necessary to establish that the product will not expose humans to unreasonable risks when used in limited, early-stage clinical studies.  ¶52. While a sponsor designs the trials, the FDA may delay or suspend clinical trials with a clinical hold.    ¶58.  A clinical hold is a serious sanction that can be imposed, among other grounds, where "***[h]uman subjects are or would be exposed to an unreasonable and significant risk of illness or injury.***" *Id.*  When a proposed study is placed on clinical hold, no new subjects may be recruited for testing the drug, and patients already testing the drug must be taken off.  *Id.*

### C.    Development Of FTX-6058

SCD negatively impacts red blood cells, which contain a protein called hemoglobin that carries oxygen to all parts of the body. ¶43.  Healthy red blood cells, which are round in shape,

pass with ease through small blood vessels, thereby performing the essential work of corporeal oxygen distribution. ¶43. By contrast, SCD causes red blood cells to become hard and sticky and alters their usually-round appearance to resemble a sickle, hence the disorder's "sickle cell" moniker. ¶44. Sickle cells get stuck when traveling through small blood vessels, impeding blood flow and inflicting pain. ¶44. Those afflicted with SCD suffer from a constant shortage of red blood cells, owing to the tendency of sickle cells to die off early, and are at risk for serious complications such as infection, acute chest syndrome and stroke. ¶44.

Crucially, SCD is caused by defects in the *adult* version of hemoglobin. *Fetal hemoglobin* (or HbF), which is produced early in human development, transports oxygen more efficiently than adult hemoglobin. ¶46. In SCD patients, the supply of HbF is gradually replaced by defective adult hemoglobin over time, which cannot transport sufficient oxygen. ¶46. According to Fulcrum, FTX-6058 is designed to increase the production of HbF in order to compensate for adult hemoglobin mutated by SCD, thereby improving oxygen transport and easing SCD symptoms. ¶71. Fulcrum has claimed that FTX-6058's preclinical data showed an increase in HbF levels of up to approximately 30% of total hemoglobin. ¶72.

More important than FTX-6058's ability to raise HbF levels, however, was Defendants' representation that Fulcrum's SCD treatment was *safe*. ¶¶82-86. This was because FTX-6058 belongs to a class of drugs that inhibit the Embryonic Ectoderm Development ("EED"), a subunit of the polycomb repressive complex 2 (or "PRC2"), one of the two subunits of polycomb-group proteins. ¶4. Members of this drug class have demonstrated severe countervailing safety risks. ¶82. Other drugs inhibiting EED or EZH2 (another PRC2 subunit) have frequent, treatment-related adverse events of thrombocytopenia (or low blood platelet count) and neutropenia (abnormally low count of a type of white blood cell). ¶83. For example,

5

the only FDA-approved EED/EZH2 inhibitor, Tazverik, has a warning in its FDA label indicating secondary malignancies and preclinical toxicology of tumorigenesis in a rat model. ¶84. Among the parallels between Tazverik and FTX-6058 was the biochemical process of methylation, which is itself associated with "a wide range of cancers including prostate cancer, breast cancer, and hematological malignancies." ¶¶85-86. But Defendants falsely claimed a lower risk profile for FTX-6058, claiming it did not cause the malignancies that plagued Tazerik (and which, in truth, plagued FTX-6058 as well). ¶85.

**D.      Defendants Work Closely With The FDA On FTX-6058**

Though Defendants could manage investors by choosing what parts of the truth regarding FTX-6058 they disclosed, they could not similarly manage the FDA, with which they had ongoing, substantial communications. Even before the start of the Class Period, FTX-6058's Orphan Drug designation provided Fulcrum with additional lines of communication with FDA officials and additional feedback from the FDA. ¶¶59-60.

FTX-6058 also had Fast Track Review designation, a process designed to facilitate the development, and expedite the review of, drugs to treat serious conditions and fill an unmet medical need. ¶61. Fast Track Review may entitle a sponsor to, among other things, expedited review of the NDA in question. ¶61. As confirmed by Former Employee ("FE") 1, an Associate Director of Drug Product Development at Fulcrum from September 2020 until August 2022, Fulcrum had competition from several other drug companies pursuing their sickle cell own treatments, resulting in internal marching orders at Fulcrum to obtain "fast track" approval from the FDA. ¶¶74-76.

However, this approach subjected FTX-6058 (already part of a risk-laden class of drugs) to even more FDA oversight and feedback. ¶¶60, 62, 64. Fast Track Review in particular calls

6

for "[m]ore frequent meetings with FDA to discuss the drug's development plan and ensure collection of appropriate data needed to support drug approval" and "[m]ore frequent written communication from FDA …." ¶62.  As a result, Defendants were well aware of the FDA's concerns.  ¶¶62, 64.  Throughout 2022, Fulcrum submitted preclinical data to the FDA in connection with FTX-6058.  ¶81.  In December 2022, the FDA granted FTX-6058 Fast Track Designation for the treatment of SCD.  ¶144.

> **E.    After Communicating with the FDA, Defendants Take Internal Action**

FE1 revealed that, by 2022, it was known internally at Fulcrum that FTX-6058 failed to meet target therapeutic goals and that the drug was on the toxic side.  ¶103. In July 2022, Fulcrum's Chief Medical Officer ("CMO"), Defendant Morabito, abruptly resigned.  ¶37.  Then, understanding internally that there was a serious question about hematological malignancy side effects, Fulcrum hired several experts in hematological malignancies between July and August of 2022.  ¶116.  FE1 stated that immediately after the hiring of these specialists, FE1 was told by Mani Sundararajan ("Sundararajan"), Vice President of Research and Development, that the Company situation was going down and the market was not favorable, and that the Company needed to restructure.  ¶¶74, 117.  In response to these concerns, Fulcrum laid off approximately eighteen (out of just 104) employees (a staggering *17.3%* of the Company's total workforce) in August 2022.  ¶117.  Even as Defendants privately braced for the rising storm of FDA disapproval and took steps internally to address the safety issues affecting FTX-6058, their investor-directed statements conveyed the inaccurate impression that there were no roadblocks to FDA approval.

## III.    ARGUMENT

### A.    The CAC States A Claim for Violations Of Section 10(b) and Rule 10b-5 of the Exchange Act

A claim under Section 10(b) and Rule 10b-5 has six elements: (1) a material misrepresentation or omission (*i.e.*, falsity), (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance (often fraud on the market), (5) economic loss, and (6) loss causation. *See Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 237 (1st Cir. 2013). Here, Defendants challenge only (1) falsity, (2) scienter, and (6) loss causation. *See* Defs' Mem. at 12, 24, 29. The Court must "read the Complaint in the manner most favorable to the plaintiff, drawing reasonable inferences in the plaintiff's favor." *In re Stone & Webster Inc., Sec. Litig.*, 414 F.3d 187, 200 (1st Cir. 2005).

The Court of Appeals has explained that "[t]here is no one-size-fits-all way of analyzing securities fraud cases; rather, we take a '"fact-specific approach" that proceeds case by case.'" *Karth v. Keryx Biopharmaceuticals, Inc.*, 6 F.4th 123, 134 (1st Cir. 2021) (quoting *Cabletron*, 311 F.3d at 36). *See also Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, No. 14-199-CV, 2015 WL 4491319, at *7 (2d Cir. July 24, 2015) ("While robust, this pleading standard does not involve applying the more probing test used at the summary judgment or judgment as a matter of law stage of litigation, as the court is 'unaided by discovery' at the motion to dismiss stage.").

Reading the facts alleged in the CAC in a manner most favorable to the Plaintiff, and with all inferences drawn in his favor, Plaintiff has adequately pled all required elements of an Exchange Act claim. Thus, Defendants' Motion to Dismiss should be denied.

### 1.    The Court Should Decline To Consider Defendants' Extraneous Materials

Defendants contravene Circuit precedent in submitting materials not cited in the CAC–

8

some of them excerpted by Defendants themselves–for the express purpose of rebutting Plaintiff's well-pled factual allegations. *See* the "Declaration of Deborah S. Birnbach in Support of Defendants' Motion to Dismiss the Amended Complaint" ("Birnbach Declaration") (ECF No. 36) & Exhibits thereto; Exhibit ("Ex.") 20 (introduced to dispute CAC allegations regarding Fulcrum's hiring of hematological malignancy experts (Defs' Mem. at 17)); Ex. 21 (introduced to challenge CAC allegations regarding Defendants' preclinical studies (Defs' Mem. at 25)); Exs. 22 &23 (introduced to contest CAC allegations concerning Defendant Gould's stock sales (Defs' Mem. at 20 n.15)); Ex. 24 (Defs' Mem. at 8 (proffered as an "example[] of forward looking statements").

> As one court in this District explained:

> Ordinarily, on a motion to dismiss, "*a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment*." *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001). However, the First Circuit recognizes "*a narrow exception*" to this rule which allows courts considering a motion to dismiss to review "documents the authenticity of which are not disputed by the parties; . . . official public records; . . . documents central to plaintiff['s] claim; [and] . . . documents sufficiently referred to in the complaint." Id. (quoting *Watterson* [*v. Page*], 987 F.2d [1,] [] 3 (1st Cir. 1993)). Nevertheless, the decision whether to consider or exclude such material rests with the trial court's discretion. *See Schaffer v. Timberland Co.*, 924 F. Supp. 1298, 1305-06 (D.N.H. 1996) (refusing, "in the exercise of its discretion," to consider extraneous materials, including analysts' reports, articles from trade publications, press releases and internal company memoranda, in ruling on defendant's motion to dismiss).

*Tutor Perini Corp. v. Banc of Am. Sec. LLC*, No. 11-10895-NMG, 2013 U.S. Dist. LEXIS 136455, at *8-9 (D. Mass. July 17, 2013) (excluding extraneous materials submitted by the defendants). Likewise, Defendants' submission of extraneous materials is improper, and Exhibits 21-24 to the Birnbach Declaration should be excluded. Should the Court elect to consider these materials, Plaintiff respectfully requests that the Court convert Defendants'

9

motion, pursuant to Fed. R. Civ. P. 12(d), to a motion for summary judgment, and allow Plaintiff a reasonable opportunity for discovery. *See Alt. Energy, Inc.*, 267 F.3d at 33 (on a motion to dismiss, consideration of documents outside of the complaint is predicated on converting the motion into one for summary judgment."); *Schaffer*, 924 F. Supp. at 1305-06 (consideration of extraneous materials at the pleading stage "would bypass the Rule 12 scrutiny of the pleadings and, instead, would accelerate this litigation to the broader evidentiary inquiry reserved for summary judgment or, in the event of a factual dispute, trial on the merits.").

### 2.      The CAC Adequately Pleads Falsity

Falsity is alleged "when plaintiff claims that defendant made an untrue statement of a material fact … or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading." *Bos. Sci.*, 523 F.3d at 85; *see also Cabletron*, 311 F.3d at 36 (requiring the disclosure of facts "so that what was revealed would not be so incomplete as to mislead."). The PSLRA merely requires that a complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). It "do[es] not require a plaintiff to plead evidence." *Cabletron*, 311 F.3d at 33.

Defendants do not contest that the CAC identifies each alleged misrepresentation and omission with particularity, nor could they. For each, Plaintiff identifies which Defendant(s) made the statement, when the statement was made, how it was conveyed to investors, the content of the misrepresentation or omission, and why Plaintiff contends that each was materially false and/or misleading when made.

#### a. Defendants' Statements Regarding Present Health And Safety Outcomes Are Actionable

Defendants misrepresented or omitted the truth about FTX-5860's safety data. In

10

particular, Defendants made no mention of the profile of hematological malignancies observed in the non-clinical studies, but instead claimed that FTX-6058 had a distinct "lack" of safety issues. For example, Defendants claimed that "[w]e have [ ] observed that FTX-6058 demonstrated robust levels of HbF elevation with **no adverse effects on important cellular health markers."** ¶93. Defendants further claimed that "FTX-6058 was generally well-tolerated with no serious adverse events reported and no discontinuations *due to treatment-emergent adverse events*, or TEAEs, across all SAD and MAD cohorts." ¶93. And, Defendants represented that the only safety issues affecting FTX-6058 were "headache and lip numbness." ¶139. In regard to the same preclinical data that the FDA confirmed was negative, Defendants stated that **"[w]e are highly encouraged [by] our robust preclinical data ..."** ¶97. In addition, and despite the internal understanding that FTX-6058 demonstrated toxicity, ¶103, Defendants told investors that "we have completed three-month tox[icity] [study] *and the three months tox gave us the continued encouragement to continue pursuing clinical development as planned*." ¶98.

The foregoing statements were at odds with what was known internally at Fulcrum at the time, and are so incomplete as to be misleading, particularly because subjects would be exposed to an unreasonable and significant risk of illness or injury. *Matrixx*, 563 U.S. at 37. Critically, Defendants failed to acknowledge, *inter alia*, that (i) FTX-6058 had adverse effects on important cellular health markers; (ii) preclinical data submitted in support of FTX-6058 indicated the presence of serious adverse events; (iii) they would be unable to "rapidly develop FTX-6058 for the treatment of select hemoglobinopathies" because preclinical data submitted in support of FTX-6058 showed safety concerns regarding potential hematological malignancies; (iv) FTX-6058 demonstrated toxicity; (v) FTX-6058 failed to meet target therapeutic goals; (vi) the foregoing safety concerns increased the FTX-6058 did not meet FDA requirements for continued

11

human trials because subjects would be exposed to an unreasonable and significant risk of illness or injury; (vii) accordingly, the Company had overstated FTX-6058's clinical and/or commercial prospects; and (viii) Defendants had overstated the safety of EED inhibitors.

Misstating and withholding life-and-death safety issues is material under any formulation, and easily surpasses the applicable pleading standards for materiality. A statement's materiality "is a question of fact that should normally be left to a jury rather than resolved by the court on a motion to dismiss." *Cabletron*, 311 F.3d at 34. "[W]hether a statement is misleading depends on the perspective of a reasonable investor." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). Courts in this Circuit "consider the entirety of the relevant facts available at the time of the allegedly misleading statement, not simply the words of the statement itself." *Karth*, 6 F.4th at 135. Information is material "if a reasonable investor would have viewed it as 'having significantly altered the total mix of information made available.'" *Bos. Sci.*, 523 F.3d at 85 (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 232 (1988)).

Defendants' claim that they had not yet confirmed hematological malignancy issues in other PRC2 inhibitors outside of some animal data, *see* Defs' Mem. at 30, is a red herring. As an initial matter, the hematological safety problems of that drug class was a matter of public record. ¶¶83-84. Moreover, Defendants themselves internally consulted hematological malignancy experts, reflecting their awareness of this concern. ¶¶16, 116. Thus, at best, Defendants' strategic attempt to feign ignorance creates factual and credibility issues for the trier of fact. *Blanford*, 2015 WL 4491319, at *7. It has nothing to do with any pleading deficiency.

### b. Defendants' Statements Regarding Current Development Are Actionable

During the Class Period, Defendants misleadingly touted the contemporaneous status of

12

FTX-6058. In August 2022, despite having already summoned experts on the cancer issue that they now knew plagued FTX-6058 and evidence of toxicity, Defendants claimed that "[w]e have strong preclinical evidence and now clinical evidence in sickle cell disease subjects demonstrating that 6058 produces rapid and durable HbF induction." ¶121. In November 2022, as the situation continued to deteriorate, Defendants regaled investors with a positive view of the Company: "[t]his third quarter for Fulcrum was focused on execution, and we've been able to make major strides in both our lead programs." ¶127. And in January 2023, Defendants claimed that, as a matter of present fact, "FTX-6058 is a potential best-in-class oral HbF inducer candidate that could address critical gaps in the SCD treatment landscape." ¶132. Like Defendants' safety-related claims, their internal concerns requiring a panel of hematological experts contrast starkly with their investor-facing public pronouncements, and support the view that investors were impermissibly deprived of material information. *Matrixx* is instructive on this point:

> ***The information provided to Matrixx by medical experts revealed a plausible causal relationship between Zicam Cold Remedy and anosmia.*** Consumers likely would have viewed the risk associated with Zicam (possible loss of smell) as substantially outweighing the benefit of using the product (alleviating cold symptoms), particularly in light of the existence of many alternative products on the market. Importantly, Zicam Cold Remedy allegedly accounted for 70 percent of Matrixx's sales. Viewing the allegations of the complaint as a whole, the complaint alleges facts suggesting a significant risk to the commercial viability of Matrixx's leading product.
>
> ***It is substantially likely that a reasonable investor would have viewed this information "'as having significantly altered the "total mix" of information made available*.'** *Basic*, 485 U.S., at 232 ….

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46-47, 131 S. Ct. 1309, 1323 (2011)

Accordingly, the CAC sufficiently pleads materially false and misleading statements, and pleads that Defendants made misleading statements pursuant to the requirements of the

13

PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure.

### c.    Defendants' Statements Regarding The Current Status And Positioning Of FTX-6058 Are Actionable

Defendants also made statements of present fact that, despite having a prospective component, draw their effectiveness from describing the present state of affairs at Fulcrum. Hence, these statements are actionable.  For example, Defendants' statement that "[w]e are [] *on track* to initiate a Phase 1b trial with FTX-6058 in other hemoglobinopathies, including beta thalassemia." ¶89.[2] Defendants also stated that, "[a]s we advance two potentially life-changing therapies through clinical development while expanding our pipeline, *we are well-positioned* to establish Fulcrum as a leading rare disease company, supported with a strong financial foundation and a cash runway into 2024." ¶107.   Moreover, Defendants stated that "our goal is to transition into a registrational trial as early as possible in 2023," and "[w]e do believe that *that is consistent with what we're hearing* … that this would be a drug because of the benefits of HbF that would be broadly utilized and has the potential to be standard of care." ¶111. Defendants further stated that, "[o]ur strategic refocus will better position us to continue to advance our exciting pipeline" (¶118). And, Defendants claimed that "6058 *has tremendous potential* to deliver life-changing benefits for people living with sickle cell disease." ¶121.

These mixed statements of present fact are plainly not forward-looking as Defendants claim.  *See* Defs' Mem. at 27-28.  "The safe harbor …  is intended to apply only to allegations of falsehood as to the forward-looking aspects" and so cannot immunize the above statements, which are contemporaneously-grounded.  *See Stone & Webster*, 414 F.3d at 213. *See also Dahhan v. OvaScience, Inc.*, 321 F. Supp. 3d 247, 254 (D. Mass. 2018) ("[T]he element of Defendants' statements that pertained to the status of Defendants' current expectations or status

---

[2] beta thalassemia is another type of hemoglobin abnormality. ¶45

were not forward-looking, and are not protected by the safe harbor.").[3]

Nor can these statements be immunized as puffery, as Defendants incorrectly assert. Defs' Mem. at 25.  statements of corporate optimism are inactionable only when they are "so vague, so general, or so loosely optimistic that a reasonable investor would find [them] unimportant." *In re Smith & Wesson*, 604 F. Supp. 2d at 342. As a threshold matter, whether statements are puffery depends on context. *See Scritchfield v. Paolo*, 274 F.Supp.2d 163, 175-176 (D.R.I. 2003) "[O]nly purely forward looking statements are entitled to protection as 'mere puffery.'  Statements of present or historical fact are not mere 'puffery,'" *see Smith & Wesson*, 604 F. Supp. 2d at 342, and a statement that is "measurable by comparative research is not considered puffing," s*ee Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp. 2d 318, 341 (D.N.J. 1999). In addition to being quantifiable, the supposedly "puffed" statements were intended to reassure investors that FTX-6058 was unbothered by the safety issues that hobbled the market reach of other PRC2 inhibitors and was on track to secure FDA approval.  Such misstatements are actionable.  *See In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (statements "made repeatedly in an effort to reassure the investing public" are not puffery).

### d.        Defendants Had A Duty To Disclose Under Item 303

Item 303 requires that a registrant "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(3)(ii). "The SEC's interpretive release regarding Item 303 clarifies that the Regulation imposes a disclosure duty where a trend, demand, commitment, event or uncertainty is both [1] presently

---

[3] Likewise, Defendants cannot immunize statements of present fact by phrasing them as "beliefs" or "opinions." Defs' Mem. at 26-27. As the Supreme Court has clarified, "Omnicare would nullify that statutory requirement for all sentences starting with the phrases "we believe" or "we think." But those magic words can preface nearly any conclusion, and the resulting statements, as we have shown, remain perfectly capable of misleading investors. *Omnicare*, 575 U.S. at 192-93.

known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations.'" *Litwin v. Blackstone Group*, L.P., 634 F.3d 706, 716 (2d Cir. 2011).

The CAC pleads that Defendants knew, but failed to disclose, as required by Item 303, that Fulcrum had begun to implement a clinical trial for FTX-6058 that failed to meet regulatory safety requirements for human trials, as was ultimately disclosed at the end of the Class Period, and that this material adverse trend, event, and uncertainty relating to FTX-6058 was reasonably likely to cause a material change in the relationship between costs and revenues. ¶¶92, 96, 106, 120, 115, 126. Defendants, for their part, concede that "the First Circuit has at least implicitly endorsed claims under Item 303" (Defs' Mem. at 29) but argue that they "extensively and expressly disclosed precisely the risks of a clinical hold" (*id.*). Elsewhere in their brief, however, Defendants acknowledge that they withheld relevant testing that showed malignant hematomas in a class a drug for that was a common, and serious complication. *See* Defs' Mem. at 1, 30. Therefore, Defendants' argument that they effectively complied with Item 303 is without force.

### 4. The CAC Pleads A Strong Inference of Scienter

#### a. The PSLRA Does Not Require A Smoking Gun

To establish scienter, plaintiffs must "show either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness." *Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 8 (1st Cir. 2021) (quoting *Kader v. Sarepta Therapeutics, Inc.*, 887 F.3d 48, 57 (1st Cir. 2018)). The knowing omission of material information is probative of scienter. *Id.* at 87. Recklessness is generally defined as "a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care." *Greebel v. FTP Software, Inc.*, 194 F.3d

16

185, 198 (1st Cir. 1999). "The inference that the defendant acted with *scienter* need not be irrefutable, *i.e.*, of the 'smoking-gun genre,' or even the 'most plausible of competing inferences.'" *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) (internal citations omitted).

A complaint should be sustained if a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. The Court must "assume as true the raw facts as alleged in the [Complaint] and draw reasonable inferences in favor of [Plaintiffs]." *In re Bos. Sci. Corp. Sec. Litig.* 686 F.3d 21, 27 (1st Cir. 2012).

In determining whether a complaint sufficiently alleges scienter, courts in this Circuit consider the totality of the circumstances, and do not scrutinize each alleged omission in piecemeal fashion. *See, e.g., Washtenaw*, 28 F. Supp. 3d at 104; *see also Collier v. ModusLink Global Solutions, Inc.*, 9 F. Supp. 3d 61, 76 (D. Mass. 2014) (holding that a defendant may not "divide and conquer" complaint allegations). Notably, the PLSRA does not require a plaintiff to "plead evidence." *Moduslink*, 9 F. Supp. 3d at 69 (internal quotation marks and citations omitted). When there are equally strong inferences for and against scienter, "the draw is awarded to the plaintiff." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 757 (1st Cir. 2011); *see also OvaScience, Inc.*, 321 F. Supp. 3d at 255 (same).

**b. Defendants Had Access To Information That Their Statements Were False**

"[T]he fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002); *Washtenaw County*, 28 F. Supp. 3d at 115 (inferring scienter on motion to dismiss because of the defendants' "access to the

17

information"). Courts regularly uphold complaints when a plaintiff alleges (a) that a defendant minimized negative FDA feedback and (b) points to information, known to the defendants, showing that they were aware of a broader truth. *See In re Transkaryotic Therapies, Inc. Sec. Litig.*, 319 F. Supp. 2d 152, 162 (D. Mass. 2004) (making false and misleading statements with direct knowledge of the FDA's serious criticisms is also "classic evidence of scienter.") (internal quotation marks and citations omitted); *In re Sepracor, Inc., Sec. Litig.*, 308 F. Supp. 2d 20, 31 (D. Mass. 2004) (same).

In February 2022, before the start of the Class Period, Fulcrum obtained Orphan Drug status for FTX-6058, which ensured additional access and communications with FDA officials, and additional feedback on Fulcrum's trials and submissions. During the Class Period, Defendants also obtained Fast Track designation for FTX-6058, resulting in "***more frequent meetings with FDA to discuss the drug's development plan and ensure collection of appropriate data needed to support drug approval***" and "***[m]ore frequent written communication from FDA*** …." Fulcrum has not disputed that such standard practices were followed here, providing both the Individual Defendants and the Company with actual knowledge of the agency's serious concerns. That the Company's back-and-forth with the FDA resulted in Fulcrum hiring malignancy experts and laying off a substantial portion of its workforce only confirms that it was well aware of the safety concerns. Defendants' choice, in the face of this strife, to regale investors with claims of a positive safety profile and lack of roadblocks to approval is classic evidence of scienter. *Transkaryotic*, 319 F. Supp. 2d at 162; *accord Aldridge*, 284 F.3d at 83.

The Company made much of Defendants Stuart and Gould's industry-based knowledge when it touted their 20 and 30 years of respective experience in the pharmaceutical industry

18

and/or senior level experience. ¶160. This, too, supports that Fulcrum was not naïve in processing the FDA's feedback.  Defendant Stuart served as Fulcrum's Chief Executive Officer ("CEO") from March 2021 until January 2023. At the time Defendant Stuart assumed his role as Fulcrum's CEO, the Company touted his "over 20 years of industry experience, predominantly in the rare disease space …. proven track record of helping to successfully advance numerous rare disease programs from the clinic to commercialization," and potential to "bring significant value to Fulcrum in his new role.  ¶35.  Defendant Gould served as president and CEO of Epizyme from 2010 to 2015, as director of novel therapeutics at Broad Institute of MIT and Harvard from 2006 to 2010, and spent twenty-three years at Merck holding a variety of leadership positions. ¶36.  Defendants' own description of Fulcrum's leadership undermines Defendants' claim that they were unaware of any safety issues affecting PRC2 inhibitors. Defs' Mem. at 14-15.

### c.    The FE Statements Support A Strong Inference of Scienter

This Court should credit the statements of FE 1 and 2 because they (i) held positions at Fulcrum that gave them access to the same information they provide in the CAC; (ii) demonstrate that the situation internally at Fulcrum was the opposite of what Defendants communicated to investors; and (iii) corroborate the CAC's allegations.  Confidential witnesses like FE 1 and 2 need only be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 111 (D. Mass. 2014).  The CAC does this.  *See* ¶¶74-79, 80, 103, 116-117, 148.

FE1 is identified as Associate Director of Drug Product Development at Fulcrum from September 2020 until August 2022.   ¶74.  The CAC states who FE1 reported to (Fulcrum's

19

Head of Chemistry, Manufacturing, and Controls and the Executive Director for Research Development) and even who FE1's supervisors reported to (Sundararajan).    ¶74.    FE1's disclosures concerning the presence of competitors, pace of drug research, timetable for achieving FDA approval, preoccupation with obtaining Fast Track Review, frequency of internal discussions about FTX-6058, attempts to access foreign markets, failure to meet therapeutic goals, toxicity of FTX-6058, hiring of hematological malignancy experts, and firsthand conversations with Sundararajan are all within the ambit of FE1's role at Fulcrum.  ¶¶75-78, 103, 116-117.  Likewise, FE2 is identified as an Associate Scientist and Computational Biologist at Fulcrum from July 2019 to September 2021.  ¶79.  In that capacity, FE2 was reasonably situated to know the scope of Fulcrum's developmental pipeline, whether Fulcrum had any future trials outside of its two lead products, and the ubiquity of adverse FDA reactions to the Company. ¶¶80, 148.

The FE allegations have the added benefit of corroborating the CAC's other, well-pled allegations.  For example, the most plausible inference to be drawn from FE1's hiring of multiple experts in hematological malignancies during the Summer of 2022 is that the preclinical data Defendants had already submitted to the FDA gave rise to serious concerns about FTX-6058 that Fulcrum was scrambling to address.  ¶¶16, 116.  In the same vein, FE2's account of Fulcrum's decision to jettison more than 17% of its workforce is mirrored by an extremely visible series of high-profile resignations that was sufficiently glaring to engender public discussion of their connection with the FDA's clinical hold on FTX-6058.  ¶¶117, 161.

The Court should reject Defendants' unsupported argument that "these confidential witness allegations do not comply with the strictures of the PSLRA" (Defs' Mem. at 16). *N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35 (1st Cir. 2008), cited by

Defendants (*see* Defs' Mem. at 16), merely holds that courts may look into the level of detail provided by confidential witnesses; it does not speak to whether the level of detail provided by *these* former employees (or even employees analogous to them) may add to the scienter inquiry. *Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 245 (1st Cir. 2015), too, does not disqualify the FE statements. *See* Defs' Mem. at 16 (citing *Abiomed*). The *Abiomed* court did not lay down a rule that confidential witness statements must reflect one-on-one colloquies with the individual defendants, as Defendants here assert. Defs' Mem. at 16. Instead, the court held that the witnesses had not been specifically described so as to fulfill the specific purpose for which they were included in the complaint, *i.e.*, establishing defendants' intent. *Abiomed*, 778 F.3d at 245.[4]

By contrast, the FEs cited in the CAC do not claim to possess special knowledge of the Individual Defendants' mental states, but rather describe the state of affairs at Fulcrum as the FEs would have witnessed it from their respective internal vantage points. Nothing more is required. *Washtenaw*, 28 F. Supp. 3d at 111; *see also Hill v. State St. Corp.*, 2011 WL 3420439, at *13 (D. Mass. Aug. 3, 2011) ("[w]ithout discovery, it is next to impossible for Plaintiffs to produce any more"). Indeed, Defendants themselves attempt to explain away the FE statements as repeating information that was either publicly disclosed by Fulcrum or related to the control group in FTX-6058's Phase 1b trial. *See* Defs' Mem. at 17.[5] By Defendants' own logic, the FE

---

[4] *Metzler Asset Mgmt. GmbH v. Kingsley*, 928 F.3d 151, 161 (1st Cir. 2019), which Defendants also cite (Defs' Mem. at 16), is similarly inapposite: there, the confidential witnesses were evaluated by the court narrowly, based on their specific capacity to substantiate the mental state of a single named defendant. Unsurprisingly, then, the court placed great weight on the connection between the confidential witness statements, on the one hand, and that individual defendant, on the other. Defendants err in mistaking *Metzler*'s fact-intensive inquiry for a one-size-fits-all formula.

[5] In their brief, Defendants do not deny hiring experts in hematological malignancies, *see* Defs' Mem. at 17, but hypothesize that they "could have" done so to "monitor and assist" patients enrolled in the control arm of FTX-6058's Phase 1b trial. Defs' Mem. at 17. At summary judgment, Defendants will have the opportunity to present evidence to rebut the CAC's inference that these experts were engaged in

statements concern matters that would be generally known to nearly every salaried employee of a small biopharmaceutical company with a narrow pipeline, including FE1 and FE2.  As such, Defendants have failed to articulate a coherent basis for making the acceptance of the FE allegations contingent on the FEs "hav[ing] spoken with any Individual Defendant" (Defs' Mem. at 16), much less discounting the FE allegations altogether.[6]

### d. That Developing FTX-6058 Was A Core Operation Of Fulcrum Supports An Inference of Scienter

Scienter may be imputed to Defendants where "[f]acts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its officers." *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 19 (D. Mass. 2004); *see*, *e.g.*, *Loc. No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc.*, 838 F.3d 76, 82 (1st Cir. 2016) ("[T]he importance of a particular item to a defendant can support an inference that the defendant is 'paying close attention' to that item," if "that close attention would have revealed an incongruity so glaring as to make the need for further inquiry obvious."); *Aldridge*, 284 F.3d at 84 (scienter adequately pled where "the CrossPad product line was very important to" the defendant and "the primary driver of [division] growth").

Defendants cannot credibly dispute knowledge of materially-adverse, non-public information that contradicted their public statements about FTX-6058 due to the fact that FTX-

---

connection with Fulcrum's efforts to gain FDA approval for a type of drug well-known to cause hematological malignancies, and which later received a clinical hold in connection with its potential to cause hematological malignancies, ¶¶23,86.  For pleading purposes, however, such well-pleaded allegations must be accepted as true, with all inferences drawn in Plaintiff's favor. *See Bos. Sci.*, 686 F.3d at 27.

[6] Defendants' other objection, *i.e.*, that FE1's characterization of FTX-6058 as being "on the toxic side" is "too non-specific" (Defs' Mem. at 17) also fails, both a subjective, arbitrary demand for more detail and because FE1's statement is leaps and bounds more detailed than Defendants' radio silence on the topic of FTX-6058's toxicity during the Class Period. In any event, Defendants cannot seriously dispute that Fulcrum's Associate Director of Drug Product Development would be in a position to comment on the toxicity of one of the Company's two lead drug products.

22

6058 was, without question, a lead drug candidate. *See*, *e.g.*, ¶129; *see also OvaScience*, 321 F. Supp. 3d at 255 ("The importance of [the fertility treatment] supports the inference that [top executives] knew of the Company's sales and inability to sell 1,000 cycles."). Indeed, Defendants do not deny – and thereby concede – that FTX-6058 was a core operation of Fulcrum. Defs' Mem. at 20-21. Instead, Defendants' sole argument against the core operations theory is that it may not be invoked to establish scienter on a standalone basis absent any other scienter allegations. *Id.* Plaintiff agrees, as demonstrated by CAC's plethora of facts supporting Defendants' recklessness. *See*, *e.g.*, ¶¶26, 37, 74-79, 80, 103, 116-117, 143, 148-149, 154-165. Where the CAC's allegations are considered in their totality, as they must be, *see Washtenaw*, 28 F. Supp. 3d at 104, the core operations doctrine renders a strong inference of scienter irrefutable.

### e. Numerous High-Level Resignations Support An Inference Of Scienter

"[R]esignations of high-ranking company officers" can "support a contemporaneous knowledge of the alleged wrongdoing" where, as here, accompanied by "a litany of other allegations bearing on the issue of scienter." *Moduslink*, 9 F. Supp. 3d at 76.[7] Here, analysts expressly linked substantial resignations to executive awareness of the problems concealed from investors: a February 27, 2023 Oppenheimer & Co. report stated, with respect to the underlying causes of the clinical hold announced just three days previously, that "***[r]ecent management turnover is fueling speculation that this is an issue the company has been aware of for some time***." ¶143. This observation was well-founded given the deluge of sudden, high-profile resignations at Fulcrum during and shortly after the Class Period. ¶161. Fulcrum's executive churn included the following departures:

---

[7] *See also Frank v. Dana Corp.*, 646 F.3d 954, 960-62 (6th Cir. 2011); *Middlesex Ret. Sys. v. Quest Software, Inc.*, No. CV 06-6863, 2008 WL 7084629, at *9 (C.D. Cal. July 10, 2008) (executive resignation indicative of scienter).

- Fulcrum's CMO, Defendant Morabito, resigned effective July 13, 2022;

- Defendant Stuart, Fulcrum's CEO, resigned effective January 3, 2023;

- Defendant Dunn, Fulcrum's President of R&D, resigned effective January 3, 2023;

- Santiago Arroyo, Fulcrum's CMO following Defendant Morabito's resignation, also resigned effective March 7, 2023;

- Fulcrum's CFO and Treasurer resigned effective April 21, 2023; and

- Defendant Gould, Fulcrum's CEO following Defendant Stuart's resignation, was replaced effective July 1, 2023. [*Id.*]

Although the Class Period in this action spans a full year, approximately 67% of these executive resignations were clustered in the months bookending Fulcrum's disclosure of the FDA clinical hold. The departure of key executives, including two CEOs, two CMOs, and a CFO, most close to the revelation of the concealed concerns, further supports a strong inference of scienter. *See Moduslink*, 9 F. Supp. 3d at 76.

### f.   That Defendants Held Themselves Out To Investors As Knowledgeable Of The Facts They Misrepresented Supports An Inference Of Scienter

Defendants' scienter is also supported by their claim to have knowledge of and be authoritative sources to discuss details related to FTX-6058's potential FDA approval. Given the extensive communications that the Individual Defendants had with analysts and investors, and the detail of their representations, they each made themselves aware of the Company's and FDA's actual (but undisclosed) findings with respect to FTX-6058 or had no factual basis to make the specific statements that they made. *See* ¶¶97-98, 100, 109-111, 121-122, 129-130, 139. In either event, the Individual Defendants were at least reckless with respect to the truth. *See S. Ferry LP # 2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) (If a defendant speaks but does not have actual knowledge about the subject, "it would be at least actionably reckless to

reassure the public about these matters at all.").

Courts have found scienter where defendants profess knowledge and/or speak as an authoritative source on the issues at the heart of the misstatements. *See*, *e.g.*, *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009) ("Among the facts alleged by Shareholders, the most powerful evidence of scienter is the content and context of [the former CFO's] statements themselves."). *See also In re PTC Therapeutics, Inc. Sec. Litig.*, No. CV161124KMMAH, 2017 WL 3705801, at *17 (D.N.J. Aug. 28, 2017) (holding that the defendants' "statements to investors during earnings calls and healthcare conferences implied that they had first-hand knowledge" of important studies related to a drug's FDA approval and conversations with the FDA, and thus "bolster[s] the inference that [the defendants] knew at the time that [their] statements were false or was reckless in disregarding the obvious risk of misleading the public"); *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 571 (S.D.N.Y. 2011) (allegations "that [the company] and the individual defendants who were speakers had either knowledge of or access to the omitted facts" are sufficient to raise a strong inference of scienter.).[8]

### g. The CAC Sufficiently Alleges Motive And Opportunity

Defendants erroneously assert that "[t]he AC also fails to allege any plausible motive for fraud," Defs' Mem. at 2.  As a threshold matter, Plaintiffs are not required to plead a motive or opportunity in order to sufficiently allege scienter. *See Tellabs*, 551 U.S. at 325.  Nevertheless, the CAC clearly outlines how Defendants had both a motive and opportunity to mislead investors about the prospects for FTX-6058.  The CAC pleads that Fulcrum had only two drug candidates, and that of these two, FTX-6058 was the most important and provided a direct means for

---

[8] Defendant Gould's significant Class Period stock sales, which netted over $92,000 in proceeds, ¶36, also compelled him to speak truthfully. *See Dirks v. S.E.C.*, 463 U.S. 646, 654 (1983)); *see also Chiarella v. United States*, 445 U.S. 222, 227 (1980).

Defendants to raise hundreds of millions of dollars. *See* ¶¶3, 8, 49, 67, 69, 73, 138. As noted above, Defendants' misrepresentation of FTX-6058's safety profile was the means by which Defendants inflated Fulcrum's share price and enabled the Company to raise $125 million in a secondary offering during the Class Period. ¶138. Such allegations are sufficient to give rise to a strong inference of scienter. *See In re Twinlab Corp. Securities Litigation*, 103 F. Supp. 2d 193, 206 (E.D.N.Y. 2000) (desire to inflate the stock price to maximize revenue from a secondary offering was, together with other allegations, sufficient to allege motive at the pleading stage.).

### h. No Competing, Nonculpable Inference

Defendants argue that a nonculpable inference is more compelling because they supposedly "reported … positive decisions" made by the FDA with respect to FTX-6058. Defs' Mem. at 21. This fails as a competing explanation of Defendants' scienter because it is wholly consistent with the core claims of the CAC, *i.e.*, that Defendants leveraged positive claims about FTX-6058 to falsely represent that it did not suffer from safety roadblocks. Defendants are essentially mirroring the CAC's allegations in favor of a nonculpable inference of scienter. The law is clear that such a draw must be awarded to Plaintiff. *City of Dearborn Heights*, 632 F.3d at 757.

The Court should also disregard Defendants' argument that because they did not delay disclosure of the clinical hold, they are entitled to override the CAC's strong inference of scienter. Defs' Mem. at 21-22. *In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 42 (1st Cir. 2014), which Defendants cite in support of this proposition, does not suffice, because those defendants' prompt disclosure of an investigation was only credited in light of their additional efforts to "keep the market informed" (*id.*). By contrast, Defendants here readily admit that they chose not to disclose safety data evidencing hematological malignancies. Defs' Mem. at 22. Hence their

26

decision not to further mislead the market is inadequate to rebut the CAC's scienter allegations.[9]

Defendants also argue that there were no actionable misstatements or omissions because they made certain disclosures related to boilerplate risks. Defs' Mem. at 22. None of those general disclosures, however, cured the misstatements or meaningfully informed the market of the particular omissions alleged in the Complaint. This is supported by Fulcrum's sharp stock price decline when the truth began to come out on February 24 and March 9, 2023, as well as the reactions of securities analysts and financial media. ¶¶141-147. Had the alleged omissions been fully disclosed and investors properly informed of the true state of FTX 6058's safety profile and potential roadblocks to FDA approval, the market would not have reacted in the manner that it did when the truthful information actually came to light.

### i.    The CAC Adequately Alleges Corporate Scienter

In addition to the Individual Defendants, the CAC sufficiently alleges Fulcrum's scienter. ¶¶164-65. The First Circuit has recognized that "scienter alleged against the company's agents is enough to plead scienter for the company." *Cabletron,* 311 F.3d at 40; *see also In re Sonus Networks, Inc. Sec. Litig.*, No. Civ.A.04-10294-DPW, 2006 WL 1308165, at *24 (D. Mass. May 10, 2006) ("since the Complaint sufficiently pleads a strong inference of scienter as to [non-defendant Sonus officer] Hemme that is attributable to Sonus, I deny Defendants motion to dismiss the Section 10(b) and Section 11 claims against Sonus"). This action is no different. As the Individual Defendants' scienter is sufficiently pleaded, Fulcrum's scienter is likewise pleaded.

### 4.    The CAC Adequately Pleads Loss Causation

---

[9] If anything, Defendants were incentivized to promptly reveal the clinical hold when they did, because the February 24, 2023 disclosure included less damaging information that the subsequent, March 9, 2023, disclosure. *Compare* ¶141 *with* ¶144. Thus, Defendants' multiple disclosure enabled a "soft landing" that was less damaging to Fulcrum's share price. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 261 (5th Cir. 2009) (describing the process of gradual price deflation through a series of corrective disclosures).

Loss causation is the causal connection between the false statements and a stock drop. *See Massachusetts Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 237 (1st Cir. 2013). To plead loss causation, a plaintiff is only required to "the Plaintiff need[] only 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" *In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 46 (D. Mass. 2006) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). This requirement is met if "a plaintiff purchases shares at a price inflated by defendant's fraud and [] the share price [falls] significantly after the truth [becomes] known." *Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*, 775 F. Supp. 2d 227, 244 (D. Mass. 2011). The First Circuit has held that "a corrective disclosure need not be a 'mirror-image' disclosure--a direct admission that a previous statement is untrue." *CVS Caremark*, 716 F.3d 229, 240.[10]

The CAC unquestionably provides Defendants with "some indication of the loss and causal connection [Plaintiff] has in mind. *See Credit Suisse-AOL*, 465 F. Supp. 2d at 46; *Dura Pharms.*, Inc., 544 U.S. at 347. On February 24, 2023, Fulcrum issued a press release announcing that the FDA had placed a clinical hold on FTX-6058. ¶141. The February 24, 2023 press release revealed that the clinical hold (i) was initiated by the Agency due to previously reported preclinical data; (ii) implicated patient safety; and (iii) was related to modulation of the PRC2 complex. ¶141. The next day, February 24, 2023, Fulcrum's stock price fell $7.23 per

---

[10] *See also Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009); *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 544 (N.D. Ill. 2007) ("This court does not read *Dura* to imply that a plaintiff cannot satisfy loss causation without identifying a corresponding, mirror-image prior representation for every disclosure that precedes a share price decline."); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283-89 (S.D.N.Y. 2008) ("A plaintiff may plead loss causation without alleging a disclosure that precisely mirrors the substance of a prior undisclosed fraud."). Said differently, "a securities fraud plaintiff is not necessarily precluded from establishing loss causation where a corrective disclosure does not, on its face, specifically identify or explicitly correct a previous representation, or expressly disclose the particular fraudulent scheme the plaintiff alleges." *Motorola*, 505 F. Supp. 2d at 546.

share, or 56.09%, to close at $5.66 per share.  ¶142.

Then, on March 9, 2023, Fulcrum issued a press release that further informed investors about the safety issues and regulatory communications behind FTX-6058's clinical hold.  ¶144. In particular, the March 9, 2023 press release supplemented the February 24 press release in disclosing that (i) FTX-6058 was marred by the same malignancy issue affecting other EED/EZH2 inhibitors, ¶¶83-84, and (ii) The FDA requested that Fulcrum further define the population where the potential benefit of continued treatment with FTX-6058 outweighs potential risk, signaling that the addressable market was likely significantly limited.  ¶144.  That same day, March 9, 2023, Fulcrum's stock price fell $1.44, or 23%, to close at $4.82 per share. ¶146.

Because both disclosures revealed facts about FTX-6058 that Defendants had concealed through the same misrepresentations and omissions challenged in the CAC, Plaintiff has adequately pled loss causation.  *See Sekuk Glob. Enters. v. KVH Indus.*, No. 04-306ML, 2005 U.S. Dist. LEXIS 16628, at *50-51 (D.R.I. Aug. 11, 2005) ("As they have alleged that the price of KVH stock dropped after the truth regarding Defendants' misrepresentations became known, this Court finds that they have met their burden of pleading loss causation.").

Defendants do not dispute that the CAC provides them with an indication of Plaintiff's theory of loss causation, nor could they.  Instead, they argue factual issues reserved for trial, claiming that that the February 24, 2023 press release was "a completely new event" and the March 9, 2023 press release did "not 'correct' anything Defendants previously stated." Defs' Mem. at 30.  They are wrong.  These disclosures directly correct Defendants' misrepresentations of FTX-6058's safety profile, development and progress, which falsely claimed FTX-6058 did not suffer from safety roadblocks like other EED/EZH2 inhibitors, and the stock dropped

29

significantly after both disclosures causing investors losses.  ¶¶89, 93, 110, 122, 132, 139, 141, 142, 144, 146.  At any rate, if Defendants have any credible and admissible evidence to the contrary, they may present it at summary judgment or trial.  *See Tutor Perini Corp.*, 2013 U.S. Dist. LEXIS 136455, at *66-67 ("While the defendants may choose to rely on [extraneous] evidence at the summary judgment stage in the case, the materials are outside the complaint and will not be considered now.")

The CAC easily surpasses the modest pleading burden for loss causation, and should be sustained.  *See Credit Suisse-AOL*, 465 F. Supp. 2d at 46; *Dura Pharms.*, Inc., 544 U.S. at 347.

**B.        The CAC States a Claim for Violations of Section 20(a) of the Exchange Act**

The CAC adequately alleges that the Individual Defendants are control persons of Fulcrum within the meaning of Section 20(a) of the Exchange Act. ¶¶185-190.  Defendants concede as much, only challenging the underlying Exchange Act claims.  *See* Defs' Mem. at 30. Because the CAC allege a viable claim under Section 10(b), Defendants' bid to dismiss the control person claim should be denied as a matter of course.  *See, e.g., Crowell*, 343 F. Supp. 2d at 13.

**III.    CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that Defendants' Motion to Dismiss be denied in its entirety.  Should this Court dismiss the CAC in whole or in part, Plaintiff respectfully requests leave to amend.[11]

---

[11] Defendants mischaracterize the law to argue that Plaintiff should be denied leave to amend in the event the of dismissal.  *See* Defs' Mem. at 30 n.32.  The First Circuit has affirmed that "the PSLRA did not alter the liberal amendment policy of Fed. R. Civ. P. 15." *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 51 (1st Cir. 2008).  While Defendants cite to *Sousa v. Sonus Networks, Inc.*, 261 F. Supp. 3d 112, 121 (D. Mass. 2017) in support of disallowing further amendments, plaintiff there was denied leave to amend based on a case-specific futility analysis that has no bearing on the CAC which (i) satisfies the relevant pleading requirements and (ii) has not been dismissed and, as such, is not subject to a futility analysis.

Dated:  January 12, 2024                    Respectfully submitted,

                                            <u>/s/ Louis C. Ludwig</u>
                                            **POMERANTZ LLP**
                                            Joshua B. Silverman (*pro hac vice*)
                                            Louis C. Ludwig (*pro hac vice*)
                                            10 South LaSalle Street, Suite 3505
                                            Chicago, Illinois 60603
                                            Telephone: (312) 377-1181
                                            Facsimile: (312) 229-8811
                                            jbsilverman@pomlaw.com
                                            lcludwig@pomlaw.com

                                            *Lead Counsel for Lead Plaintiff and the Class*

                                            Daryl Andrews (BBO #658523)
                                            Glen DeValerio (BBO #122010)
                                            **ANDREWS DEVALERIO LLP**
                                            P.O. Box 67101
                                            Chestnut Hill, MA 02467
                                            Telephone: (617) 999-6473
                                            daryl@andrewsdevalerio.com
                                            glen@andrewsdevalerio.com

                                            *Liaison Counsel for Lead Plaintiff and the Class*

31

## **CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") on this January 12, 2024.

/s/ *Louis C. Ludwig*
Louis C. Ludwig

32